UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, and SANDY JUKEL, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>         - against -<br><br>MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,<br><br>                    Defendants. | **MEMORANDUM OPINION & ORDER**<br><br>20 Civ. 11047 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

In this putative class action, Plaintiffs Matthew Shafer, Sheri Haugabook, Peter Heidt, Jeffrey Shover, Mace Tamse, George Livanos, Mark Loftus, Jeffrey Samsen, Jeffrey Sheresky, Steve Sheresky, Steve Nadler, and Sandy Jukel assert that Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management Development and Succession Committee (the "Compensation Committee"), and certain unnamed members of the Compensation Committee (together, "Morgan Stanley" or the "Bank"), violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not paying Plaintiffs all of their deferred compensation when they left their financial advisor positions at

Morgan Stanley.  Defendants have moved to compel arbitration and for a stay of these

proceedings.  (Dkt. No. 65)  For the reasons stated below, Defendants' motion will be granted.

## BACKGROUND[1]

Plaintiffs are former financial advisors at Morgan Stanley Smith Barney.[2]  They

reside throughout the country and worked for the Bank at various times between 1994 and 2020.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 11-22; Krentzman Decl. (Dkt. No. 68) ¶¶ 5-16)

"Defendant Morgan Stanley is a Delaware corporation with a principal place of

business in New York, New York.  Morgan Stanley is a global financial services firm that,

through its subsidiaries and affiliates, including [Defendant Morgan Stanley Smith Barney LLC,

a Delaware limited liability company with its principal place of business in New York, New

York] provides financial advisory services to clients.  Defendant Compensation Committee is a

committee of Morgan Stanley's Board of Directors formed to discharge the Board's

responsibilities related to compensation. . . . The Compensation Committee is an unincorporated

---

[1]  In resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).

The facts discussed below are drawn from (1) the Amended Complaint (Dkt. No. 58); (2) the alleged "Plan Documents" cited in the Amended Complaint, which have been docketed as exhibits to Plaintiff's September 15, 2023 letter (Dkt. No. 83); and (3) the declarations and accompanying exhibits submitted by the parties (Porco Decl. (Dkt. No. 67); Krentzman Decl. (Dkt. No. 68); Jasinski Decl. (Dkt. No. 72-1)).

[2]  Morgan Stanley describes the financial advisor's role as "help[ing] [clients] create a wealth plan that takes [their] specific goals and circumstances into account," including providing advice on "retirement income . . . , asset allocation . . . , and changes in tax policy." Morgan Stanley Wealth Mgmt., Why Advice Matters (May 31, 2023), available at https://www.morganstanley.com/articles/advice-matters.

association with its principal place of business in New York.  John and Jane Does 1-20 are the individual members of the Compensation Committee." (Id. ¶¶ 23-26)

Plaintiffs purport to bring this action on behalf of all Morgan Stanley financial advisors who forfeited deferred compensation as a result of leaving their Morgan Stanley employment between December 29, 2014 and the present.  (Id. ¶ 90)

Plaintiffs assert general federal question jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA jurisdiction pursuant to 29 U.S.C. § 1132(e).  (Id. ¶ 7)

## I.    FACTS

### A.    Financial Advisors' Compensation at Morgan Stanley

Morgan Stanley's "compensation program[]" for financial advisors during the relevant time period largely consists of two components:  salary and incentive compensation.[3] (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) at 2)[4]

"All Advisors . . . receive a guaranteed monthly salary.  Total compensation in any month will not be lower than the applicable monthly salary by state." (Id. § 1.1)  As of 2018, the salary for New York-based financial advisors was $4,225 per month, or $50,700 per year.  (Id. § 1.1)

Incentive compensation is based on the "Total Credits" that a financial advisor is awarded monthly.  (Id. § 1.2.1)  "The Advisor's Total Credits for each month [are] determined based on the applicable Credit Rate" – a percentage between 28% and 55.5% that increases with

---

[3]  Morgan Stanley also offers certain income and savings programs that are not at issue here, including a "lending growth award program" and a "capital accumulation program."  (See generally 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2))

[4] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

"(1) the Advisor's trailing 12-month Gross Revenue and (2) his/her Length of Service" –

"multiplied by the Creditable Revenue generated [by the Advisor] in such month." (Id. § 1.2.1)

Incentive compensation is further divided between (1) "Cash Credits," which are

"calculated monthly and [result in cash compensation] paid in arrears on a monthly basis," and

(2) "Deferred Credits," which result in deferred compensation paid out years later. (Id. §§ 1.2.2–

1.2.3)  The percentage of Total Credits allotted to "Deferred Credits" is "based on a Deferral

Ratio determined by the Advisor's Trailing 12-month Gross Revenue," which varies from 1.5%

(for the $0 to $239,999 revenue band) to 15% (for the $5 million+ revenue band) as such revenue

increases. (Id. §§ 1.2.2–1.2.3)

The parties' dispute here involves the "Deferred Credits" that result in deferred

compensation paid out years after it is earned.

The 2018 Financial Advisor Compensation Plan provides the following example

of incentive compensation:

> An Advisor with a Length of Service ("LOS") of 15 years produces $800,000 in Trailing 12-month Gross Revenue as of May 31, 2018. The Advisor's Creditable Revenue for June 2018 is $70,000.
> - Credit Rate is 44.0%
> - Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]
> - Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]
> - Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

(Id. § 1.2.3)

"Twenty-five percent of the cumulative monthly Deferred Credits [are] granted in

the form of a restricted stock unit [('RSU')] award that is scheduled to convert to shares of

Morgan Stanley common stock approximately four years from the grant date" (the "Equity

Incentive Plan"). (Id. § 1.2.2)  "[S]eventy-five percent of the cumulative monthly Deferred

Credits [are] granted in the form of a cash-based deferred compensation award scheduled to be

paid approximately six years from the grant date" (the "Compensation Incentive Plan"). (Id. §

1.2.2; see Compensation Incentive Plan Document (Dkt. No. 83-4); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8))  The Compensation Committee administers both

plans.  (Compensation Incentive Plan Document (Dkt. No. 83-4) § 2(a)(i); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8) § 5(a))

> "[Financial advisors] have individual, notional accounts in the [Compensation
Incentive Plan] for each award they receive, i.e., they have an account for each year's deferred
compensation.  [Financial advisors] can invest their accounts in notional investments, like in a
401(k) plan, with the value of their accounts tracking the performance of the selected
investments."  (Am. Cmplt. (Dkt. No. 58) ¶ 38 (citing 2017 Compensation Incentive Plan Award
Certificate (Dkt. No. 83-5) § 1))  As to vesting under the Equity Incentive Plan, "a Stock Unit
will be payable, at the discretion of the [Compensation] Committee, in Stock or in cash equal to
the Fair Market Value on the payment date of one Share."  (Equity Incentive Compensation Plan
Document (Dkt. No. 83-8) § 8)

> As to both plans, "[d]eferred compensation awards are contingent upon the
Advisor remaining employed through the grant and vesting dates of the award."  (2018 Financial
Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2)  Plaintiffs refer to this policy as the
"Cancellation Rule."  (Am. Cmplt. (Dkt. No. 58) passim)

> There are several exceptions to the Cancellation Rule.  Deferred cash
compensation and deferred equity compensation both vest after employment if the financial
advisor's employment ends because of (1) disability; (2) "full career retirement" – i.e.,
"termination of . . . [e]mployment . . . for any reason other than under circumstances involving
any Prohibited Activity, and other than due to [a financial advisor's] death or [departure for]
[g]overnmental [s]ervice," after a financial advisor has achieved a contractually specified

combination of age and years of service; (3) "[i]nvoluntary termination by [Morgan Stanley]" –
i.e., layoffs; or (4) departure for governmental service.  (2017 Compensation Incentive Plan
Award Certificate (Dkt. No. 83-5) §§ 3(c)-(d), 4-5, 16(j); Equity Incentive Compensation Plan
Award Certificate (Dkt. No. 83-9) §§ 5(c), 6-7, 22(n))

"[E]nter[ing] into an employment or consulting relationship with a firm offering
Competitive Services" constitutes "Prohibited Activity."  Accordingly, a long-tenured financial
advisor who, after leaving Morgan Stanley, accepts a position at another bank or brokerage firm
is not eligible for the "full career retirement" exception to the Cancellation Rule.  (2017
Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 16(p)(3)-(4); Equity Incentive
Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 10(c)(1), 22(f)(1), 22(n))

### B.       The Arbitration Agreements

In moving to compel arbitration, Morgan Stanley cites arbitration clauses in three
types of Morgan Stanley employment agreements:  the "Bonus Agreement"; the "Employment
Agreement"; and the "CARE Program."

### 1.       The Bonus Agreement's Arbitration Provision

The Bonus Agreement's arbitration provision provides as follows:

7. Resolution of Disputes

(a) Any controversy or claim arising out of or in any way relating to this
Agreement or any benefits or payments available and/or due under this
Agreement, as well as any controversy or claim arising out of or in any way
relating to Employee's employment with Morgan Stanley or termination thereof,
including, but not limited to common law claims for breach of contract or tort,
wage and hour claims, and/or statutory discrimination claims (individually and
collectively referred to herein as "Covered Claims"), will be resolved by final and
binding arbitration before the Financial Industry Regulatory Authority ("FINRA")
in accordance with the FINRA Code of Arbitration Procedure for Industry
Disputes.  Notwithstanding the foregoing, any Covered Claim that has been
initiated or is being maintained on a class, collective, or representative action
basis, or is otherwise brought on behalf of others, may not be submitted to
arbitration before FINRA.  Also, notwithstanding the foregoing, any Covered

Claim that arises in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

(b) If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim, other than claims that arise under ERISA, will be resolved by final and binding arbitration pursuant to a single arbitrator before the American Arbitration Association ("AAA").  Such arbitration, except as provided otherwise in this paragraph 7, will be carried out in accordance with the AAA Employment Arbitration Rules and Mediation Procedures.  Any judgment or award issued by the arbitrator may be entered in any court having jurisdiction.

(c) Employee and Morgan Stanley agree to waive, and hereby waive, any right to a jury trial with respect to any Covered Claims.  Employee and Morgan Stanley further agree that no Covered Claims may be initiated or maintained on a class action, collective action, or representative action basis either in court or in arbitration and any such Covered Claim will be decided as an individual claim only.  With respect to any Covered Claim, Employee may not participate as a class or collective action representative or a class, collective, or representative action member, or be entitled to a recovery from a class, collective, or representative action.  An arbitrator appointed under this paragraph 7 shall not conduct a class, collective, or representative action arbitration and shall not allow a person to serve as a representative of others in an arbitration conducted pursuant to this paragraph 7.  Nothing in this paragraph 7 shall preclude Employee from pursuing or participating in a class action in court where the Employee's claim is based on Employee's status as a customer or investor.

(d) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek injunctive or other provisional relief from any court in aid of arbitration or to maintain the status quo pending arbitration.  In the event that any portion of this paragraph 7 is held to be in conflict with a mandatory provision of applicable law, the remainder of this paragraph 7 shall not be affected to the extent permitted by law.  For example, if a court determines that a particular provision of this paragraph 7 is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected.  Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.  Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver.  If for any reason the class action, collective action, or representative action waiver is found to be unenforceable, the class action, collective action, or representative action may only be heard in court and may not be arbitrated under this paragraph 7.

(e) Employee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. . . .

