# Exhibit C

Page 1

1   IN THE MATTER OF THE ARBITRATION)

2   BETWEEN                         )

3   ALFREDO SERRANO, BRIAN PATRICK  )

4   THOMAS, DANIEL G. RAUP,         )

5   DEAN HEIL, et al.               )

6              Claimants,           )

7     vs.                           ) No. 22-02150

8   MORGAN STANLEY,                 ) c/w/ 22-02147

9              Respondent.          )

10

11              TRANSCRIPT OF PROCEEDINGS had at the

12   arbitration of the above-entitled matter, held

13   at 55 West Monroe, Suite 2600, Chicago,

14   Illinois, on the 27th day of February, 2024,

15   commencing at 9:00 a.m.

16

17   BEFORE:

18   MARK W. SOLOCK, Arbitrator

19   ALLEN GREENBERG, Arbitrator

20   CAROLINE N. HARNEY, Arbitrator

21

22   Reported by: Susan Haselkamp, CSR

23   License No. 084-004022

24

```
                                              Page 2
 1     APPEARANCES:
 2     On behalf of the Claimant:
 3          SALMANSON GOLDSHAW, PC, by
            MR. SCOTT GOLDSHAW,
 4          MS. CHRISTEN L. CASALE,
            Two Penn Center, Suite 1230
 5          1500 John F. Kennedy Blvd.
            Philadelphia, Pennsylvania 19102
 6          (215) 640-0593
 7               and
 8          ROSCA SCARLATO, by
            MR. ALAN ROSCA,
 9          2000 Auburn Drive
            Suite 200
10          Beachwood, Ohio 44122
            (216) 946-7070
11          arosca@rscounsel.law
12
       On behalf of the Respondent:
13
            O'MELVENY & MYERS, LLP, by
14          MS. MEAGHAN VERGOW,
            MR. ALEXANDER REED,
15          MR. CHRISTOPHER HUNT,
            MS. YOUJIN KWON,
16          MR. TIMUR AKMAN-DUFFY,
            1625 Eye Street, NW
17          Washington, DC 20006
            (202) 383-5368
18          mvergow@omm.com
            areed@omm.com
19
20          MR. MARK GREENFIELD, In-house counsel
21     ALSO PRESENT:
22          MS. KIMBERLY GROTENRATH
            MR. PETER HACKSHAW
23          MR. DANIEL RAUPP
            MR. HENRY ENNO
24          MR. GARY PHELPS
```

1    BY MR. HUNT:

2        Q.    So I believe, Mr. Bruce, yesterday you

3    testified that you did not receive a salary at

4    Morgan Stanley; is that right?

5        A.    As a financial advisor trainee, you do

6    receive a salary for a set amount of time before

7    you're licensed, go into production.

8        Q.    But then when you're not a trainee

9    anymore, do you receive a salary?

10       A.    You do.  There's a set draw.  So

11   there's an amount of money that you get on a

12   bimonthly basis, but that is netted against the

13   production of the advisor.

14       Q.    Let's go to Tab 4, that's JX76.  2015

15   Compensation Guide.  Let me know when you're

16   there, sir.

17       A.    Dash 676?

18       Q.    It's JX76.

19       A.    I'm there.

20       Q.    Okay.  So let's go to Bates number 655,

21   Section 1.1.1.  It says salary at the top.

22       A.    Okay.

23       Q.    Okay.  Is this -- is this the -- in the

24   first sentence here, it says, all FA/PWAs will

1    under the grid was subject to the rules and

2    conditions of the program?

3         A.   Yes.

4         Q.   And one of these conditions was --

5    well, strike that.

6              Let's look at Page 658 marked in the

7    bottom right corner.  And I'm going to direct

8    you to the very top, the first full sentence.

9    Could you please read that, beginning deferred

10   compensation?

11        A.   In the event --

12        Q.   Sorry.  The top line, first full

13   sentence above that first full paragraph.

14        A.   Deferred compensation awards are

15   contingent upon the FA/PWA remaining employed

16   through the grant investing dates of the award.

