# Exhibit D

```
                                                             Page 1

                            ARBITRATION

    ALFREDO SERRANO, BRIAN PATRICK    )
    THOMAS, DANIEL G. RAUPP, DEANNE   )
    HEIL, et al.,                     )
                                      )
                    Claimants,        ) No. 22-02150
                                      ) c/w/ 22-02147
            vs                        )
                                      )
    MORGAN STANLEY,                   )
                                      )
                    Respondent.       )
    ----------------------------------)

            REPORT OF PROCEEDINGS had at the arbitration in

    the above-entitled cause commencing on the 28th day of

    February, 2024, at 55 West Monroe, Suite 2600, Chicago,

    Illinois, at the approximate hour of 9 o'clock a.m.


    BEFORE:

    MARK W. SOLOCK, Arbitrator

    ALLEN GREENBERG, Arbitrator

    CAROLINE N. HARNEY, Arbitrator



    Reported Stenographically by
    Angela J. Galipeau, RPR, CSR-IL
    Notary Public, State of Indiana
    Job No. 6486020
```

```
 1      APPEARANCES:
 2        On behalf of the Claimants:
 3              MR. SCOTT GOLDSHAW, ESQ.
                MS. CHRISTEN L. CASALE, ESQ.
 4              Salmanson Goldshaw, P.C.
                1500 John F. Kennedy Boulevard
 5              Philadelphia, Pennsylvania 19102
                (215) 640-0593
 6
                MR. ALAN L. ROSCA, ESQ.
 7              Rosca Scarlato, LLC
                2000 Auburn Drive, Suite 200
 8              Beachwood, Ohio 44122
                (216) 946-7070
 9
10        On behalf of the Respondent:
11              MS. MEAGHAN VERGOW, ESQ.
                MR. ALEXANDER REED, ESQ.
12              MR. CHRISTOPHER HUNT, ESQ.
                MR. TIMUR AKMAN-DUFFY, ESQ.
13              O'Melveny & Myers, LLP
                1625 Eye Street, NW
14              Washington, DC 20006
                (202) 383-5368
15
                MR. MARK GREENFIELD, ESQ., In-House Counsel
16              Morgan Stanley;
17
          ALSO PRESENT
18              MS. KIMBERLY GROTENRATH.
19                        *      *      *
20
21
22
23
24
25
```

1      their awards?
2                 MS. CASALE:  Objection to relevance.  And if I
3          may, there's a continuing objection to this line of
4          inquiry, but I believe Ms. VerGow listed testimony
5          from the claimants regarding whether they themselves
6          submitted questions regarding how the compensation
7          plan worked.  And while I maintain that that
8          testimony was not relevant, whether other financial
9          advisors asked questions certainly would not be.
10                ARBITRATOR SOLOCK:  Well, relevancy has a very
11         low standard.  So that objection will be overruled,
12         and you may answer the question.  Do you need the
13         question repeated?
14                THE WITNESS:  Yes, please.
15     BY MS. VERGOW:
16     Q.  I believe the question was did you receive any questions
17         from financial advisors who expressed confusion about how
18         the vesting and cancellation terms of these awards worked.
19     A.  I don't recall having anything that made it to me in terms
20         of vesting schedules and what are they, and we certainly
21         had opinions about deferred compensation, but [inaudible].
22     Q.  Okay.  And based on your interactions with the field and
23         your interactions with advisors and branch managers and
24         these councils and so on, did you form any impressions
25         about whether financial advisors at Morgan Stanley

Page 22

```
 1        genuinely understood how this deferred compensation works?
 2    A.  Advisors understood how deferred compensation works, yes.
 3        Again, not something specific to just Morgan Stanley.
 4        Plenty of other firms actually have deferred compensation
 5        as well.  So it was very widely understood.
 6    Q.  All right.  Let's dig a little more deeply into the plan's
 7        purposes.  At a high level again, what are the primary
 8        purposes of the deferred compensation awards to financial
 9        advisors?
10    A.  We're incenting for advisors to stay at the firm, and
11        we're incenting advisors for good guardianship,
12        professional and ethical standard.
13    Q.  And what are the mechanisms by which you're able to
14        enforce those incentives?
15    A.  So we have the cancellation terms we've talked about.  So
16        if you're in the vesting period, they don't uphold those
17        two standards, then we have a right to cancel.  We do also
18        have described in the policy something described as a
19        clawback, which is even after the award has been granted,
20        and then the vesting period has ended, we have some right
21        to be able to pull that back off after the fact.
22    Q.  Why is retaining advisors so important to Morgan Stanley?
23    A.  If you're retaining advisors, you're retaining talent,
24        retaining revenue generation, retaining assets and
25        relationships of clients.  It's incredibly important to us
```