(2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7; see also 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7) (same); Shafer 2015 Bonus Agmt. (Dkt. No. 67-2) § 7) (similar))[5]

### 2.    The Employment Agreement's Arbitration Provision

The Employment Agreement contains the following arbitration provision:

7. ARBITRATION

7.1 Any controversy or claim arising out of or relating to (i) your employment by Morgan Stanley (excluding statutory employment claims and other claims covered by Paragraph 7.2), or (ii) this Agreement (or its breach), will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction.  Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.  This Paragraph will not be deemed a waiver of Morgan Stanley's right to injunctive or provision[al] relief from any court, as provided for in this agreement.

7.2 Notwithstanding the arbitration requirement of paragraph 7.1 above, you agree that certain other claims (including, but not limited to, statutory discrimination and other statutory employment claims) must be submitted to Morgan Stanley's Alternate Dispute Resolution Program, "Convenient Access to Resolutions for Employees" ("CARE").  Claims required to be submitted to CARE are recited in the CARE Guidebook maintained by the CARE Administrator's Office and in the CARE Program explanatory brochure.

(2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7)

### 3.    The CARE Program

"For more than ten years, Morgan Stanley has administered an alternative dispute resolution program called 'CARE,' short for Convenient Access to Resolution for Employees.

---

[5]  The cited 2014 and 2015 bonus agreements contain substantially similar – albeit not identical – language addressing the arbitration of claims.  The parties have not argued that language differences in the relevant sections of the 2014 and 2015 bonus agreements are material.

CARE applies to all U.S. Morgan Stanley employees, and a CARE guidebook explaining the

program is available to employees on Morgan Stanley's intranet site. . . . In 2015, Morgan

Stanley announced an expansion of the CARE [P]rogram.  Morgan Stanley notified all U.S.

employees of the expansion via their individualized Morgan Stanley email accounts.  These

communications were sent in waves. . . .  [and] describ[ed] the process through which employees

could opt out of participating."  (Krentzman Decl. (Dkt. No. 68) ¶¶ 20, 22)

   The 2015 email regarding the CARE Program expansion and opt-out reads as

follows:

> Morgan Stanley is announcing the expansion of CARE and modifications to
> related Firm policies and programs to extend arbitration obligations for all US
> employees – registered and non-registered.  Effective October 2, 2015, arbitration
> under the CARE Arbitration Program will be mandatory for all employees in the
> U.S., and all covered claims between the Firm and employees will be resolved
> through final and binding arbitration on a nonclass, non-collective and non-
> representative action basis as more fully described in the Arbitration Agreement
> and CARE Guidebook. . . .
>
> By continuing your employment with Morgan Stanley, you accept and agree to,
> and will be covered and bound by the terms of the Arbitration Agreement and the
> arbitration provisions of the CARE Guidebook, unless you elect to opt out of the
> CARE Arbitration Program by completing, signing and submitting an effective
> CARE Arbitration Program Opt-Out Form by October 2, 2015.

(Sept. 2, 2015 Morgan Stanley Human Resources email (Dkt. No. 68-3) at 2)

   The 2015 email contains hyperlinks to the "Arbitration Agreement" (the "CARE

Program Arbitration Agreement") and the "CARE Guidebook."  (Id.)

   The CARE Program Arbitration Agreement provides as follows:

> **Binding Mutual Arbitration.**  You and Morgan Stanley agree that any Covered
> Claims (defined below) will be resolved by final and binding arbitration as set
> forth in this Arbitration Agreement and in the arbitration provisions of the CARE
> Guidebook, a copy of which is annexed hereto.  This Arbitration Agreement,
> including the Waivers set forth in paragraph 4 of this Arbitration Agreement, shall
> be governed by and interpreted in accordance with the Federal Arbitration Act
> ("FAA").  This Arbitration Agreement applies with respect to all Covered Claims,
> whether initiated by you or Morgan Stanley, and makes arbitration the required

and exclusive forum for the resolution of all Covered Claims.  By entering into this Arbitration Agreement, you and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, you and Morgan Stanley are giving up your and its right to a jury trial in any forum.

**Covered Claims.**  Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring.  Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.  **This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**

**Excluded Claims.**  The following claims and disputes are not subject to this Arbitration Agreement:  (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim filed in court in which you are individually named as a plaintiff, opt-in plaintiff, defendant or other named party before the date on which this Agreement was sent to you, and (vi) any claim that is expressly precluded from arbitration by a federal statute. . . .

Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.

(CARE Program Arbitration Agmt. (Dkt. No. 68-5) §§ 1-4 (emphases in original))  The CARE

Guidebook contains similar language.  (CARE Guidebook (Dkt. No. 68-4) at 4-6, 20)

      **C.**      **Applicability of Arbitration Provisions to Plaintiffs**

      Defendants have proffered evidence that Plaintiffs are bound by the arbitration

provisions contained in the following agreements:

- Shafer:  2015 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 6 and Ex. B);

- Haugabook, Heidt, Shover, Livanos, Samsen, Jeffrey Sheresky, Steve Sheresky, Jukel:  2015 CARE Program expansion, by virtue of not having opted out (Krentzman Decl. (Dkt. No. **68**) ¶ 31);

- Tamse:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 8 and Ex. C);

- Loftus:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 10 and Ex. D); and

- Nadler:  2008 Employment Agreement (Krentzman Decl. (Dkt. No. 68) ¶ 18 and Ex. A).

**II.**      **PROCEDURAL HISTORY**

      The Complaint was filed on December 30, 2020, with Shafer as the sole plaintiff.

(Dkt. No. 1)[6]

      On March 24, 2022, Plaintiffs filed the Amended Complaint.  (Dkt. No. 58)  The

Amended Complaint asserts claims for (1) declaratory and equitable relief pursuant to ERISA

§ 502(a)(3), 29 U.S.C. § 1132(a)(3) (id. ¶¶ 98-101); (2) "reformation of the [Financial Advisor]

Deferred Compensation Plan and [for] benefits under the reformed plan," pursuant to ERISA §§

502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3) (id. ¶¶ 102-07); and (3) "breach of fiduciary

duty against the Compensation Committee regarding the [Compensation Incentive Plan] and the

---

[6]  On April 5, 2021, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 42)  The Court denied that motion without prejudice on March 10, 2022, after new plaintiffs moved for joinder and stated that they intended to file an Amended Complaint.  (Dkt. No. 57)

[Equity Incentive Plan]," pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).  (Id. ¶¶ 108-17 (capitalization altered))

On June 29, 2022, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 65)

## DISCUSSION

## I.      LEGAL STANDARDS

### A.      Motion to Compel Arbitration

Under the Federal Arbitration Act (the "FAA"), an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement."  9 U.S.C. § 4.  The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution."  Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).  Given the federal policy favoring arbitration, "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration."  Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011).  However, this "presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made."  Id.

"'In deciding whether a dispute is arbitrable, [a court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'"  Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 394 (2d Cir. 2015) (quoting Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 281 (2d Cir. 2005), abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287 (2010)).  "When deciding whether the parties agreed to arbitrate a certain matter (including

arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  As to the scope of the arbitration agreement, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion."  Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)).  "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."  Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4).  Where, however, "'the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and "avoid the need for further court proceedings."'"  Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011); Bensadoun, 316 F.3d at 175).

As noted above, in resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw[] all reasonable inferences in favor of the non-moving party."  Id. (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002); citing Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)).  However, "[a] party to an arbitration

agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." Harrington v. Atl. Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)).

**B.      ERISA**

"ERISA's comprehensive regulatory scheme governs most employee benefit plans." Liberty Mut. Ins. Co. v. Donegan, 746 F.3d 497, 503 (2d Cir. 2014), aff'd sub nom. Gobeille v. Liberty Mut. Ins. Co., 577 U.S. 312 (2016). "The statute . . . seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." Gobeille, 577 U.S. at 320-21.

ERISA § 502(a), codified at 29 U.S.C. § 1132(a), provides that

[a] civil action may be brought –

(1) by a participant or beneficiary –

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(1)-(3).

"To state a claim under ERISA, a plaintiff must allege and establish the existence of an 'employee benefit plan' that is governed by ERISA." Albers v. Guardian Life Ins. Co., No. 98 Civ. 6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr. 19, 1999).

ERISA addresses two types of "employee benefit plans":  "welfare plans" and "pension plans."  ERISA § 3(2)(A) defines "pension plan" as follows:

> (A) Except as provided [elsewhere in ERISA], the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
>
>> (i) provides retirement income to employees, or
>>
>> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A).

ERISA requires pension plans to "provide that an employee's right to his normal retirement benefit is nonforfeitable" in most circumstances.  ERISA § 203(a), codified at 29 U.S.C. § 1053(a).  In the case of an "individual account plan,"[7] benefits must generally fully vest (1) after three years of service, or (2) gradually in accordance with a statutorily defined schedule. Id. §§ 203(a)(2)(B)(i)-(iii).

## II.   ANALYSIS

### A.   Whether the Parties Agreed to Arbitrate

As discussed above, Defendants have offered evidence that Plaintiffs Shafer, Tamse, Loftus, and Nadler executed written agreements containing arbitration clauses.  As to the remaining Plaintiffs, Defendants have offered evidence that they continued to work at Morgan Stanley without opting out of the 2015 CARE Program expansion, which provides for binding

---

[7] "The term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), codified at 29 U.S.C. § 1002(34).

mutual arbitration.  (See Porco Decl. (Dkt. No. 67) and accompanying exhibits; Krentzman Decl.

(Dkt. No. 68) and accompanying exhibits)  Plaintiffs do not dispute the evidence showing their

agreement to the arbitration provisions at issue.  Given this record, the Court concludes that

Defendants have demonstrated that Plaintiffs and Defendants entered into agreements to

arbitrate.  See Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004)

(employee's signed contract containing arbitration clause sufficient to establish agreement to

arbitrate under New York law); Victorio v. Sammy's Fishbox Realty Co., LLC, No. 14 CIV.

8678 CM, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015) (same); Lockette v. Morgan

Stanley, No. 18-CV-876 (JGK), 2018 WL 4778920, at *4–5 (S.D.N.Y. Oct. 3, 2018) (concluding

that plaintiff's continued work at Morgan Stanley after receiving the 2015 CARE Program

expansion email and plaintiff's decision not to opt out were sufficient to demonstrate an

agreement to arbitrate under New York law); Pelligrino v. Morgan Stanley Smith Barney LLC,

No. 17-CV-7865 (RA), 2018 WL 2452768, at *3-5 (S.D.N.Y. May 31, 2018) (same).

It is likewise clear that the arbitration provisions at issue unambiguously delegate

disputes as to arbitrability to the arbitrator, except as to challenges to the provisions' class action

waivers.  (2014 Tamse Bonus Agmt. (Dkt. No. 67-**3**) § 7(d) ("Any dispute as to the arbitrability

of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.

Notwithstanding the foregoing, any issue concerning the validity of the class action, collective

action, or representative action waiver must be decided by a court, and an arbitrator does not

have authority to consider the issue of the validity of the waiver."); Shafer 2015 Bonus Agmt.