17        Q.   And you understand what it means for an

18   award to be contingent?

19        A.   Yes.

20        Q.   To do something else, or something has

21   to happen for the award to be earned?

22        A.   Yes.

23        Q.   And you understood this was one of the

24   rules and conditions of the program?

1  subject to the rules and conditions set forth in
2  this program; is that right?
3      A.   That is correct.
4      Q.   And you were eligible for other
5  potential awards detailed here, too, growth of
6  award, lending award.  Those aren't at issue in
7  this case, right?
8      A.   Correct.
9      Q.   And turning to the next page of the
10  Compensation Guide.  You were guaranteed a
11  monthly salary, right?
12      A.   I can't -- well, I mean, according to
13  1.1, this is what it says.  But I never thought
14  twice about it.
15      Q.   You know you made much more than the
16  salary ultimately, right?
17      A.   I just didn't think about it.  But
18  that's -- that was not -- I wasn't working for a
19  salary.  I was working to help my clients better
20  their situation.
21      Q.   I understand.  But you -- you
22  understand that the salary was guaranteed no
23  matter what?
24      A.   I'm reminded of that.

Page 130

1   credits based on your credit rate and creditable

2   revenue.  Do you see that?

3       A.   I do.

4       Q.   And you understood that your credit

5   rate is based on two factors, full year gross

6   revenue and length of service.  Do you see

7   that?

8       A.   Yes.

9       Q.   And you understood how to translate

10  that credit rate into compensation, right?

11      A.   That's correct.

12      Q.   So if we look at 1.2.3, the cash

13  compensation section of the Compensation Guide,

14  under calculation of cash credit advance.

15          ARBITRATOR SOLOCK:  Are you there?

16  Hold on.  It's Bates 658.

17          THE WITNESS:  Yes, I'm there.

18  BY MS. VERGOW:

19      Q.   Well, let's start at the beginning of

20  this section.

21      A.   Sure.

22      Q.   You understood that total credits less

23  deferred credits would be awarded as cash

24  credits, right --

Page 131

1        A.    Yes.

2        Q.    -- as it says here?

3        A.    Yes.

4        Q.    And that the cash credits would be

5    calculated monthly?

6        A.    Yes.

7        Q.    And those in this example are expressed

8    in terms of dollars --

9        A.    Okay.

10       Q.    -- right?

11       A.    Sure.

12       Q.    And then how that translated into money

13   in your pocket is detailed under calculation of

14   cash credit advance, right?

15       A.    Correct.

16       Q.    And so the cash credit advance was the

17   amount by which cash credits exceeded your

18   salary for the month, right?

19       A.    Sorry, could you restate that?

20       Q.    I'm just reading from the document.

21   Cash credit advance is the amount by which cash

22   credits exceed FA salary for the month.

23       A.    Yes.

24       Q.    So the money in your pocket every month

Page 132

1  was the amount of cash credits that you were

2  awarded in excess of your salary; is that

3  right?

4       A.    That is correct.

5       Q.    Okay.  And meanwhile, you also

6  received a deferred credit allocation; is that

7  right?

8       A.    I believe so.

9       Q.    And that was described in 1.2.2 of the

10 Compensation Guide.  And that's on the previous

11 page.

12      A.    Correct.

13      Q.    And at the beginning of that page, it

14 says, a percentage of total credits are

15 allocated to the financial advisor as deferred

16 credits based on the deferral ratio determined

17 by the full year gross revenue as shown in the

18 deferred ratio schedule below, right?

19      A.    Right.

20      Q.    And you understood how to do that

21 computation, right?

22      A.    I did.

23      Q.    And then the deferred compensation

24 section of the Comp Guide continues, and I'm

Page 133

1   looking at the first -- sorry, the final

2   paragraph on this page to explain how deferred

3   credits are translated into dollars in your

4   pocket, right?

5        A.   Are we looking at 657?

6        Q.   I'm looking at 657.

7        A.   Okay.

8        Q.   And it explains that the value of the

9   deferred credits for 2015 will not be paid to

10  the FA in cash on a current basis.  Do you see

11  that?