| | | |
|---|---|---|
| 1 | | that we are building a franchise.  We have shareholders. |
| 2 | | Therefore, we want to retain our advisors. |
| 3 | Q. | And why was it important to Morgan Stanley to promote good |
| 4 | | guardianship? |
| 5 | A. | Good guardianship has a number of aspects, right?  So just |
| 6 | | culture of a firm and how we all work together.  We have |
| 7 | | regulatory bodies that are also looking at us and working |
| 8 | | with us as to how we maintain our professional standards. |
| 9 | | So it was incredibly important that we had these tools -- |
| 10 | | have these tools. |
| 11 | Q. | Did you form any impressions while you were the head of |
| 12 | | OBM about whether promoting these practices benefits |
| 13 | | financial advisors as well? |
| 14 | A. | So the benefit to advisors, they have compensation at the |
| 15 | | end of the vesting schedules, right?  So this is still |
| 16 | | compensation to them ultimately at the end.  In terms of |
| 17 | | retention, yes, we believe that we are a franchise that |
| 18 | | could build practices, help them.  Therefore, we believe |
| 19 | | there's a benefit in staying and being good actors. |
| 20 | Q. | All things being equal, a financial advisor would like to |
| 21 | | be affiliated with a strong brand? |
| 22 | A. | Yeah.  We believe we have a strong brand, and we believe |
| 23 | | advisors want to orient to that. |
| 24 | Q. | Morgan Stanley maintains a code of conduct? |
| 25 | A. | We do.  We have an employee code of conduct.  So every |

| | | |
|---|---|---|
| 1 | | year, every employee has to sign up for the employee code |
| 2 | | of conduct. |
| 3 | Q. | And what does that set out at a high level? |
| 4 | A. | Again, the professional and ethical standards we're held |
| 5 | | to. |
| 6 | Q. | And I think you mentioned Morgan Stanley regulators. |
| 7 | A. | Correct. |
| 8 | Q. | Did you participate in discussions with regulators where |
| 9 | | they expressed to you an interest in good guardianship? |
| 10 | A. | I worked directly with many regulatory bodies, and |
| 11 | | deferred compensation and incentive compensation overall |
| 12 | | was the core part of my conversation with them. |
| 13 | Q. | Can you identify the regulators you discussed this with? |
| 14 | A. | So we've worked with FINRA, OCC, SEC, Federal Reserve. |
| 15 | | We've spent time with a lot of regulatory bodies. |
| 16 | Q. | And what was your understanding of these regulators' role |
| 17 | | in enforcing good guardianship at Morgan Stanley? |
| 18 | A. | So my conversations less maybe about enforcement, more |
| 19 | | about how do you build policy, how do you build practice |
| 20 | | that is going to not over-incent towards bad behaviors, |
| 21 | | but also making sure we have the catch if there were to be |
| 22 | | bad actors.  So there's always this balancing act with our |
| 23 | | regulatory bodies, understanding what is the best path |
| 24 | | forward.  And obviously some of that was leaving us with |
| 25 | | recourse if we needed to. |

Page 25

```
1    Q.   And what do you recall from your discussions with those
2         regulators about what they wanted to understand about how
3         compensation was incentivizing good conduct or perhaps
4         incentivizing bad conduct?
5    A.   So, again, this aspect of what controls do we have and
6         then what happens should we trigger those controls, and we
7         discovered something that's not with the standard we
8         thought, what recourse do we have.  And deferred
9         compensation was definitely a key part of the topic.
10   Q.   Was this one conversation or many?
11   A.   Many.  Over the years, we had an open dialogue with many
12        of our regulatory bodies about what we were doing with
13        policy design and staying the course with our agreed
14        discussions.
15   Q.   And did you specifically discuss the cancellation
16        provisions of these awards in these discussions?
17   A.   Very much so.  Early on, as they were getting more
18        familiar in my tenure with those policies, we went into
19        some depth about what those conditions were.  And then
20        over the years, it was more of a how things changed; are
21        you thinking about changing.  So that was kind of the
22        nature of the time.
23   Q.   And you mentioned the Fed was one of the regulatory bodies
24        you interacted with?
25   A.   That's correct, yes.
```