(Dkt. No. 67-2) § 7(d) ("Any issue concerning the arbitrability of a particular issue or claim

pursuant to this arbitration agreement (except for issues concerning the validity or enforceability

of the class action, collective action, or representative action Waivers) must be resolved by the

arbitrator, not the court."); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1 ("Except as

otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim

pursuant to this arbitration provision is to be resolved in arbitration."); CARE Program

Arbitration Agmt. (Dkt. No. 68-5) § 4 ("Any issue concerning arbitrability of a particular issue

or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or

enforceability of the class action, collective action, or representative action Waivers) must be

resolved by the arbitrator, not the court.")) See Frazier v. Morgan Stanley, No. 16 CIV. 804

(RJS), 2018 WL 11585450, at *8 (S.D.N.Y. Nov. 29, 2018) (holding that identical provision in

Morgan Stanley employment agreements "clearly provide[d] for the arbitration of questions

concerning the arbitrability of any dispute arising out of or relating to those agreements").[8]

      While Plaintiffs do not dispute that the signed agreements and Plaintiffs' failure to

opt out of the CARE Program expansion signify consent to arbitration, they argue that "[e]ven if

the arbitration agreements applied to Plaintiffs' claims, they were superseded by the

[Compensation Incentive] [P]lan [D]ocument, which specifically requires disputes about the plan

to be resolved in court, **not** arbitration." (Pltf. Opp. (Dkt. No. 72) at 18-19 (emphasis in original))

      In support of this argument, Plaintiffs cite to the Compensation Incentive Plan

Document's "Governing Law and Exclusive Jurisdiction" provision:

---

[8]  Citing NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1031-32 (2d Cir. 2014),
and Archer & White Sales, Inc. v. Henry Schein, Inc., 935 F.3d 274, 281 (5th Cir. 2019),
Plaintiffs contend that "the parties did not clearly and unmistakably commit questions about the
arbitrability of Plaintiffs' inherently representative ERISA claims to an arbitrator." (Pltf. Opp.
(Dkt. No. 72) at 15 n.11)  These cases are not persuasive here, however, because they address
arbitration provisions that do not contain the explicitly worded delegations quoted above.  In
NASDAQ-OMX Grp., for example the agreement at issue was "silent as to who should decide
arbitrability."  NASDAQ OMX Grp., 770 F.3d at 1031.  And in Archer & White Sales, the Fifth
Circuit found that "[t]he parties could have unambiguously delegated th[e] question [of who
decides arbitrability], but they did not, and we are not empowered to re-write their agreement."
Archer & White Sales, 935 F.3d at 282.

> [The Compensation Incentive Plan] and the related legal relations between a
> Participant and the Firm shall be governed by, and construed in accordance with,
> the laws of the State of New York, without regard to any conflicts or choice of
> law rule or principle that might otherwise refer the interpretation of the Award or
> Account Value to the substantive law of another jurisdiction.  Following the
> timely and proper exhaustion of applicable internal claims and appeals
> procedures, the courts of New York shall have exclusive jurisdiction over the Plan
> and any dispute arising in connection with the Plan, a Participant's participation
> in the Plan or rights under the Plan.

(Compensation Incentive Plan Document (Dkt. No. 83-4) § 17)  The Compensation Incentive

Plan Document – unlike the agreements containing arbitration clauses discussed above – does

not contain a merger clause.[9]

According to Plaintiffs, the "Governing Law and Exclusive Jurisdiction"

provision in the Compensation Incentive Plan Document constitutes "'a subsequent contract

regarding the same matter'" – i.e., arbitration – that "'supersede[s] the prior contract[s].'"  (Pltf.

Opp. (Dkt. No. 72) at 19 (quoting Applied Energetics, 645 F.3d at 526))  But the evidence before

the Court suggests that nearly all of the agreements at issue containing the arbitration provisions

were executed after the Compensation Incentive Plan Document was issued.

---

[9]  The Bonus Agreement's arbitration provision states that "[e]mployee and Morgan Stanley
agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered
Claims, superseding all prior written and oral agreements regarding the resolution of Covered
Claims. . . ."  (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(k); see also 2014 Tamse Bonus
Agmt. (Dkt. No. 67-3) § 7(e) (same); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7(e) (same))

The Employment Agreement states that "[t]his writing constitutes the entire agreement of the
parties with respect to the subject matter recited in this Agreement.  This Agreement may be
amended only by a writing signed by both you and Morgan Stanley."  (2008 Nadler Employment
Agmt. (Dkt. No. 68-1) § 13)

The CARE Program Arbitration Agreement states that "**[t]his Arbitration Agreement applies
to all Covered Claims, including any Covered Claims based on, arising out of, or which
arose out of or in any way relate to acts and omissions that occurred before you and
Morgan Stanley entered into this Arbitration Agreement.**"  (CARE Program Arbitration
Agmt. (Dkt. No. 68-5) § 2 (emphasis in original))

While the Compensation Incentive Plan Document is not dated, Plaintiffs assert "[u]pon information and belief, [that] this document has been in effect since 2008 and [is] part of the 'applicable award documentation' when participants' deferred compensation is credited to their account each January." (Jasinski Decl. (Dkt. No. 72-1) ¶ 4)  However, the record does not indicate whether (1) the Compensation Incentive Plan Document has changed over time, or (2) if, when issued as part of the "applicable award documentation" in a given year, it should be considered a document current as of that year or in the alternative, merely a copy of a 2008 document.  These matters are material here, because all Plaintiffs other than Nadler signed arbitration agreements <u>after</u> 2008, when Plaintiffs assert that the Compensation Incentive Plan Document was issued.  (Porco Decl. (Dkt. No. 67) ¶¶ 6-11; Krentzman Decl. (Dkt. No. 68) ¶¶ 23-30)  And given the merger provisions found in the agreements containing arbitration clauses, if these agreements were executed after the Compensation Incentive Plan Document was issued, there is a compelling argument that these agreements supersede the Compensation Incentive Plan Document.

For example, Plaintiff Mark Tamse "was employed by Morgan Stanley as a[] [financial advisor] from March 7, 1994, until March 27, 2015." (Krentzman Decl. (Dkt. No. 68) ¶ 9)  On February 18, 2014, he entered into a Bonus Agreement containing an arbitration provision, which provides that "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof . . . will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority." (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) §§ 7(a))  The Bonus Agreement further provides that the arbitration provision "constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered

Claims." (Id. § 7(e))  Based on the merger provision, it appears that the Bonus Agreement's arbitration clause would supersede the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction clause with respect to any deferred compensation that Tamse received under the Compensation Incentive Plan.

In any event, even if – contrary to the record before the Court – the Compensation Incentive Plan Document was issued after the agreements containing the arbitration provisions, the Governing Law and Exclusive Jurisdiction provision would not vitiate the arbitration provisions, because to the extent that the Compensation Incentive Plan is an ERISA plan – as Plaintiffs allege (Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117) – the Governing Law and Exclusive Jurisdiction provision is null and void.

As discussed above, the Amended Complaint asserts that the deferred compensation programs at issue are ERISA plans, and all of the claims alleged in the Amended Complaint are premised on ERISA.  (See Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117)  The "exclusive jurisdiction" provision on which Plaintiffs rely, however, states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that disputes arising under the Compensation Incentive Plan must be resolved by the "courts of New York."  (Id. § 17)

Accepting Plaintiffs' argument that the deferred compensation programs at issue are ERISA plans, the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision is null and void to the extent that it provides that all disputes arising under it are governed by New York law, and that all disputes arising under it must be heard by New York courts.  Claims under ERISA are governed by Federal law and are heard by Federal courts.

"If a state law 'relate[s] to . . . [an ERISA] employee benefit plan,' it is pre-empted." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (quoting ERISA § 514(a), codified at 29 U.S.C. § 1144(a) ("Except as provided in [statutory exceptions not relevant here], the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of [ERISA].") (alterations in Dedeaux). Moreover, ERISA provides – with a narrow exception not at issue here – that "[t]he district courts of the United States shall have exclusive jurisdiction of an action under [ERISA]." ERISA § 4301(c), codified at 29 U.S.C. § 1451(c); see Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *4 n.6 (S.D.N.Y. Mar. 30, 2007) ("Federal district courts have exclusive jurisdiction over all claims arising under ERISA except for those arising under § 1132(a)(1)(B).").

Accordingly, the Governing Law and Exclusive Jurisdiction provision in the Compensation Incentive Plan Document – which states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that "the courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan" (Dkt. No. 83-4 § 17) – is null and void with respect to the ERISA claims raised in the Amended Complaint. See Kentucky Ass'n of Health Plans, Inc. v. Nichols, 227 F.3d 352, 367 (6th Cir. 2000) ("[I]f ERISA preempts . . . state law . . . , there is no state law to which the administrator of the . . . plan must conform."), aff'd sub nom. Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003); Matter of HECI Expl. Co., Inc., 862 F.2d 513, 521 (5th Cir. 1988) ("Even if a party may, under some circumstances, waive the application of federal law to a

federally preempted state law claim by failing to raise federal law in a timely fashion, it would go too far to hold that parties could <u>agree</u> to apply state law to an ERISA claim.") (emphasis in original) (citation omitted); <u>Stevenson</u>, 2007 WL 9815654, at *4 n.6**.**

    Finally, where an agreement containing an exclusive jurisdiction provision overlaps with – but does not entirely displace – a related agreement containing an arbitration provision, the issue of which provision applies presents a question of scope, and is thus subject to language in an arbitration provision delegating disputes about arbitrability to an arbitrator. <u>See CleanSpark, Inc. v. Discover Growth Fund, LLC</u>, 485 F. Supp. 3d 494, 504 & n.10 (S.D.N.Y. 2020) ("where a later-in-time forum selection clause arguably wholly supersedes the earlier-in-time arbitration agreement . . . a court must independently determine whether the agreement to arbitrate is still enforceable"; where the later agreement does not entirely displace the earlier agreement and contains an exclusive jurisdiction provision that applies only to disputes within the scope of the later agreement, the arbitration provision has not been "wholly displaced by the forum selection clause, . . . the Court need not pause on the threshold question [of whether there has been an agreement to arbitrate]," because "'[w]hether the forum-selection clause in the later-in-time agreement supersedes the arbitration clauses in the earlier agreement[] presents a question of arbitrability'" that can be delegated to the arbitrator) (quoting <u>TAPCO Underwriters, Inc. v. Catalina London Ltd.</u>, No. 14-**CV**-8434, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8, 2014)) (alteration omitted); <u>PB Life & Annuity Co. v. Universal Life Ins. Co.</u>, No. 20-CV-2284 (LJL), 2020 WL 2476170, at *3, *6–11 (S.D.N.Y. May 12, 2020) (reinsurer and insurer first entered into reinsurance agreement containing an arbitration provision, and then entered into trust agreement containing a New York choice of law and exclusive jurisdiction provision; the court held that, with respect to disputes implicating both agreements, whether the arbitration

provision or exclusive jurisdiction provision controlled was a question of arbitrability properly delegated to the arbitrator).

Here, the subject matter of the Compensation Incentive Plan Document is not identical to the subject matter of the employment agreements containing the arbitration provisions, and the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision applies only to the Compensation Incentive Plan.  (Dkt. No. 83-4 § 17)  The jurisdiction provision does not apply to claims regarding the Equity Incentive Plan.  In these circumstances, as in CleanSpark and PB Life, disputes over the jurisdiction provision's application are within the arbitrator's ambit.

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210 (2d Cir. 2014), Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc., 5 F. Supp. 3d 537 (S.D.N.Y. 2014), Applied Energetics, Inc. v. NewOak Cap. Markets, LLC, 645 F.3d 522 (2d Cir. 2011), and Ruiz v. New Avon LLC, No. 18-CV-9033 (VSB), 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) – all cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 72) at 19-20) – are not to the contrary.