12       A.   I do.

13       Q.   But will instead be awarded as deferred

14  compensation shortly following year-end,

15  provided you're employed on that date, right?

16       A.   I understand, yeah.

17       Q.   And you understood that's how it

18  worked?  And then detailed here are the vesting

19  terms and -- detailed here is the form of the

20  award, 25 percent stock, 75 percent cash,

21  right?

22       A.   Yes.

23       Q.   And the vesting terms for those awards

24  are detailed here?

Page 134

1      A.   Yes.

2      Q.   And if you continue to the next page.

3   You understood that the award that's contingent

4   on your remaining employed during the grant

5   vesting date of the award?

6      A.   Yes.

7      Q.   And that this would become money in

8   your pocket when you were employed on the

9   vesting date, right?

10     A.   I understand what was written here,

11  yes.

12     Q.   Okay, all right.  Thank you.

13          I just want to look at one last

14  document with you.  Let's look at Tab 16 in your

15  binder.  And you can take a minute to peruse it.

16  This is an e-mail between you and

17  Adrienne Weissman.  Is that your wife?

18     A.   That is my wife.

19     Q.   And you were expressing to her some

20  views about the comp plan that was announced in

21  2014; is that right?

22     A.   Sure.

23     Q.   And that was the 2015 Compensation

24  Guide, right?

Page 205

1        A.    Before.

2        Q.    Okay.  We can put that down.

3              And I'm going to show you a document

4   that's been marked as Respondent's Exhibit 1.

5   This is the document I mentioned before, which

6   is data that was produced by Morgan Stanley in

7   this litigation.  And then admissibility has

8   been stipulated by Claimants.  It's in Tab 9 of

9   your binder.

10             All right.  So, Mr. Tiffner, this is a

11  lot of numbers.  What are we looking at on this

12  page here?  What's the title of this

13  spreadsheet?

14       A.    It says Financial Advisor EICP Awards

15  Dividends Cancellations and Conversions.

16       Q.    And the EICP is the awards issued under

17  the stock plan --

18       A.    That's right.  These are --

19       Q.    -- is that right?

20       A.    -- restricted stock unit awards.

21       Q.    Okay.  And what is -- this includes

22  date of respecting various things, right?  So

23  what does awards granted mean?

24       A.    That's the total number of shares that

 1    were granted.

 2        Q.   Okay.  Is it shares granted actually?

 3        A.   No.  These might be -- these might be

 4    awards.

 5        Q.   Well, let me just ask you a better

 6    question.

 7             When a financial advisor receives an

 8    EICP award, do they receive an award of units or

 9    an award of shares?

10        A.   I'm sorry.  Stock units.

11        Q.   Okay.  And what does dividends issued

12    referred to here?

13        A.   The awards have a dividend reinvestment

14    feature.

15        Q.   Okay.

16        A.   So the stock units would earn

17    additional stock units at the point that Morgan

18    Stanley declares a dividend.

19        Q.   Okay.  Let me ask -- let me ask you.

20    Can you explain the difference between a unit

21    and a share?

22             ARBITRATOR SOLOCK:  Thank you.

23             MS. VERGOW:  Yes.

24             THE WITNESS:  So a restricted stock

Page 207

```
 1    unit is a promise to deliver a share of Morgan

 2    Stanley stock following a vesting period.

 3              Is it that fast?  I'm sorry.

 4              ARBITRATOR SOLOCK:  Is it a one-to-one

 5    correspondence?

 6              THE WITNESS:  Generally, yeah.

 7              ARBITRATOR SOLOCK:  Okay.

 8              THE WITNESS:  And then a share is

 9    common stock of Morgan Stanley.

10              ARBITRATOR SOLOCK:  Right, right,

11    right.

12    BY MS. VERGOW:

13       Q.   So you're awarded a unit --

14              ARBITRATOR SOLOCK:  It's a promise,

15    right?

16              THE WITNESS:  It's a promise to

17    deliver, that's right.

18    BY MS. VERGOW:

19       Q.   And then dividends may issue --

20       A.   Correct.

21       Q.   -- on Morgan Stanley common stock in

22    the meantime.  And let's go to the last column.

23    What happens when an award is converted?  What

24    does that mean?
```

1      A.    That's essentially when the restricted

2    stock unit converts to a share of Morgan Stanley

3    stock.   That's the income event for the

4    individual.