Page 26

```
 1   Q.  At a general level, what's the Fed's regulatory -- I'm
 2       sorry.  What is the Fed?  I'm using shorthand.  What's the
 3       Fed?
 4   A.  Federal Reserve.
 5   Q.  Okay.  And what is the Federal Reserve's regulatory
 6       relationship with Morgan Stanley?
 7   A.  Can you clarify the question?
 8   Q.  How does -- what regulatory responsibility does the Fed
 9       have in your understanding with respect to Morgan Stanley?
10   A.  So, I mean, a number of aspects.  More particularly
11       through the area I was attuned to, wanted to make sure,
12       again, these general acts of good guardianship over time,
13       and that we weren't over-incenting for malbehavior.
14   Q.  And the Fed would conduct periodic exams --
15   A.  That's correct, yes.
16   Q.  -- of Morgan Stanley?
17           Okay.  And you discussed the cancellation with the
18       Fed?
19   A.  Absolutely, yes.
20   Q.  I'm going to show you an e-mail that is at tab 2 of your
21       binder.  This is an e-mail between you and someone named
22       Carla Lien on September 21, 2015.
23   A.  That's correct.
24   Q.  Who is Carla Lien?
25   A.  She was in the admin office for the head of field
```

Page 27

1          management at the time.
2    Q.    Okay.  And can you explain what you were discussing with
3          Ms. Lien in this e-mail?
4    A.    So you will find on these two pages a summary of our
5          controls and a high-level summary where it's relevant to
6          guardianship from our -- both our branch manager and our
7          advisor compensation policies.
8    Q.    Let me take a step back.  The subject line is "Fed Deck,
9          Revised Comp page."  So what is this that we're looking at
10         on this page?
11   A.    My assumption from this is that this was head of field
12         management sitting in front of the Fed to describe the
13         summary points we have here around guardianship and what
14         we do to uphold standards.
15   Q.    Is this a slide that you prepared?
16   A.    This was a slide that my team would have prepared, yes.
17   Q.    Okay.  For a presentation to the Fed?
18   A.    Correct.
19   Q.    Okay.  And looking in the section titled "Incentives" on
20         that first page, can you read the second bullet and its
21         sub bullets, please, starting with "Advisor Incentive
22         Compensation"?
23   A.    So, "Advisor incentive compensation includes several
24         misconduct provisions."  Three sub bullets:  "Prospective
25         compensation adjustments where grid rates may be adjusted

Page 28

1         downward at management discretion based on advisor
2         conduct.  Factors considered include significant trade
3         errors, excessive customer complaints, regulatory or other
4         ethical lapses, or other conduct determined to be contrary
5         to the best interests of clients or the firm."
6            Next bullet, "Withholding compensation/awards";
7         thirdly, "Cancellation and/or clawback of deferred
8         compensation."
9   Q.    Why was your team at OBM involved in preparing this
10        material for the discussion with the Fed?
11  A.    We owned these aspects of policy design and, therefore,
12        we're the subject matter experts to offer this.
13  Q.    You mentioned this earlier, I think.  But can you explain
14        briefly the difference between "cancellation" and
15        "clawback"?
16  A.    "Cancellation" is something that would be triggered during
17        the vesting period.  So during the X amount of years, we
18        would cancel out award for any of these triggers.
19        "Clawback," you grant the award.  It vests over the period
20        of time.  You discover activity after the fact, after the
21        vesting date, and we are leaving ourselves the right to be
22        able to ask for that money back.
23  Q.    As an enforcement mechanism, is one more effective than
24        the other?
25  A.    Cancellation is vastly more effective than asking for

1     someone -- asking for the money back afterwards.
2  Q. And why did you consider it important to communicate to
3     the Fed that you had these provisions in your awards?
4  A. We know that they would want to stress test the scenario
5     of discovering bad actors and want to understand what
6     recourse we had at our disposal to ensure we could exact
7     penalties.
8  Q. This e-mail is from September 21, 2015, right?
9  A. Correct.
10 Q. I'd like you to flip to tab 3 in your binder.  This is an
11    e-mail from September 30, 2015.
12 A. Correct.
13 Q. And take a minute to get acquainted, but this is an e-mail
14    chain involving Ms. Lien again, and you and Mr. Porco, who
15    you mentioned before, right?
16 A. Correct.
17 Q. And then on the chain, a little bit lower are Mr. Barry
18    Goldstein, Larry Frers, and others?
19 A. Correct.
20 Q. Who was Mr. Goldstein?
21 A. He was my direct manager at the time.
22 Q. Okay.  And who was Larry Frers?
23 A. He was, I believe, head of either field management or
24    wealth management HR.
25 Q. And in this e-mail on this first page, there's a Ms. Laura