In Goldman and Citigroup Glob. Markets, courts concluded that broker-dealer agreements that provided for exclusive jurisdiction in the Southern District of New York, and that contained merger provisions, superseded the "background FINRA arbitration rule." Goldman, 764 F.3d at 212, 216; see also Citigroup Glob. Markets, 5 F. Supp. 3d at 539-40.

In Applied Energetics, plaintiff manufacturer and defendant broker-dealer "entered into a preliminary letter agreement" that required disputes to be submitted to arbitration before the National Association of Securities Dealers, FINRA's predecessor.  Applied Energetics, 645 F.3d at 523.  The letter agreement "contemplated that the parties would enter into a subsequent, more formal agreement."  Id.  The parties subsequently entered into the

contemplated more formal agreement, which (1) "expressly provided that the agreement would be governed by New York law"; (2) provided that "[a]ny dispute arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York"; and (3) contained a merger clause. Id. The Second Circuit concluded that the language in the later formal agreement superseded the arbitration provision in the initial letter agreement because (1) "[the formal agreement's] language that 'any dispute' between the parties 'shall be adjudicated' by specified courts stands in direct conflict with the [letter agreement's] parallel language that 'any dispute shall be resolved through binding arbitration'"; and (2) "[u]nder New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." Id. at 525-26 (quotation and alterations omitted).

And in Ruiz, the plaintiff employee signed (1) a November 14, 2017 employment agreement in which the parties "irrevocably consent and submit to the sole exclusive jurisdiction of the United States District Court for New York, or the Courts of the State of New York," with respect to "[a]ny and all actions arising out of the [employment agreement] or the termination thereof"; (2) a November 27, 2017 "Employment Arbitration Agreement" containing an arbitration provision for employment disputes; and (3) a revised December 19, 2017 employment agreement with a later start date, which contained the same exclusive jurisdiction clause as the original agreement, as well as a merger clause. Ruiz, 2019 WL 4601847, at *2, *7. The court concluded that the exclusive jurisdiction clause in the December employment agreement displaced the arbitration agreement agreed to the previous month, because the "language [of the December agreement] – which encompasses any dispute relating to Ruiz's employment by New

Avon – is both mandatory and exclusive, and cannot be reconciled with the parties' prior agreement to arbitrate all disputes"; and (2) and because of the merger clause.  Id. at *9.

These cases are not on point because the circumstances in the instant case are entirely different.  As an initial matter, these cases do not involve a situation in which – as here – Plaintiffs have brought exclusively federal ERISA claims and then incongruously cited to a contract provision stating that any disputes are governed by New York law and must be heard by "the courts of New York."  Moreover, in all four of Plaintiffs' cases, the later-in-time agreement (1) had the same subject matter as the prior agreement, and/or (2) contained a merger clause. Here, as discussed above, it is not clear that the Compensation Incentive Plan Document is the later document and, in any event, the Compensation Incentive Plan Document does not contain a merger clause and does not address subject matter that is identical to the subject matter of the Employment Agreement, the Bonus Agreement, or the CARE Program.  See PB Life, 2020 WL 2476170, at *9 (finding Goldman and Applied Energetics not on point where the subject matter of the contracts at issue overlapped only in part).

In sum, in multiple documents, Plaintiffs agreed – either via a signed writing or by not opting out of the CARE Program expansion – to arbitrate disputes regarding their employment at Morgan Stanley.  Morgan Stanley has thus made a "prima facie showing" of "the agreements' contractual validity," and Plaintiffs have not met their "'heavy burden . . . to disprove [the] presumption[]'" that the "'agreement[s] [are] valid.'"  Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 241 (S.D.N.Y. 2020) (quoting Aviall, Inc. v. Ryder System, Inc., 913 F. Supp. 826, 831 (S.D.N.Y. 1996)), objections overruled, No. 10 Civ. 6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021).

B.      **Whether the Agreements to Arbitrate**
        **Encompass the Claims at Issue**

The arbitration provisions at issue here encompass "any controversy or claim

arising out of or in any way relating to Employee's employment with Morgan Stanley or

termination thereof"; "any controversy or claim between Employee and Morgan Stanley . . .

based on, arising out of, or which arose out of or in any way relate to Employee's employment,

compensation, and terms and conditions of employment with Morgan Stanley"; "[a]ny

controversy or claim arising out of or relating to . . . employment by Morgan Stanley"; and "any

and all claims or disputes between you and Morgan Stanley or any of its current, former, and

future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or

which arose out of or in any way relate to your employment, compensation, and terms and

conditions of employment with Morgan Stanley anywhere in the world, or the termination

thereof . . . includ[ing] . . . claims under, based on, or relating to any federal . . . statute or

regulation."  (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(a); 2015 Shafer Bonus Agmt. (Dkt.

No. 67-2) § 7(a); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1; CARE Program

Arbitration Agmt. (Dkt. No. 68-5) § 2)

"Courts have typically found such language indicative of a broad agreement."

Cour Pharms. Dev. Co., Inc. v. Phosphorex, Inc., No. 20-CV-4417 (JPO), 2021 WL 1062568, at

*3 (S.D.N.Y. Mar. 19, 2021) (listing cases); see Sportvision, Inc. v. MLB Advanced Media, LP,

No. 18 CIV 3025 (PGG), 2020 WL 1957450, at *5 (S.D.N.Y. Apr. 23, 2020) ("A clause

'submitting to arbitration "[a]ny claim or controversy arising out of or relating to th[e]

agreement" is the paradigm of a broad clause.'") (quoting <u>Collins & Aikman Prod. Co. v. Bldg.</u>

<u>Sys., Inc.</u>, 58 F.3d 16, 20 (2d Cir. 1995); further citation omitted) (brackets in <u>Sportvision</u>).[10]

---

[10]  Citing <u>Cooper v. Ruane Cunniff & Goldfarb Inc.</u>, 990 F.3d 173 (2d Cir. 2021), Plaintiffs contend that "Plaintiffs' claims do not 'arise from or relate to their employment' because they do not involve facts particular to them."  (Pltf. Opp. (Dkt. No. 72) at 12)

In <u>Cooper</u>, plaintiff employees, "[a]cting on behalf of a putative class of plan participants and an employee benefit plan . . . sued [an investment advisor] under § 502(a)(2) of [ERISA], claiming damages arising from [the advisor's] alleged breach of fiduciary duty and mismanagement of a profit-sharing fund sponsored by [plaintiffs'] employer ."  <u>Cooper</u>, 990 F.3d at 175.  In particular, plaintiffs alleged that the investment advisor had breached its fiduciary duty by investing "almost 30% of the Plan's total assets" in "shares [of] Valeant Pharmaceuticals," which precipitously declined in value following a series of scandals involving Valeant's price-gouging and fraud.  <u>Id.</u> at 175, 177; <u>see</u> Katie Thomas, <u>Battered Valeant Stock Drops a Further 50% After Weak Guidance</u>, N.Y Times (Mar. 15, 2016), <u>available at</u> https://www.nytimes.com/2016/03/16/business/valeant-q4-financial-2016-guidance.html?smid=url-share.

Defendant moved to compel arbitration, citing employment agreements that "mandate[d] arbitration of 'all legal claims arising out of or relating to employment, application for employment, or termination of employment, except for claims specifically excluded under the terms' of the Agreement."  <u>Id.</u> at 178.  The Second Circuit reversed the district court's decision granting the motion to compel arbitration, holding that plaintiffs' breach of fiduciary duty claim did not "relate to" their employment:

> Cooper's claims hinge entirely on the investment decisions made by Ruane; the substance of his claims has no connection to his own work performance, his evaluations, his treatment by supervisors, the amount of his compensation, the condition of his workplace, or any other fact particular to Cooper's individual experience.  Moreover, . . . others who were never DST employees could have brought claims identical to those stated by Cooper – for example, the mismanagement claims could have been pursued by other Plan beneficiaries (such as spouses, heirs, or designees of participants); by other Plan fiduciaries, including DST itself; and by the Secretary of Labor.  <u>See</u> ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (authorizing plan participants and beneficiaries and the Secretary of Labor to bring a civil action for breach of fiduciary duties).

> We therefore [conclude] . . . that in the context of an employment arbitration agreement, a claim will "relate to" employment only if the merits of that claim involve facts particular to an individual plaintiff's own employment.  Here, the merits of Cooper's claims do not involve such facts.

<u>Id.</u> at 183-84 (citations omitted).

Plaintiffs contend, however, that they have brought their claims in a

representative capacity on behalf of ERISA plans, and that as a result their claims are not

arbitrable.  According to Plaintiffs, (1) "[t]he parties did not agree to arbitrate claims brought in

Plaintiffs' representative capacity"; (2) "[t]he ERISA plan[s] did not agree to arbitrate Plaintiffs'

claims"; and (3) "[e]ven if the parties agreed to arbitrate Plaintiffs' claims in individual

---

Here, according to Plaintiffs,

> the arbitration provisions, like the arbitration agreement in <u>Cooper</u>, pertain to Plaintiffs' employment.  But, as in <u>Cooper</u>, the merits of Plaintiffs' claims do not involve facts particular to their employment.  The claims do not concern Plaintiffs' work performance, evaluations, working conditions, amount of compensation, or any other fact particular to their individual experiences at Morgan Stanley.  Rather, Plaintiffs' claims concern whether the [Compensation Incentive Plan] and [Equity Incentive Plan] are governed by ERISA and, if so, whether the Cancellation Rule violates ERISA.  Nothing about these claims "<u>involve facts particular to an individual plaintiff's own employment</u>."  To the contrary, the relevant facts apply equally to every [financial advisor] who forfeited deferred compensation, and each such [financial advisor] can bring the same claims.  Indeed, even the Secretary of Labor could do so.

(Pltf. Opp. (Dkt. No. 72) at 12-13 (quoting <u>Cooper</u>, 990 F.3d at 184) (emphasis in Pltf. Opp.))

Plaintiffs' "relate to employment" argument is not persuasive.  Although both <u>Cooper</u> and the instant case involve § 502(a)(2) breach of fiduciary duty claims, the similarities between the cases end there.  In <u>Cooper</u>, the alleged breach of fiduciary duty was the mismanagement of fund assets, an issue entirely unrelated to plaintiffs' employment.  Here, by contrast, the alleged breach of fiduciary duty is "selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA."  (Am. Cmplt. (Dkt. No. 58) ¶ 113) These challenged actions "relate to" Plaintiffs' employment, because whether Plaintiffs' deferred compensation vested depends on the timing and circumstances of their separation from Morgan Stanley, including whether they were fired, quit, or retired.  <u>Cooper</u>'s concern that "[r]elatedness" "not encompass everything that touche[s] employment in any way," <u>Cooper</u>, 990 F.3d at 183, is thus not implicated here.  <u>See Duke v. Luxottica U.S. Holdings Corp.</u>, No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *9 (E.D.N.Y. Sept. 30, 2023) (finding that <u>Cooper</u> did not preclude plaintiff's "claims against her former employer directly, challenging her former employer's calculation of her retirement benefits," because there was "a more substantial nexus between Plaintiff's claims and her employment" than in <u>Cooper</u>).

In sum, <u>Cooper</u>'s analysis of "relate to employment" does not support Plaintiffs' position here.

arbitrations, those arbitration agreements are unenforceable as 'prospective waiver[s] of a party's

right to pursue statutory remedies' under ERISA § 502." (Pltf. Opp. (Dkt. No. 72) at 15, 18, 21

(quoting <u>Am. Exp. Co. v. Italian Colors Rest.,</u> 570 U.S. 228, 235 (2013)) (brackets in Pltf. Opp.))