5      Q.    Okay.

6            ARBITRATOR SOLOCK:  Could I ask a

7    question, just so I understand?

8            When the promise is made, the share --

9    the stock might be worth a certain amount,

10   correct?

11           THE WITNESS:  Correct.

12           ARBITRATOR SOLOCK:  When it matures or

13   vests, do they get the amount that it was --

14   when it was first promised or do they get the

15   amount that it's worth upon distribution?

16           THE WITNESS:  So they get the amount at

17   the point of distribution.

18           ARBITRATOR SOLOCK:  So that could have

19   increased, correct?

20           THE WITNESS:  Correct.

21           ARBITRATOR SOLOCK:  I have the same

22   question for cash.  They're made a promise of

23   deferred compensation in cash.

24           THE WITNESS:  Correct.

Page 209

1              ARBITRATOR SOLOCK:  And starting in
2     2015, there was an eight-year vesting period,
3     correct?
4              THE WITNESS:  Correct.
5              ARBITRATOR SOLOCK:  And that changed
6     from 2014 when it was a six-year vesting period,
7     correct?
8              THE WITNESS:  2014 was also eight
9     years.
10             ARBITRATOR SOLOCK:  When did it change
11    from six years to eight years?
12             THE WITNESS:  They went from eight
13    years to six years in 2016.  It got shorter.
14             ARBITRATOR SOLOCK:  Oh, it got shorter?
15             THE WITNESS:  Yeah, it got shorter.
16             ARBITRATOR SOLOCK:  Okay, all right.
17    Now, my question is hypothetically you're made
18    a promise of $100 if you stay four years,
19    correct?
20             THE WITNESS:  You're awarded a grant.
21             ARBITRATOR SOLOCK:  Yes.  But it hasn't
22    matured, it hasn't vested?
23             THE WITNESS:  That's correct.
24             ARBITRATOR SOLOCK:  So what goes on

Page 210

1    with that $100?  Is it invested, does it grow?

2              THE WITNESS:  So in the deferred cash

3    plan specifically?

4              ARBITRATOR SOLOCK:  Yes, yes.

5              THE WITNESS:  So in deferred cash

6    plans, the individuals have the ability to

7    notionally allocate their dollars against a

8    series of funds.

9              So they choose to reallocate those

10   dollars, again, in notional funds.  They're not

11   actually invested in anything.  That's what I

12   mean by notional.  And they get the returns of

13   those underlying funds at the point of the

14   distribution.  So in your $100 example, if they

15   choose poorly --

16             ARBITRATOR SOLOCK:  They could go

17   down.

18             THE WITNESS:  -- they could go down.

19             ARBITRATOR SOLOCK:  And if they choose

20   wisely, it could go up?

21             THE WITNESS:  Correct.

22             ARBITRATOR SOLOCK:  And what if they

23   don't choose at all?

24             THE WITNESS:  They would get a money

Page 211

1    market rate of return.  So a very -- a very

2    nominal rate of return.

3                ARBITRATOR SOLOCK:  Okay.  So the money

4    is put somewhere?

5                THE WITNESS:  Correct.  There's a

6    hedging portion that goes behind the programs.

7                ARBITRATOR SOLOCK:  Okay.  That's all I

8    want to ask.

9                MS. VERGOW:  I want to clarify that.

10   BY MS. VERGOW:

11       Q.   When you say the money, are you

12   familiar with the term rabbi trust?

13       A.   Yeah.  That's for the equity awards.

14       Q.   Okay.  And so for the notional -- the

15   cash awards, when those are paid, where are

16   those paid from?