1       Southerland.  Who is she?
2    A. She works within the HR department.
3    Q. Can you explain what Ms. Southerland is communicating to
4       Barry, you, and others in this e-mail?
5    A. So this is -- looks like a follow-up, and they are looking
6       for details of how many employees and to what financial
7       extents we have triggered cancellation.
8    Q. And was that information identified?
9    A. Correct.  At the bottom of this first page, you'll see
10      both in 2014, full year, and for 2015, I guess
11      year-to-date at that point.
12   Q. And what was the information that you -- that your team
13      found for 2014?
14   A. So we had 24 wealth management employees where we
15      triggered these cancellation terms.
16   Q. And how much in invested deferred compensation awards were
17      canceled?
18   A. It amounted to $6-and-a-half million.
19   Q. And in 2015?
20   A. 2015, we were up to 13 employees with $2.8 million.
21   Q. And once again, what was your understanding of why the Fed
22      wanted you to provide this information?
23   A. They wanted to know that we not only had the policy, but
24      we were actually acting on that policy and, therefore,
25      wanted to see these stats.

1           ARBITRATOR SOLOCK:  Excuse me.  What does "OCC"
2       stand for?
3           THE WITNESS:  I can't remember off the top of my
4       head, but I know it was more oriented to our bank
5       activities.
6           ARBITRATOR GREENBERG:  Options Clearing
7       Corporation.
8           MS. VERGOW:  I think in this instance, it's the
9       Office of the Comptroller of the Currency.  But there
10      are many OCCs.
11  BY MS. VERGOW:
12  Q.  So what's the SEC?  It's a test.
13  A.  Security Exchange Commission.
14          ARBITRATOR SOLOCK:  And what is FINRA?  Just
15      kidding.
16  BY MS. VERGOW:
17  Q.  Do you have any understanding based on your interactions
18      with those regulators whether Morgan Stanley could just
19      elect to remove the cancellation provision from its
20      deferred compensation awards?
21  A.  Could we just extract it from policy?  Yes.  Would we face
22      a lot of scrutiny for doing so and removing the recourse
23      and controls?  Absolutely.  And it would break down the
24      trust we had with regulators and what we're trying to
25      design around the compensation policy.  So I would argue

Page 34

1      no, you wouldn't be able to do this as simply.
2  Q.  Okay.  All right.  Let's shift gears.  I'd like to walk
3      through the process you used to develop the financial
4      advisor compensation claim every year, and we're going to
5      use a demonstrative to help us walk through it.
6          So in very broad strokes, what did that process look
7      like -- actually, let me not ask in broad strokes.  Let's
8      start at the beginning.  How did the process start?
9  A.  So we start an entire year before the policy -- in this
10     case 2015, the policy is effective.  As we are delivering
11     this case, the 2014 policy, we start getting feedback
12     immediately.  So we're communicating heavily.  It's very
13     much topical.  So we're gathering feedback at that point.
14         For the first call it six months of the -- of the
15     2014 period here, we are gathering a range of options.
16     Some of those are strategic in nature.  Some of them are
17     just purely feedback from our advisors and managers.  But
18     we've effectively built a menu of options that we could
19     build into the 2015 policy.  By the time we hit the summer
20     period, so mid 2015, we are starting to sit down in front
21     of senior management.  We start to understand more about
22     budgets, strategy of what next year looks like.
23         And that's when we start to hone this list.  We start
24     to take the large menu and start to make it into what we
25     would think of as a policy proposal, and that leads us