   In considering Plaintiffs' arguments, this Court must first determine whether (1)

the Compensation Incentive Plan and the Equity Incentive Plan are ERISA plans; and (2) if so,

whether – as Plaintiffs contend – arbitration of their claims was not consented-to by each alleged

ERISA plan and/or would be contrary to ERISA.[11]

---

[11] Defendants contend that "[b]ecause plaintiffs have agreed to arbitrate arbitrability, the Court
need not – and should not – reach arbitrability itself. . . . [T]he validity of plaintiffs'
representative action waiver is not at issue. The parties do not dispute whether plaintiffs have
waived the right to bring a representative action – they dispute whether plaintiffs' claims seeking
individual benefits must be arbitrated. The agreements clearly and unmistakably commit such
questions to the arbitrator, and plaintiffs have identified no arbitrability issue reserved to the
court that 'at least arguably covers the present dispute.'" (Def. Reply Br. (Dkt. No. 69) at 7-8
(quoting <u>NASDAQ OMX Grp.,</u> 770 F.3d at 1031))

By contrast, Plaintiffs contend that "[t]hree of the four arbitration provisions purport to waive the
right to pursue a Covered Claim 'on a class action, collective action, or representative action
basis.' To the extent that any such claim is allowed to proceed, it must do so in court.
Moreover, 'any issue concerning the validity or enforceability of any of the class action,
collective action, and representative action waivers shall be decided by a court of competent
jurisdiction, and not by an arbitrator.' Thus, contrary to Morgan Stanley's argument that any
disagreement about the arbitrability of Plaintiffs' claims is reserved for the arbitrator, the Court –
not an arbitrator – must decide whether Plaintiffs' claims must be allowed to proceed on a class-
action or representative-action basis, such that they are not subject to arbitration." (Pltf. Opp.
(Dkt. No. 72) at 15 (quoting 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(d); citing 2014
Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(d), and CARE Program Arbitration Agmt. (Dkt. No.
68-5) § 4; alterations omitted); <u>see also</u> 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1)

In sum, Plaintiffs argue that the arbitration provisions are unenforceable because (1) they
"prohibit[] Plaintiffs from bringing [their] claim[s] [on] a representative basis"; and (2) this
restriction violates ERISA. And they further contend that the validity of the class action waivers
must be determined by a court. (<u>Id.</u> at 15, 22) Because the arbitration provisions provide that
the validity of the class action waivers must be determined by a court, this Court concludes that
this aspect of the parties' arbitrability dispute must be determined by the Court and not by an
arbitrator.

1.      <u>**Whether the Deferred Compensation Programs are ERISA Plans**</u>

Plaintiffs contend that Morgan Stanley's deferred compensation programs are "employee benefit pension plan[s]" under ERISA because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  (Am. Cmplt. (Dkt. No. 58) ¶ 64) (capitalization altered).  <u>See</u> ERISA 3(2)(A)(ii), <u>codified</u> <u>at</u> 29 U.S.C. § 1002(2)(A)(ii).[12]  According to Plaintiffs, the deferred compensation programs' deferral of income "extend[s] to the termination of covered employment or beyond" in that (1) financial advisors "whose employment ends because of a disability, involuntary termination, retirement, or full career retirement still receive their deferred compensation on the scheduled distribution date . . . after their employment with Morgan Stanley . . . end[s]"; and (2) financial advisors "who qualify for a government service termination receive their deferred compensation when they leave Morgan Stanley."  (<u>See</u> <u>id.</u> ¶¶ 59-67 (capitalization altered))

a.      <u>**Applicable Law**</u>

As discussed above, ERISA defines "pension plan" to include, <u>inter alia</u>, any employer "plan, fund, or program" that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. . . ."  ERISA § 3(2)(A), <u>codified</u> <u>at</u> 29 U.S.C. § 1002(2)(A).  In determining whether an employer's plan or program is an "employee benefit pension plan" under ERISA, the Act directs courts to consider the "express terms" and "surrounding circumstances" of the plan or program.  ERISA § 3(2)(A), <u>codified</u> <u>at</u> 29 U.S.C. § 1002(2)(A).  The Second Circuit has cautioned that the ERISA provision defining pension plans "is 'not to be read as an elastic girdle that can be stretched to cover any content

---

[12]  Plaintiffs do not contend that Morgan Stanley's deferred compensation programs "provide[] retirement income to employees."  ERISA § 3(2)(A)(i).

that can conceivably fit within its reach.'" Pasternack v. Shrader, 863 F.3d 162, 168 (2d Cir. 2017) (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980)).

Most cases that have considered whether an employer's plan or program "results in deferral of income" for purposes of § 3(2)(A)(ii) have involved bonus plans, typically in the form of stock options programs or "long-term incentive plans." E.g., Albers, 1999 WL 228367, *1; International Paper Co. v. Suwyn, 978 F. Supp. 506, 508-09 (S.D.N.Y. 1997); Foster v. Bell Atl. Tricon Leasing Corp., No. 93 CIV. 4527 (LAP), 1994 WL 150830, *1 (S.D.N.Y. Apr. 20, 1994); Hahn v. Nat'l Bank, N.A., 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000); Pasciutti v. LiquidPiston, Inc., No. 3:20-CV-01243 (RNC), 2021 WL 4502950, *2 (D. Conn. Sept. 30, 2021); Oatway v. Am. Int'l Grp., 325 F.3d 184, 187 (3d Cir. 2003); Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 (8th Cir. 1999).  In determining whether a bonus plan is subject to ERISA, a court must consider both § 3(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c), which provides that "the terms 'employee pension benefit plan' and 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." See, e.g., Albers, 1999 WL 228367, at *3-4 (analyzing deferral of bonus payments under both § 1002(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c)); Foster, 1994 WL 150830, at *2 (same).

In that context, courts consider whether a plan's "purpose [is] to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits." Oatway, 325 F.3d at 188.  In such an inquiry, "[a] [p]lan's express statement of purpose . . . is entitled to weight when determining the nature of the plan." Hahn, 99 F. Supp. 2d at 279.  Courts also consider whether plans "by operation . . . require the deferral of income," or

on the other hand, if "any such deferral to periods extending to termination is merely incidental."

Suwyn, 978 F. Supp. at 512; see id. at 511 (plan does not result in the deferral of income when it

"cannot be said to generally defer the receipt of income to the termination of employment");

Foster, 1994 WL 150830, at *2 ("[T]he 'natural reading of [29 U.S.C.] § 1002(2)(A)(ii)'s

requirement that there be a "deferral of income . . . to the termination of covered employment or

beyond" is that the statute requires that a plan generally defer the receipt of income to the

termination of employment.  The statute is not satisfied when, under the facts of a particular

case, a portion of withheld income happens to become due after termination.'") (quoting Hagel

v. United Land Co., 759 F. Supp. 1199, 1202 (E.D. Va. 1991); emphasis and ellipsis in Foster).

In Tolbert v. RBC Cap. Markets Corp., 758 F.3d 619 (5th Cir. 2014), the Fifth

Circuit considered whether an employer's "wealth accumulation plan" was an "employee benefit

pension plan."  The court noted that the "wealth accumulation plan"

> "[was] designed to provide an opportunity for [certain] employees to invest a
> portion of their compensation in tax-deferred savings and investment options in
> an effort to support long-term savings and allow such employees to share [in
> defendant] RBC's growth and profitability, if any." . . .  Generally, a participating
> employee [could] elect to have her account distributed either "In–Service" (i.e.,
> during her employment) or upon separation from employment. . . . Vesting where
> the employee has separated from employment is dependent on the employee
> either (1) entering into a "business transition agreement" or (2) satisfying the
> requirements "under the Plan for Retirement" and entering into a non-competition
> agreement.

Id. at 622-23 & n.1 (quoting plan document; alteration omitted).

RBC argued that its wealth accumulation plan "[was] not a 'pension plan' because

'the primary purpose of the [plan] [was] not to provide retirement or deferred post-termination

income, but rather, to attract and retain key employees by awarding bonuses and other

incentives.'"  Id. at 623 (quoting RBC's brief) (emphasis in RBC's brief; alteration omitted).

Although the Fifth Circuit found that the wealth accumulation plan "was not designed to provide retirement income," and noted that, under § 3(2)(A)(i), the issue of whether a plan "provides retirement income" depends on the "primary thrust" and "purpose" of the plan, id. at 624, it rejected RBC's arguments with respect to § 3(2)(A)(ii).  As to that provision, the Tolbert court holds that the employer's purpose is irrelevant, and that the proper inquiry is whether a deferral of income necessarily ensues as a result of the plan:

> The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i).  Under subsection (ii), the critical inquiry is, according to the text of the statute, whether the plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  Our court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income.  Moreover, RBC's reading would render the entirety of subsection (ii) superfluous, an unacceptable result. . . .

> In analyzing subsection (ii), we begin with the predicate – "results in a deferral of income."  The Supreme Court had occasion recently to construe the ordinary meaning of the word "results" in Burrage v. United States, 571 U.S. 204 (2014).  The Court explained that "a thing 'results' when it arises as an effect, issue, or outcome from some action, process or design."  Id. at 210 (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)).  Accordingly, subsection (ii) provides that a "plan" is a "pension plan" when a "deferral of income" arises as an "effect, issue, or outcome" from that plan.  The remaining text of subsection (ii) – "by employees for periods extending to the termination of covered employment or beyond" – indicates that the employees must defer the income to the end of their employment or beyond.

> . . . .

> We conclude that the plain language of the statute and the interpretations expressed in [our precedents] all compel one result:  The [wealth accumulation plan] is a "pension plan" under subsection (ii).  The [wealth accumulation plan's] "express terms" reveal themselves at the outset of the document.  The first section of the [wealth accumulation plan], the statement of purpose, refers to the [wealth accumulation plan] as a "deferred compensation plan" and explains that, by design, employees have the option "to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year."  Later sections of the [wealth accumulation plan] contain provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred.  A deferral of income therefore "ensues from" (or, "arises as an effect of") the express terms of the [wealth accumulation

plan].  Put another way, by participating in the [wealth accumulation plan], the plaintiffs have "[forgone] income in exchange for receiving income" at a later date.  See Boos v. AT&T, Inc., 643 F.3d 127, 134 (5th Cir. 2011).

The "express terms" of the [wealth accumulation plan] also contemplate employees deferring income "to the termination of covered employment or beyond."  The vesting sections explain that, upon separation, unvested amounts vest immediately.  The distribution sections contain further support:  "If distribution is made due to Separation," then "available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years."  Accordingly, the [wealth accumulation plan] fits comfortably within the meaning of subsection (ii).

Id. at 624-26 (citations altered; emphases in original; footnote, further citations, and alterations omitted).

The Fifth Circuit goes on to reject RBC's reliance on § 2510.3-2(a) – the regulation setting out the "systematically deferred" standard for bonuses – and related case law, finding that RBC's wealth accumulation plan is not a bonus plan:  "The [wealth accumulation plan] is not among the 'specific plans' identified in § 2510.3-2(c), and we therefore decline to require the [wealth accumulation plan] to satisfy the 'systematically deferred' condition.  In other words, the [wealth accumulation plan] fits comfortably within the meaning of § 1002(2)(A)(ii), and nothing in § 2510.3-2(c) takes it out.  Reliance on [Emmenegger v. Bull Moose Tube Co., 197 F.3d 929 (8th Cir. 1999)] is thus misplaced."  Id. at 626 (paragraph break omitted).