17       A.   So the cash awards are paid as

18   compensation dollars at the point of the

19   distribution.

20       Q.   Okay.  But where does the money come

21   from?  Is it held in an account somewhere?

22       A.   No, no.

23       Q.   Okay.  That's what I want to clarify.

24       A.   Yeah.  No, there's no money held in an

Page 212

1    account for the person at all.

2        Q.    Okay.

3        A.    It's an obligation to pay, so from --

4            ARBITRATOR SOLOCK:  So there's -- it's

5    not like that money is invested anywhere?

6            THE WITNESS:  Correct.  We could -- we

7    could choose to do it that way, but we don't.

8    It's not a --

9            ARBITRATOR SOLOCK:  But what if they

10   have a notional, is that the right term?

11           THE WITNESS:  Notional, yes.

12           ARBITRATOR SOLOCK:  They can elect to

13   declare a notional place to put it?

14           THE WITNESS:  They could declare to

15   invest it notionally in an investment vehicle,

16   some mutual fund.

17           ARBITRATOR SOLOCK:  And then you would

18   do that for them?

19           THE WITNESS:  They would just get the

20   return of that.  They don't actually get

21   invested in anything.  So if it's --

22           ARBITRATOR SOLOCK:  Right, right,

23   right.  But you would -- you would --

24           THE WITNESS:  Guaranty the returns.

Page 213

1              ARBITRATOR SOLOCK:  Exactly.  And you

2     would just monitor where they had it and see

3     what -- what that -- what instrument, how it

4     performed, correct?

5              THE WITNESS:  And from our perspective,

6     if let's say they had a 5 percent rate of

7     return, we're guarant -- I won't say guarantied.

8     But we're giving them the 5 percent rate of

9     return at the point of distribution.

10             ARBITRATOR SOLOCK:  Okay.

11    BY MS. VERGOW:

12       Q.    And the notional investments, those are

13    tracked in a bookkeeping account --

14       A.    That's correct.

15       Q.    -- is that right?

16       A.    Yes.

17       Q.    And they're given a menu of notional

18    investments to choose from --

19       A.    That's correct.

20       Q.    -- that they could select?

21             THE COURT REPORTER:  I'm sorry, please

22    wait before you start.

23    BY MS. CASALE:

24       Q.    And, Mr. Tiffner, when -- when is the

Page 214

1    stock conversion -- when is the stock award

2    taxed?

3         A.    At the point --

4         Q.    Is it taxed at the point of award or

5    when it converts?

6         A.    At the point of conversion.

7         Q.    Okay.  When is the cash award taxed?

8         A.    At the point of distribution.

9         Q.    Okay.  Are there exceptions to that?

10        A.    The FICA is the only exception to

11   the --

12        Q.    Okay.  Can you explain -- I don't want

13   to get too wonky, but I just want to make sure

14   we've got it in the record.

15             What does it mean to have to pay your

16   FICA tax?

17        A.    So the way that they look at FICA tax

18   from an IRS perspective, it's based on a

19   substantial risk of forfeiture.  So the concept

20   of substantial risk of forfeiture essentially

21   says that if someone is retirement eligible,

22   they're making an assumption in a conservative

23   way that that person will ultimately receive the

24   benefit of that program.

Page 215

1          So we have to take the FICA tax from
2    the individual in advance of the scheduled
3    distribution date.  And there's an exception
4    under the program that allows us to do so.  So
5    there is an acceleration of payment that
6    100 percent goes to pay the taxes on behalf of
7    the individual.
8          And then they remain in the program and
9    are paid out on schedule for the remainder of
10   the award that's there at the point of the
11   scheduled distribution date.
12         ARBITRATOR SOLOCK:  So you make the
13   FICA distribution before they've actually
14   received the money?
15         THE WITNESS:  That's correct.
16         ARBITRATOR SOLOCK:  What if they never
17   receive the money?
18         THE WITNESS:  So then they would be
19   able to through their taxes get a refund for the
20   FICA portion of it.
21         ARBITRATOR SOLOCK:  Okay.  Thank you.
22   BY MS. VERGOW:
23     Q.  Okay, all right.  Let's go back to the
24   chart, Mr. Tiffner.