Page 60

1       the term sheets.
2   Q.  And why not just include all of it in this?
3   A.  This is a lengthy guide already.  We make a decision about
4       what is relevant to be in here, pertinent to the incentive
5       nature we're trying to drive, versus what is important
6       terms and conditions of the award being granted.
7   Q.  All right.  Mr. Kemp, I'd like to shift now to certain
8       exceptions that Morgan Stanley has adopted to
9       cancellation.  You're familiar with those exceptions?
10  A.  I am, yes.
11  Q.  And what are they?
12  A.  So death, disability, term not for cause, and then we have
13      time --
14  Q.  And then government service exception is not listed here?
15  A.  Yes.
16  Q.  How often is that used?
17  A.  I can recall it once being used.
18  Q.  Okay.  Do you have an understanding of why Morgan Stanley
19      has adopted those exceptions to cancellation?
20  A.  These are humane kind of considerations.  We don't think
21      it would be fair and ethical if someone were to pass that
22      we would just cancel their deferred awards; and,
23      therefore, we provide an exception to it.
24  Q.  And does allowing these exceptions to cancellation detract
25      from the purposes of the award in any way?  Does it

Page 61

```
 1        detract from the retention or the good guardianship
 2        purpose?
 3    A.  No.  These are, again, humane aspects.  They do not affect
 4        the incentive that we've set up.
 5    Q.  And we addressed this before.  But this includes an
 6        exception for retirement.  Does Morgan Stanley want its
 7        advisors to stay until they retire?
 8    A.  We do, yes.
 9    Q.  Why is that?
10    A.  We want them to accumulate revenue, clients, assets.  We
11        want talent inside of the Morgan Stanley brand.  We want
12        them to see their careers through to retirement at Morgan
13        Stanley.
14    Q.  All right.  Let's talk about how these elements of
15        financial advisor compensation stack up next to each
16        other.  Let's look at tab 6 of your binder.  This is
17        Respondent's Exhibit 53, and I'd like you to look at page
18        Bates stamp 77408.  What is this?
19    A.  This is a summary document highlighting compensation
20        through wealth management.
21    Q.  And who prepared this slide?
22    A.  This is my team.
23    Q.  And let's walk through this.  So this shows total
24        compensation expenses for financial advisors?
25    A.  This goes beyond financial advisors as well.
```

Page 129

```
 1          period of four years or greater; do you recall?
 2     A.   Always greater than four years, from my recollection.
 3     Q.   Okay.  And do you recall any competitor that didn't employ
 4          cancellation terms in their deferred compensation awards?
 5     A.   Cancellation terms were always part of the programs.
 6     Q.   Okay.  Mr. Kemp, in Ms. Casale's cross, she asked you some
 7          questions about whether regulators have expressed any
 8          interest or concern to you about discouraging advisor
 9          mobility.  Do you remember that?
10     A.   I do, yes.
11     Q.   And I think in your answer, you alluded to the fact that
12          this actually had come up in conversations with
13          regulators, that they did express a concern to you about
14          encouraging advisors to stay, fair?
15     A.   Yes.  The interest from the regulators was that deferred
16          compensation and the guardianship aspect of it, if
17          advisors have moved firms, we lose the ability to have
18          recourse to bad behavior.  So not that they wanted and
19          mandated everyone stay in the firm they're employed, but
20          we needed to be able to show that we had limited measure
21          if people were to move.
22     Q.   Did the regulators have any interest in the potential
23          implication for client fees when advisors moved from one
24          firm to another?
25     A.   It would certainly come up as a discussion in terms of
```

Page 130

```
 1         moving between firms and changing how clients were being
 2         charged for similar services.
 3    Q.   And what about tax implications for clients?  Did that
 4         come up in your discussions with regulators as a downside
 5         when advisors moved from firm to firm?
 6    A.   It would come up in discussion for sure.
 7    Q.   Fair to say the regulators' chief concern is the
 8         guardianship of customers, right?
 9    A.   Absolutely.
10    Q.   On her examination of you, Ms. Casale also reviewed a
11         couple documents that I'd like to return to briefly with
12         apologies that they're in this giant joint exhibit binder.
13         I'm going to go with you to Joint Exhibit 6 and 70, just
14         very briefly.
15             All right.  So looking at Joint Exhibit 6, you
16         recognize this as the plan document for the Morgan Stanley
17         compensation incentive plan; is that right?
18    A.   It's one of the versions, yes.
19    Q.   And so this is a plan document for the umbrella plan under
20         which deferred compensation awards of all stripes are
21         issued under Morgan Stanley?
22    A.   That's correct.
23    Q.   So Ted Pick's deferred compensation could be -- the Morgan
24         Stanley CEO's compensation could be issued under this?
25    A.   This is not exclusive to advisors as governing the
```