In Wilson v. Safelite Grp., 930 F.3d 429 (6th Cir. 2019), the Sixth Circuit followed the Tolbert analysis and held that a "similar" "income deferral plan" was an ERISA pension plan under § 3(2)(A)(ii), because the plan "expressly provide[d] for employees to defer income from several sources to the future and authorize[d] options for payment of deferred income both before and after termination"  Id. at 437.

Although the Second Circuit has not addressed Tolbert and Wilson, much of the reasoning in Pasternack v. Shrader, 863 F.3d 162 (2d Cir. 2017) is consistent with the analysis in

these cases.  For example, the <u>Pasternack</u> court states that (1) "the two subparagraphs of [§ 3(2)(A)] set out independent tests to determine whether a plan is protected by ERISA"; (2) "[t]he statutory phrase 'provides retirement income' does not cover every instance in which a person cashes out an investment after retirement, even though a participant will have anticipated this income when planning for retirement.  The very fact that [§ 3(2)(A)(i)] is an alternative to [§ 3(2)(A)(ii)], which explicitly asks whether a plan 'results' in deferred income, suggests that the phrase 'provides retirement income' considers the plan's primary purpose rather than its result"; and (3) "[s]ubparagraph (ii) extends ERISA coverage to any plan that 'results in a deferral of income by employees.'  The word 'results' calls for an effects-based inquiry rather than one based on purpose."  <u>Id.</u> at 168-69 & 170 n.5.

      Having considered the relevant case law, this Court concludes that the test to be applied for determining ERISA coverage is whether the deferred compensation program at issue is a bonus plan.  If it is, a court must consider both the plan's purpose and whether deferral of income is systematic.  If the deferred compensation program is not a bonus plan, a court should consider only whether the deferred compensation program "results in" deferred income.

### b.    Whether Plaintiffs' Deferred Compensation Programs Are Bonus Programs

      Plaintiffs contend that financial advisors'

> deferred compensation in the [Financial Advisor] Deferred Compensation Program is not a "bonus" . . . [because] [financial advisors] do not have to do anything "in addition to what is expected" of them in order to earn Deferred Credits . . . .  Given that [financial advisors] are expected to generate revenue, their compensation for performing this core function – at the absolute minimum level – is not, and cannot, be a "bonus."  Rather, [financial advisors'] compensation – including their deferred compensation – is a "commission." . . . Indeed, the [Financial Advisor] Compensation Plan distinguishes between [financial advisors'] "deferred compensation," which is a part of their commissions, and "bonuses," which are in addition to their commissions. [Financial advisors] earn deferred compensation under a non-discretionary, uniformly applied "Grid" starting at the first dollar of revenue they generate.  In

> contrast, [financial advisors] earn "year-end bonuses" by achieving
> individualized, performance-based goals such as increasing their prior year's
> revenue by specified percentages or cross-selling products to clients.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 73-79 (citing 2018 Financial Advisor Compensation Plan (Dkt.

No. 83-2) § 1.2.2 (differentiating "deferred compensation award[s]" from "year-end bonuses . . .

paid to Firm employees generally")))

This Court concludes that the deferred compensation programs at issue here are

not bonus programs.

As discussed above, Morgan Stanley financial advisors' deferred compensation is

a portion of their incentive compensation, which in turn is a fraction of the revenue they

generate.  Compensation as a percentage of individually generated revenue is a "commission."

See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee

for a particular transaction, usually as a percentage of the money received from the transaction");

Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.)

("a percentage of the money received in a sale or other transaction paid to the agent responsible

for the business").

By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,]

[especially] a payment by way of division of a business's profits, given over and above normal

compensation."  Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New

International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an

equivalent given in addition to the usual compensation").

Courts generally treat these two types of compensation as distinct.  See Smith v.

Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in ERISA action,

concluding that employee benefits committee did not "err[] in deciding that commissions are not

bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New

York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995)

("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v.

Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D.

Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary

definitions).

The same approach is appropriate here. Because Morgan Stanley financial

advisors' deferred compensation is premised on the revenue they generate, deferred

compensation payments are not "over and above normal compensation." Moreover, Morgan

Stanley financial advisors are paid separate year-end bonuses that are distinct from the

Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation

Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus

Agmt. (Dkt. No. **67-3**); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

In sum, the deferred compensation programs at issue here are not bonus plans.

Accordingly, in deciding whether Morgan Stanley's deferred compensation programs are ERISA

plans under § 3(2)(A)(ii), this Court considers only whether these programs "result[] in" the

deferral of income to a period after employment.

### c. Whether the Deferred Compensation Programs "Result[] in a Deferral of Income by Employees for Periods Extending to the Termination of Covered Employment or Beyond"

"Although [ERISA] do[es] not define 'deferral of income' or 'deferred

compensation,' Black's Law Dictionary defines '[d]eferred compensation' as either: (1)

'[p]ayment for work performed, to be paid in the future or when some future event occurs,' or

(2) 'an employee's earnings that are taxed when received or distributed rather than when earned,

such as contributions to a qualified pension or profit-sharing plan.'" Kuhbier v. McCartney,

Verrino & Rosenberry Vested Producer Plan, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017)

(quoting Deferred Compensation, Black's Law Dictionary (10th ed. 2014)).  And "a 'plan' is a 'pension plan' [under ERISA] when a 'deferral of income' . . . to the end of . . . employment or beyond . . . arises as an 'effect, issue, or outcome' from that plan."  Tolbert, 758 F.3d at 625 (quoting Burrage, 571 U.S. at 210).

As described above, the "credits" that determine a Morgan Stanley financial advisor's incentive compensation – which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan – are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month."  (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1)  Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however.  (Id. § 1.2.2)  Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (see ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future."  And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond."  Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  Id. § 3(2)(A)(ii).

And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" Pasternack, 863 F.3d at 168 (quoting Murphy, 611 F.2d at 575), application of ERISA in these circumstances does not unreasonably expand the reach of the Act.  Although Plaintiffs in the instant case – unlike plaintiffs in Tolbert and Wilson – cannot elect post-

employment vesting, disability, retirement, layoff, and government service are not unusual means by which workers leave their employment. And nothing in the record suggests that post-employment deferred compensation payments are rare.

Defendants argue, however, that Plaintiffs did not earn payments under the Compensation Incentive Plan and Equity Incentive Plan in advance of receiving such payments, because financial advisors "have no right to payment until and unless they remain employed at vesting – a condition [P]laintiffs [did not] meet." (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 4) Defendants thus argue that "Morgan Stanley's program does not entail <u>any</u> 'deferral of income by employees.'" (<u>Id.</u> at 4 (emphasis in original)) This argument is not persuasive, because it exalts form over substance. Whenever an action (here, leaving Morgan Stanley's employ) results in the forfeiture of a contractual right, those facts can always be recharacterized by stating that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent to the performance of the contract.

In sum, Morgan Stanley's deferred compensation programs result in the deferral of income to the post-employment period within the meaning of ERISA § 3(2)(A)(ii).

*    *    *    *

For the reasons stated above, this Court concludes that Morgan Stanley's deferred compensation programs are ERISA plans.

### 2.    Whether Plaintiffs' ERISA Claims Are Arbitrable

Second Circuit law makes clear that compulsory arbitration of ERISA claims is lawful. <u>Bird v. Shearson Lehman/Am. Exp., Inc.</u>, 926 F.2d 116, 122 (2d Cir. 1991) ("[S]tatutory claims arising under ERISA may be the subject of compulsory arbitration.").

Plaintiffs contend, however, that their claims are not arbitrable, because they are § 502(a)(2) claims for breach of fiduciary duty, and § 502(a)(3) claims for equitable relief that

are brought in a representative capacity on behalf of the plans.  According to Plaintiffs, their

§ 502(a)(2) claims "can be brought <u>only</u> in a representative capacity."  (Pltf. Opp. (Dkt. No. 72)

at 16 (emphasis in original))  Moreover, their "representative [§ 502(a)(3)] claims should not be

litigated in individual arbitrations," because these "claims 'belong' to the [Financial Advisor]

Deferred Compensation Program, including the [Compensation Incentive Plan] and [Equity

Incentive Plan], [and] Plaintiffs' individual arbitration agreements do not cover them."  (<u>Id.</u> at

18)  "[T]he ERISA plan[s] [thus] never agreed to arbitrate any claims."  (<u>Id.</u>)  Plaintiffs further

argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs'

right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of

ERISA" – namely, the ability to remediate the plans as a whole via a representative action.  (<u>Id.</u>

at 21)[13]

> Defendants respond that
>
> > [P]laintiffs do <u>not</u> actually bring these claims in a representative capacity. . . .
> > Here, [P]laintiffs seek the recovery of alleged benefits that were not paid **to them**,
> > and their claims "fall comfortably within the scope of § 502(a)(1)(B), which
> > allows a plan participant 'to recover benefits due to him,'". . . .  [P]laintiffs cannot
> > avoid their agreements to arbitrate their individual claims by slapping a
> > "representative" label on them. . . .
> >
> > [T]he plan need not agree to arbitrate claims that plaintiffs bring on their own
> > behalf. . . . The complaint here . . . alleges injuries that are personal to <u>these</u>
> > [P]laintiffs; the complaint individually describes each plaintiff's tenure at Morgan
> > Stanley and the deferred compensation each purportedly "earned" in that time and
> > now seeks.  Seeking "plan-wide relief" is not the same as seeking relief on behalf
> > of the plan, and plaintiffs' claims seeking benefits <u>from</u> the plan cannot "belong

---

[13]  Plaintiffs do not argue that § 502(a)(1) claims for benefits are, as a general matter, non-arbitrable.  Plaintiffs' claims for benefits are brought as part of the "two-step" Second Cause of Action, however, in which Plaintiffs first seek (1) reformation under § 502(a)(3), and then (2) recovery of benefits from the reformed plans pursuant to § 502(a)(1).  (Am. Cmplt. (Dkt. No. 58) ¶¶ 102-07)  <u>See Laurent v. PricewaterhouseCoopers LLP</u>, 945 F.3d 739, 747 (2d Cir. 2019) ("[W]e have previously affirmed the entry of a two-step reformation and enforcement remedy under ERISA.") (citing <u>Amara v. CIGNA Corp.</u>, 775 F.3d 510, 532 (2d Cir. 2014)).

to" the plan.  Plaintiffs' claims "belong to" themselves, not the "plan," and the plan has no say in whether to arbitrate them. . . .

Plaintiffs can obtain complete relief, if any, through their individual claims for benefits.  It makes no difference that plaintiffs purports to seek benefits on behalf of a putative class – plaintiffs' agreements to arbitrate their claims do not deprive any other putative class members of their ability to seek complete relief through their own § 502(a)(1)(B) claims. . . . Arbitration of plaintiffs' claims accordingly does not frustrate anyone's ability to obtain any ERISA remedy that they may be due.

(Def. Reply Br. (Dkt. No. 69) at 9-11 (quoting Frommert v. Conkright, 433 F.3d 254, 270 (2d

Cir. 2006) (in turn quoting 29 U.S.C. § 1132(a)(1)(B); further citations and quotations omitted;

alterations omitted) (emphasis in original))

Accordingly, this Court must determine (1) whether Plaintiffs' § 502(a)(2) claims

are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a

representative capacity; (2) whether Plaintiff's § 502(a)(3) claims are subject to arbitration,

notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; and (3)

whether arbitration would impermissibly curtail Plaintiffs' statutory rights.