Page 216

1          So we've got here the amounts.  We've

2     got a column for converted and we've got a

3     column for cancelled.  What does that mean?

4          A.   These would be awards that were

5     cancelled because they were unvested or

6     potentially violated the one of the terms of the

7     program.

8          Q.   Okay.  And so just explain if you would

9     for the Panel what's depicted here.  What

10    information do we have and about what?

11         A.   Essentially that the majority of the

12    awards that are granted are actually paid out to

13    individuals.

14         Q.   Okay.  So let's look at the 2015 plan

15    year as an example here.  So we have in the row

16    for 2015 plan awards that were granted in

17    January 2016.  Do you see that?

18         A.   I do.

19         Q.   What were the awards granted?

20         A.   What instrument were they granted?

21         Q.   No.  What was the figure?

22         A.   3.9 million.

23         Q.   Okay.  And that's 3.9 million units

24    were awarded?

1      A.    Restricted stock units, correct.

2      Q.    Okay.  And then the next column says

3  359,000 dividends issued.  What does that mean?

4      A.    So they're -- and depending what the

5  dividend rate was at the time, these were

6  reinvested dividends that were also granted to

7  the underlying awards.

8      Q.    Okay.  So the advisor eventually gets

9  the actual share of stock, they also get

10  additional shares to account for the dividends

11  that were paid in the intervening period?

12      A.    That's correct.  It's a dividend

13  reinvestment program.

14      Q.    Okay.  And the next column is

15  cancelled.  What does that reflect?

16      A.    Those would be awards that were

17  cancelled as part of this program year.

18      Q.    And so for this year, 441,000 and

19  change units were cancelled; is that right?

20      A.    That's what it says, yes.

21      Q.    And then the last column, converted.

22  What does that mean?

23      A.    Those are the amounts that would have

24  ultimately converted to the individuals as part

Page 218

1    of payments.

2         Q.    Okay.  So proportionately, roughly -- I

3    don't know if you -- you may be better at math

4    than I am.  What proportion of awards were

5    cancelled relative to the overall awards

6    granted?

7         A.    It's 8 percent, 9 percent, somewhere in

8    that neighborhood.

9         Q.    Okay, all right.  Let's -- let's look

10   at the next page.

11            All right.  More data.  Now, what are

12   we looking at here?

13        A.    This is financial advisor EICP share

14   conversions by current employees versus former

15   employees.

16        Q.    Okay.  And conversions to current

17   employees what does that mean?

18        A.    These are in-service distributions from

19   the program.

20        Q.    Okay.  And conversions to former

21   employees.  What does that mean?

22        A.    These would have been conversions of

23   stock units to employees who have terminated.

24        Q.    And total conversions, what's that?

Page 219

```
 1      A.   It would be the aggregate of the two
 2  columns.
 3      Q.   And, again, can you tell roughly what
 4  proportion of conversions went to former
 5  employees out of total conversions?
 6      A.   Probably in the same neighborhood.
 7      Q.   Okay.  And how would there be
 8  conversions to former employees?
 9      A.   The hardship, you know, conversion are
10  in there, death, disability, retirement
11  eligibility involuntary.
12      Q.   Okay.
13           MS. VERGOW:  I've got a demonstrative
14  that I will use for demonstrative purposes only
15  to aid the witness' testimony.
16  BY MS. VERGOW:
17      Q.   I'm going to show you a demonstrative
18  that captures this data in pictorial form.  Can
19  you explain just walking through what -- what
20  we're looking at here?
21      A.   Do I have it here?
22      Q.   You have it here.
23      A.   My eyes are not that good.
24      Q.   You can use the data.  Maybe the Panel
```

1  can review the bar charts.  It would be easier

2  this way.

3      A.   That's the next section, okay.

4           This looks like on a percentage basis

5  what percentage of the awards were converted for

6  current versus former employees.