### a.   ERISA § 502(a)(2) Claim for Breach of Fiduciary Duty

The Amended Complaint's Third Cause of Action alleges that

[t]he Compensation Committee is a fiduciary under the [Financial Advisor] Deferred Compensation Program because it is the administrator of the [Compensation Incentive Plan] and [Equity Incentive Plan] and is responsible for, among other things, reviewing and establishing the rules and procedures of the [Financial Advisor] Deferred Compensation Program, including the ability to determine that it is governed by ERISA.

ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries.  ERISA § 1104, 29 U.S.C. § 1104(a).  Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA.  Id.

ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but **only if** the plan's terms "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

The Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA.

. . . .

Plaintiffs and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 108-13, 117 (emphasis in original))

### i.    Applicable Law

ERISA § 502(a)(2), codified at 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought . . .  by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section [409] of this title."

ERISA § 409, codified at 29 U.S.C. § 1109, in turn provides that

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .

The "responsibilities, obligations, or duties imposed upon fiduciaries" are set out in ERISA § 404, codified at 29 U.S.C. § 1104, which provides in relevant part that fiduciaries must adhere to the "prudent man standard of care":

(a) Prudent man standard of care

(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

29 U.S.C. § 1104(a).

Thus, "ERISA imposes 'four distinct, but interrelated duties' on fiduciaries, including the duty of loyalty, the duty of prudence, the duty to diversify investments, and the duty to comply with the provisions of the plan." Anderson v. Advance Publications, Inc., No. 22 CIV. 6826 (AT), 2023 WL 3976411, at *2 (S.D.N.Y. June 13, 2023) (quoting Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 715-16 (2d Cir. 2013)).  "[T]these fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." Varity Corp. v. Howe, 516 U.S. 489, 496 (1996).

The Supreme Court has explained that it was "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes [of plaintiffs authorized to bring breach of fiduciary duty actions] is in the financial integrity of the plan." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 n.9 (1985); see also Browe v. CTC Corp., 15 F.4th 175, 205-06 (2d

Cir. 2021) ("[T]he remedies available under ERISA for fiduciary breaches are intended to provide relief to the subject plan as a whole, as opposed to any individual participant (or her beneficiary).").

Plaintiffs allege – and this Court agrees – that the deferred compensation programs at issue are "individual account plans."  (Am. Cmplt. (Dkt. No. 58) § 68)  Under ERISA, "[t]he term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), codified at 29 U.S.C. § 1002(34); see Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents, 533 F.3d 102, 104 (2d Cir. 2008) ("A 401(k) plan is a common defined contribution plan.").[14]  In the context of a defined contribution plan, § 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account," notwithstanding the tension between the individualized nature of each employee's pension and the representative nature of claims brought under § 502(a)(2). LaRue v. DeWolff, Boberg & Assocs., 552 U.S. 248, 256 (2008).

In Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006), the Second Circuit held that "the representative nature of the section 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent."  Coan, 457 F.3d at 259.  "[A]lthough plan participants need not always comply with Rule 23 to act as a representative of other plan participants or beneficiaries, those who do will likely be proceeding

---

[14]  By contrast, a "defined benefit plan" under ERISA "'conventional[ly] . . . credit[s] the employee with a specific percentage of salary for each year of employment.'"  Hirt, 533 F.3d at 104-05 (quoting Esden v. Bank of Bos., 229 F.3d 154, 158 n.4 (2d Cir. 2000)).

in a 'representative capacity' properly for purposes of section 502(a)(2)." Id. at 261 (footnote omitted).

### ii.    <u>Application</u>

In arguing that the procedural safeguards applicable to representative claims under § 502(a)(2) preclude compelled arbitration of their claims, Plaintiffs must – of course – establish that they have actually asserted representative claims under § 502(a)(2).

As both Plaintiffs and Defendants recognize (Pltf. Opp. (Dkt. No. 72) at 21; Def. Reply Br. (Dkt. No. 69) at 9-10), "section 409 of ERISA, 29 U.S.C. § 1109, on which the section 502(a)(2) right of action is based, requires plan fiduciaries '"to make good <u>to such plan</u> any losses <u>to the plan</u>"' resulting from a breach of fiduciary duty." <u>Coan</u>, 457 F.3d at 259 (quoting <u>Russell</u>, 473 U.S. at 140) (in turn quoting ERISA § 409(a), 29 U.S.C. § 1109(a)) (emphasis added in <u>Russell</u>).

Here, the Amended Complaint seeks – pursuant to § 502(a)(2) – "the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117)  This type of claim is not properly brought under § 502(a)(2), however, because it is not a claim for "losses to the plan."

While "ERISA does not define 'loss' as that term is used in section 409," <u>Donovan v. Bierwirth</u>, 754 F.2d 1049, 1052 (2d Cir. 1985), "its draftsmen were primarily concerned with the possible misuse of plan assets." <u>Russell</u>, 473 U.S. at 142.  "[T]he crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." <u>Id.</u> at 140 n.8.  Accordingly, the case law indicates that "loss" is defined with reference to investment losses or other financial diminutions of plan assets that are attributable to a fiduciary's mismanagement. <u>See Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.</u>, 843 F.3d 561, 567 (2d Cir.

2016) ("'If, but for the breach, the plan would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.'  Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested 'like other funds being invested during the same period in proper transactions.'") (quoting Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989), and Donovan, 754 F.2d at 1056) (alteration omitted).  And while the Supreme Court in LaRue held that § 502(a)(2) "authorize[s] recovery for fiduciary breaches" with respect to individual accounts, its holding is limited to "fiduciary breaches that impair the value of plan assets in . . . [such] account[s]."  LaRue, 552 U.S. at 256 (emphasis added).

Here, Plaintiffs have not alleged that the Compensation Committee – the alleged fiduciary – mismanaged plan assets or otherwise "impair[ed] [their] value" (LaRue, 552 U.S. at 256), such as by making imprudent or conflicted investment decisions, or by incurring unnecessary administrative costs.

Plaintiffs instead "seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants."  (Am. Cmplt. (Dkt. No. 58) ¶ 117)  Any such forfeited compensation, however, would be equivalent to "the balance of [each] individual's account" – which ERISA defines as an "accrued benefit" in an "individual account plan." ERISA § 3(23), codified at 29 U.S.C. § 1002(23).  The relief Plaintiffs seek in their § 502(a)(2) breach of fiduciary cause of action is thus redundant of their claim for benefits under § 502(a)(1), in which they seek to "recover their vested benefits [and] enforce their rights to the payment of their past vested benefits . . . after reformation [of the plan to comply with ERISA's anti-forfeiture rules]."  (Am. Cmplt. (Dkt. No. 58) ¶ 107; see Russell, 473 U.S. at 147 (explaining that ERISA provides for "an action pursuant to § 502(a)(1)(B) to recover accrued benefits").

In <u>L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of</u>

<u>Nassau Cnty., Inc.</u>, 710 F.3d 57 (2d Cir. 2013), the Second Circuit observed that "a 'claim for

benefits' under ERISA § 502(a)(1)(B)" is by definition distinct from "a claim for recovery of

'losses to the plan' caused by the fiduciaries' breach of duties under ERISA §§ 502(a)(2) and

409(a)." <u>Id.</u> at 66. <u>L.I. Head Start</u> cites with approval Chief Justice Roberts' concurring opinion

in <u>LaRue</u>, in which he states that "[i]f LaRue may bring his claim under § 502(a)(1)(B), it is not

clear that he may do so under § 502(a)(2) as well. . . . The significance of the distinction between

a § 502(a)(1)(B) claim and one under § 502(a)(2) is not merely a matter of picking the right

provision to cite in the complaint.  Allowing a § 502(a)(1)(B) action to be recast as one under

§ 502(a)(2) might permit plaintiffs to circumvent safeguards for plan administrators that have

developed under § 502(a)(1)(B)." <u>LaRue</u>, 552 U.S. at 258 (Roberts, C.J., concurring).

Moreover, other circuits have cautioned that plaintiffs may not use artful pleading

to bring what are, in reality, § 502(a)(1) claims, under § 502(a)(2).  See <u>Stephens v. Pension Ben.</u>

<u>Guar. Corp.</u>, 755 F.3d 959, 966 n.7 (D.C. Cir. 2014) ("[The] exception to the exhaustion

requirement [for § 502(a)(2) claims] does not embrace plan-based claims artfully dressed in

statutory clothing, such as where a plaintiff seeks to avoid the exhaustion requirement [of §

502(a)(1)] by recharacterizing a claim for benefits as a claim for breach of fiduciary duty.")

(quotation omitted); <u>Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc.</u>, 102

F.3d 712, 714 (4th Cir. 1996) ("Although [plaintiff employer] directs our attention to sections

502(a)(2) and (a)(3), the analysis of who may recover benefits under ERISA must begin with

section 502(a)(1)(B), the section which specifically provides a cause of action for benefits.

[Plaintiff employer's] description of its claim as one for breach of [defendant] Blue Cross'

fiduciary duty does not alter the fact that it is seeking medical benefits which it claims are owed

to [plaintiff's employee].  To permit the suit to proceed as a breach of fiduciary duty action

would encourage parties to avoid the implications of section 502(a)(1)(B) by artful pleading;

indeed <u>every</u> wrongful denial of benefits could be characterized as a breach of fiduciary duty

under [plaintiff's] theory.") (emphasis in original).

       The same reasoning applies here.  The Amended Complaint's Third Cause of

Action for breach of fiduciary duty is a disguised claim for benefits; while actually bringing a

claim under § 502(a)(1)(B), Plaintiffs invoke the procedural safeguards associated with a claim

under § 502(a)(2).  But because Plaintiffs have not alleged "losses to the plan," they are not, in

fact, proceeding in a representative capacity, and are therefore not entitled to the procedural

safeguards available under § 502(a)(2).

       In arguing that they have brought a § 502(a)(2) claim on behalf of the plans, and

therefore cannot be compelled to arbitrate, Plaintiffs cite <u>Cooper v. Ruane Cunniff & Goldfarb</u>

<u>Inc.</u>, 990 F.3d 173 (2d Cir. 2021), <u>Ferguson v. Ruane Cuniff & Goldfarb Inc.</u>, No. 17-CV-6685

(ALC), 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021), <u>Hawkins v. Cintas Corp.</u>, 32 F.4th 625

(6th Cir. 2022), and <u>Munro v. U.S.C.</u>, 896 F.3d 1088 (9th Cir. 2018).  (Pltf. Opp. (Dkt. No. 72) at

16, 18)

       In <u>Cooper</u>, the Second Circuit reversed a district court order granting defendant's

motion to compel arbitration of an employee's breach of fiduciary duty claim.  That claim had

been brought on behalf of a class of plan participants regarding the "catastrophic over-allocation

of Plan assets" to a single company's stock.  The motion to compel arbitration was premised on

an arbitration provision in an employee handbook that (1) applied to "all legal claims arising out

of or relating to employment," and (2) "prohibit[ed] joinder of multiple parties and class or

collective actions."  <u>Cooper</u>, 990 F.3d at 177-78, 184.  While the Second Circuit disagreed with

the district court's interpretation of the phrase "relating to employment" and reversed on that basis (id. at 180-84), the Circuit went on to state in dicta that the defendant's "[broad] reading of the Arbitration Agreement appears to make it impossible to bring an ERISA fiduciary action that satisfies both the Agreement and the Coan representative adequacy requirement." Id. at 184 (citing Coan, 457 F.3d at 261).