7      Q.   Okay.  And it's very -- I don't know if

8  it's possible to magnify it at all.  It's

9  very -- that's a little bit better.  So we see

10  in 2009 -- I won't -- you know, under 10 percent

11  across?

12      A.   It seems like under 10 percent is the

13  going rate.  The red is the former employees,

14  blue is the active employees.

15      Q.   All right.  Let's do the same exercise

16  briefly for the cash awards.  And we're going to

17  here look at the next page, which is Bates

18  stamped 24013.  What are we looking at here?

19      A.   This looks like stock unit conversions

20  in aggregate.

21      Q.   I'm sorry.  24013, the heading.  Are

22  you in Tab 9?

23      A.   I may be in the wrong tab.  I'm sorry.

24  I'm in Tab 10.

1          Q.    Okay.  Go back to Tab 9.

2                ARBITRATOR SOLOCK:  Me, too.

3                MS. VERGOW:  I'm sorry.

4    BY MS. VERGOW:

5          Q.    Go to Tab 9.  I'm sorry?

6          A.    Okay.  I'm there.

7          Q.    Okay.  So on Tab 9, Bates

8    stamped 24013.

9          A.    So this is financial advisor MSCIP

10   awards, cancellations, distributions and current

11   balances.

12         Q.    Okay.  And let's walk through what's

13   depicted here.  So awards granted, is that in

14   units or is it denominated as dollars?

15         A.    These are -- these are dollars.

16         Q.    And why is that?

17         A.    Because it's deferred cash.

18         Q.    Okay.  And cancelled, what does that

19   mean?

20         A.    These are -- similarly, these would be

21   awards that were cancelled from that specific

22   award year.

23         Q.    Okay.  And distributed?

24         A.    Those are payments to individuals.

Page 222

1      Q.    All right.  And then looking at 2018

2  and 2019.  Do you see a current balance there?

3  What does that mean?

4      A.    Those are awards that have not yet

5  distributed.

6      Q.    Okay.  And under distributed, though,

7  we see that some amounts have been paid out.

8  What's that?

9      A.    More than likely that's the FICA

10  portion that I described before, the accelerated

11  FICA.

12      Q.    Okay.

13      A.    It could be someone who decide, also.

14  But it's a small number, so it could be either

15  one.

16      Q.    Okay, all right.  And turning to the

17  next page.  What are we looking at here?

18      A.    Financial advisor MSCIP distributions

19  by current employees versus former employees.

20      Q.    Okay.  And let's look at 2015 as an

21  example.

22      A.    Okay.

23      Q.    What does that show?

24      A.    $347 million was distributed to active

Page 223

1    employees.

2        Q.   Okay.  And how about to current

3    employees?

4        A.   You mean former employees?

5        Q.   I'm sorry.  Yeah, former employees.

6        A.   It would have been $78 million.

7        Q.   And proportionately what proportion of

8    the payments went to former employees?

9        A.   A very small percentage went to former

10   employees.

11       Q.   All right.  And let's look at the

12   demonstrative, again.  And this is in Tab 10 of

13   your binder.  And I will -- actually, let me lay

14   some foundation now.

15           Did you confirm that the ratios

16   depicted in these demonstratives corresponded

17   with the data in the chart?

18       A.   I didn't calculate each one

19   individually, but the numbers were --

20       Q.   Okay.  Then I won't ask you anything

21   else.  But for demonstrative purposes then,

22   looking at Page 3 of this and consulting your

23   data, how much of the cash awards were

24   distributed to former employees relative to

Page 224

1    current employees year over year?

2        A.    Slightly higher percentage, but not the

3    majority.

4        Q.    Okay.  And overall, and here we'll look

5    at these pie charts in our demonstrative across

6    all of these years, what proportions of payments

7    under these awards went to former employees

8    relative to current employees?

9        A.    So in the case of the equity awards, it

10   was 8 percent went to former employees and then

11   for the deferred cash awards, it was just under

12   15 percent went to former employees.

13       Q.    Okay, all right.  Thank you for bearing

14   with us.  We're done with the data.

15            All right.  You mentioned, Mr. Tiffner,

16   that one of Executive Comp's roles in connection

17   with deferred compensation was communications

18   with FAs; is that right?

19       A.    That's correct.

20       Q.    The Panel has already seen a lot of

21   those, but let's look at those briefly now.  I'd

22   like you to turn to Tab 11 in your binder, which

23   is Joint Exhibit 127.

24       A.    I'm there.

Page 283

1      Q.    You mentioned you have branch managers
2  reporting in to you.  About how many branch
3  managers report to you?
4      A.    Three.
5      Q.    And do you have any other direct
6  reports?
7      A.    I do.
8      Q.    Roughly, how many direct reports do you
9  have?
10     A.    About 80.
11     Q.    And how many financial advisors do you
12  oversee in the Chicago west market?
13     A.    160.
14     Q.    So I believe you said you worked at
15  three different firms in the brokerage industry,
16  Prudential, UBS and now Morgan Stanley?
17     A.    Correct.
18     Q.    And that was over 38 years?
19     A.    Correct.
20     Q.    In your role at Morgan Stanley
21  currently, are you involved in the recruitment
22  of financial advisors?
23     A.    I am.
24     Q.    And about what portion of your current

Page 284

1   responsibilities relates to the recruitment of

2   financial advisors?

3       A.   About 50 percent, about half my time.

4       Q.   And what specific responsibilities do

5   you have with respect to recruitment?

6       A.   I'm involved in the sourcing, either

7   through my own efforts or using a recruiter,

8   professional recruiter; I'm involved in talking

9   to them about compensation, about their deal,

10  transition packages; I'm involved in onboarding

11  or my team would be to, making sure they can

12  bring their accounts over, things like that.

13      Q.   About how many conversations with

14  recruits or potential recruits have you had in

15  your career at Morgan Stanley?

16      A.   It's north of 100.

17      Q.   What about in your career generally?

18      A.   If you include UBS, maybe 130, 140.  A

19  few years at UBS.

20      Q.   And how many financial advisors have

21  you successfully recruited to Morgan Stanley?

22      A.   Just about 40.

23      Q.   In those recruiting conversations, have

24  you had the opportunity to learn what

1      A.    Yes.

2      Q.    So let's just stay on that fourth

3  paragraph.  And could you please read the

4  sentence in the middle that begins, in view of

5  these purposes.  And you can read through

6  Subsection 2.

7      A.    In view of these purposes, you will

8  earn your 2015 award only if you remain in

9  continuous employment through the scheduled

10  vesting date, subject to limited exceptions as

11  set forth below; Number 2, do not engage in any

12  prohibited activity.

13      Q.    Has a financial advisor ever expressed

14  confusion to you regarding this language?

15      A.    They have not.

16      Q.    So you just mentioned keeping employees

17  or retention as a purpose of the deferred

18  compensation awards.  How does retention of

19  financial advisors benefit Morgan Stanley?

20      A.    So if the employees -- if the advisors

21  stay with us, the clients that they bring on

22  board stay with us.  Those clients generate

23  revenues for the firm, and that's how we pay the

24  financial advisors.

Page 326

1      A.   Based on certain things happening,

2   yes.

3      Q.   Okay.

4           MR. GOLDSHAW:  I have nothing further.

5           ARBITRATOR SOLOCK:  Any redirect based

6   on that testimony?

7           MR. REED:  A little, one or two

8   questions.

9                REDIRECT EXAMINATION

10  BY MR. REED:

11     Q.   Mr. Raman, I believe during your direct

12  testimony, you stated that in your recruiting

13  discussions, you never spoken with someone who

14  had unvested deferred comp that wasn't subject

15  to cancellation?

16     A.   Correct.

17     Q.   Do you ever require those recruits,

18  when you're considering a compensation package

19  or transition package to compensate them, to

20  show you proof that their deferred comp is being

21  cancelled at their prior firm?

22     A.   Yes, I do.

23          MR. REED:  No further questions.

24          ARBITRATOR SOLOCK:  Any recross based