In Ferguson, the court applied the dicta in Cooper and, on that basis, rejected arbitration claimants' objections to certification of a settlement class regarding the same claims, made against the same third-party benefits administrator as in Cooper, even though the plan documents in Ferguson themselves – rather than an employee handbook – contained the arbitration provision. Ferguson, 2021 WL 3667979, at *3-4.

In Hawkins, plaintiff employees brought a putative class action, alleging that plan fiduciaries had breached the duty of loyalty and the duty of prudence by "offer[ing] participants the ability to invest only in actively managed funds, rather than more cost-effective passively managed funds[,] . . . [and by] charg[ing] the Plan imprudently expensive recordkeeping fees." Hawkins, 32 F.4th at 628. And in Munro, plaintiff employees, "as representatives of a class of participants and beneficiaries of the Plans," alleged that defendant plan administrators had "squandered [their negotiating] leverage by allowing the Plans' conflicted third party service providers – TIAA-CREF, Vanguard, Fidelity, and Prudential – to dictate the Plans' investment lineup, to link their recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products." Munro v. U.S.C., 16 Civ. 6191, Am. Cmplt. (Dkt. No. 40) ¶¶ 4-5 (C.D. Cal. Nov. 17, 2016). In these cases the Sixth and Ninth Circuits, respectively, held that plaintiffs could not be compelled to arbitrate based on arbitration provisions in their individual employment agreements, because

their breach of fiduciary claims "should be thought of as Plan claims, not [p]laintiffs' claims. And because the arbitration provisions only establish the [p]laintiffs' consent to arbitration, the employment agreements do not subject these claims to arbitration." Hawkins, 32 F.4th at 635; accord Munro, 896 F.3d at 1094.

These cases do not support Plaintiffs' arguments, because they involve significantly different factual circumstances. As described above, Cooper, Ferguson, Hawkins, and Munro all involve mismanagement of plan assets – i.e., straightforward "losses to the plan." Given these circumstances, plaintiffs properly raised claims under § 502(a)(2), and benefitted from the procedural safeguards available under that statutory provision. As discussed above, however, those procedural safeguards are not available to Plaintiffs, who have brought a disguised claim for recovery of benefits, rather than a true § 502(a)(2) claim. Cf. Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *5 (S.D.N.Y. Mar. 30, 2007) ("[a] court's . . . inquiry ultimately must focus on the factual nature of the claims rather than the . . . label that has been applied by the plaintiff") (quotation omitted).[15]

---

[15]  Plaintiffs have also not alleged a "breach[] [of] any of the responsibilities, obligations, or duties imposed upon fiduciaries." ERISA § 409(a), codified at 29 U.S.C. § 1109(a). Although the Amended Complaint alleges that "[t]he Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA" (Am. Cmplt. (Dkt. No. 58) ¶ 113), "'[t]rustees do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions, but rather, where the trustee fails to discharge one or more of the duties described in 29 U.S.C. § 1104.'  'The proposition that a trustee who administers a pension plan knowing it to be in violation of ERISA acts in violation of his fiduciary duties under ERISA, while perhaps facially attractive, is based on an overly broad reading of ERISA § 404(a), and comes to this court conspicuously unsupported by caselaw.'" Roe v. Empire Blue Cross Blue Shield, No. 12-CV-04788 NSR, 2014 WL 1760343, at *8 (S.D.N.Y. May 1, 2014) (quoting Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co., 387 F. Supp. 2d 175, 184-85 (E.D.N.Y. 2005)) (alterations omitted), aff'd, 589 F.

Having failed to allege a true § 502(a)(2) claim, Plaintiffs will not be heard to complain that claims under § 502(a)(2) are non-arbitrable.

### b.   ERISA § 502(a)(3) Claims for Equitable Relief

ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), provides that "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

The Amended Complaint asserts § 502(a)(3) claims in the first and second causes of action.  In the First Cause of Action,

> Plaintiffs seek a declaration that the [Financial Advisor] Deferred Compensation Program is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

> Plaintiffs also seek orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:

> a. A declaration that the [Financial Advisor] Deferred Compensation Program and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;

> b. An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;

> c. Surcharge;

> d. An "accounting" of all deferred compensation wrongfully withheld from [financial advisors] because of the Cancellation Rule;

> e. Disgorgement of all amounts wrongfully withheld;

---

App'x 8 (2d Cir. 2014).  Plaintiffs' failure to identify any fiduciary duty that the Compensation Committee breached supports this Court's conclusion that they have not brought a true § 502(a)(2) claim.

f.  Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

g.  A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiffs and the Class;

h.  An order granting Plaintiffs and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

i.  All other relief the Court determines is just and proper under its equitable powers.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 98-101)

In the Second Cause of Action, Plaintiffs assert that they and the putative class "are entitled to reformation of the [Financial Advisor] Deferred Compensation Program to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a)." (Id. ¶ 105)  As discussed above, the requested reformation is a prelude to recovery of benefits from the reformed plan under § 502(a)(1).  (Id. ¶¶ 106-07)

Plaintiffs argue that they "assert claims in a representative capacity under ERISA § 502(a)(3)," and "[t]hese representative claims should not be litigated in individual arbitrations."  (Pltf. Opp. (Dkt. No. 72) at 16-18)

The case law does not support Plaintiffs' assertion that (1) § 502(a)(3) claims must be brought on behalf of a plan, or (2) it is unlawful to compel individual arbitration of such claims.  To the contrary, the Supreme Court has held that – in contrast to § 502(a)(2) breach of fiduciary duty claims – "§ 502(a)(3) authorizes . . . lawsuit[s] for individual relief." Varity, 516 U.S. at 507.  And the case law indicates that plaintiffs who bring putative class actions alleging § 502(a)(3) claims may nevertheless be required to arbitrate their claims individually.  See Duke v. Luxottica U.S. Holdings Corp., No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *10 (E.D.N.Y. Sept. 30, 2023) (granting motion to compel arbitration of § 502(a)(3) claims brought

by plaintiffs on behalf of a putative class; stating that "the concerns [regarding procedural safeguards for § 502(a)(2) claims] do not apply").

Plaintiffs cite no case demonstrating that § 502(a)(3) claims are non-arbitrable. At best, Plaintiffs have cited case law stating that § 502(a)(3) claims are not inherently limited to individual relief.  See Banyai v. Mazur, No. 00 CIV. 9806 (SHS), 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007) ("[N]othing suggests that section 502(a)(3) authorizes only individual relief, thereby precluding suits seeking 'other appropriate equitable relief' – on behalf of the plan – against non-fiduciaries.") (emphasis in original).[16]

In sum, Plaintiffs have not demonstrated that their § 502(a)(3) claims are non-arbitrable.

### c.      Whether Arbitration Would Void Statutory Rights

The Supreme Court has held that courts cannot compel arbitration when enforcing an arbitration clause would entail a "prospective waiver of a party's right to pursue statutory remedies."  Italian Colors, 570 U.S. at 229 (quotation omitted).

Under the prospective waiver doctrine, courts have denied motions to compel arbitration where the arbitration provision at issue contains limitations on remedies that are inconsistent with ERISA.  See, e.g., Lloyd v. Argent Tr. Co., No. 22CV4129 (DLC), 2022 WL 17542071, at *3 (S.D.N.Y. Dec. 6, 2022) ("The Plan states that . . . arbitration cannot provide

---

[16] Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021) – also cited by Plaintiffs (Pltf. Opp. (Dkt. No. 72) at 17) – is not on point.  In Browe, the Second Circuit considered a district court post-bench trial opinion addressing, inter alia, § 502(a)(3) claims.  Browe, 15 F.4th at 188-89.  The court ordered the disbursement of an award on remand, and directed the district court to "include a mechanism enabling Plan participants not parties to this suit to receive any benefits to which they may be entitled."  Id. at 206.  Plaintiffs contend that this direction is an example of a plan-wide application of § 502(a)(3) relief.  (Pltf. Opp. (Dkt. No. 72) at 17)  The portion of Browe cited by Plaintiffs does not address § 502(a)(3), however, and it is thus not clear that § 502(a)(3) was the statutory basis for the disbursement.  See Browe, 15 F.4th at 206.

'any remedy which has the purpose or effect of providing additional benefits or monetary relief to any other Employee, Participant, or Beneficiary other than the Claimant.' . . . This provision imposes a limitation on relief that ERISA does not contain, and precludes remedies that ERISA expressly authorizes, such as the removal of a fiduciary."); Cedeno v. Argent Tr. Co., No. 20-CV-9987 (JGK), 2021 WL 5087898, at *2 (S.D.N.Y. Nov. 2, 2021) (same).

Prohibiting class treatment does not inherently limit statutory remedies, however, because class treatment is a procedural matter, and not a substantive right.  See Smith v. Bd. of Directors of Triad Mfg., 13 F.4th 613, 622 (7th Cir. 2021) ("[T]he problem with the plan's arbitration provision is its prohibition on certain plan-wide remedies, not plan-wide representation.  It is not that the plan funnels its participants away from class actions."); Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 408 (2010) (plurality opinion) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.  And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged.").[17]

Here, Plaintiffs argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of ERISA."  (Pltf. Opp. (Dkt. No. 72) at 21)  Plaintiffs have not

---

[17] To the extent that "the Second Circuit's opinion in Cooper indicates that the ability to bring a representative action is a 'statutory right' that an arbitration agreement cannot override," Lloyd, 2022 WL 17542071, at *4 (citing Cooper, 990 F.3d at 184), that is the result of Coan's requirement – reiterated in Cooper – that in § 502(a)(2) cases "'plan participants must employ procedures to protect effectively the interests they purport to represent.'"  Cooper, 990 F.3d at 184 (quoting Coan, 457 F.3d at 259).  As explained above, Coan's procedural requirements are not at issue here, because Plaintiffs have not brought a claim for "losses to the plan," as required by § 502(a)(2).  See Duke, 2023 WL 6385389, at *10 (holding that concerns regarding compelling arbitration of § 502(a)(2) claims do not apply in the § 502(a)(3) context).

identified any limitation on remedies that would apply in an arbitration, however, other than the class waiver. Moreover, the arbitration provisions in the Bonus Agreement and CARE Program Arbitration Agreement provide that "[a]rbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction." (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(g); see CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 5(d) (same)) Accordingly, Plaintiffs have not demonstrated that the prospective waiver doctrine applies.

*     *     *     *

For the reasons stated above, Plaintiffs have not demonstrated that the instant claims are outside the scope of the arbitration provisions to which they agreed.[18]

---

[18] Plaintiffs argue that "[i]ndividual arbitrations about whether the Cancellation Rule violates ERISA would undermine the uniform remedies that ERISA provides to participants." (Pltf. Opp. (Dkt. No. 72) at 24) But this argument is foreclosed by the Second Circuit's decision in Bird. See Bird, 926 F.2d at 122 ("We are not persuaded that the fact that federal common law is to be created and applied to ERISA disputes alleging breaches of fiduciary duties creates an inherent conflict with arbitration.").

## CONCLUSION

Defendants' motion to compel arbitration (Dkt. No. 65) is granted.  Because "the text, structure, and underlying policy of [Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested," Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015), the case will be stayed pending arbitration.

The Clerk of Court is directed to terminate the motion (Dkt. No. 65).

Dated: New York, New York
     November 21, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge