# Exhibit E

Page 1

```
 1   IN THE MATTER OF THE ARBITRATION      )

 2   BETWEEN                               )

 3   ALFREDO SERRANO, BRIAN PATRICK        )

 4   THOMAS, DANIEL G. RAUP, DEAN HEIL,    )

 5   et al.,                               )

 6          Claimants.                     )

 7     vs.                                 ) No. 22-02150

 8   MORGAN STANLEY,                       ) c/w 22-02147

 9          Respondent.                    )

10

11          TRANSCRIPT OF PROCEEDINGS had at the

12   arbitration of the above-entitled matter, held at

13   55 West Monroe, Suite 2600, Chicago, Illinois, on

14   the 29th day of February, 2024, commencing at

15   9:00 a.m.

16

17   BEFORE:

18   MARK W. SOLOCK, Umpire

19   ALLEN GREENBERG, Arbitrator

20   Caroline W. Harney, Arbitrator

21

22

23   Reported by: Cynthia J. Conforti, CSR, CRR

24   License No. 084-003064
```

```
                                                    Page 2
 1   A P P E A R A N C E S:
 2   ATTORNEYS FOR THE CLAIMANTS:
 3       SALMANSON GOLDSHAW, PC
         Two Penn Center, Suite 1230
 4       1500 John F. Kennedy Blvd.
         Philadelphia, Pennsylvania 19102
 5       215.640.0593
         BY:  MR. SCOTT GOLDSHAW
 6            MS. CHRISTEN L. CASALE
 7       ROSCA SCARLATO
         2000 Auburn Drive, Suite 200
 8       Beachwood, Ohio 44122
         216.946.7070
 9       BY:  MR. ALAN ROSCA
              arosca@rscounsel.law
10
11
     ATTORNEYS FOR THE RESPONDENT:
12
         O'MELVENY & MYERS, LLP
13       1625 Eye Street, NW
         Washington, DC 20006
14       202.383.5368
         BY:  MS. MEGHAN VERGOW
15            MR. ALEXANDER REED
              MR. CHRISTOPHER HUNT
16            MS. YOUJIN KWON
              MR. TIMUR AKMAN-DUFFY
17            mvergow@omm.cm
              areed@omm.com
18
         MR. MARK GREENFIELD, In-house counsel
19
20   ALSO PRESENT:
21       Ms. Kimberly Grotenrath
         Mr. Peter Hackshaw
22       Mr. Daniel Raup
         Mr. Henry Enno
23       Mr. Gary Phelps
24                *          *          *
```

Page 3

1                              INDEX

2

3                      CLOSING ARGUMENTS

                                                    PAGE

4

   Claimants:                                        6

5

   Respondent:                                      44

6

   Claimants: (Surrebuttal)                         92

7

8

                        INDEX TO EXHIBITS

9

                                      ADMITTED PAGE

10

11  Rosca Declaration with                          37

12  Exhibits A and B

13

14

15

16

17

18

19

20

21

22

23

24

Page 6

1   issues before we start?

2          MR. GOLDSHAW:  No.

3          ARBITRATOR SOLOCK:  Then, Counsel, you can

4   proceed to your closing argument.

5          MR. GOLDSHAW:  Thank you.

6              CLOSING ARGUMENT OF CLAIMANTS

7          MR. GOLDSHAW:  The vesting periods were

8   too long.  They were not permitted by ERISA.

9          In my opening statement, I was careful to

10  state our claim clearly because I didn't want the

11  question before this panel to be confused or lost

12  in the proceedings.

13         Did Morgan Stanley break the law when they

14  canceled deferred compensation awards to claimants

15  by relying on the long vesting periods in their

16  deferred compensation plan?

17         ERISA protects employees; that's the

18  purpose of the statute.  One of the ways it

19  protects employees is by setting maximum limits to

20  vesting periods, and Morgan Stanley's plan

21  exceeded them.

22         So if ERISA applies to Morgan Stanley's

23  deferred compensation plan, it's illegal.  If

24  ERISA applies, the vesting schedule in the plan is

1   too long.  The law has been decided on that.

2          There is a federal court opinion directly

3   on point.  It addresses the exact same deferred

4   compensation plan that we have discussed this

5   week, and in that plan, the vesting periods exceed

6   the maximum limits set forth in ERISA.

7          The opinion issued by Judge Gardephe this

8   last November is directly on point.  It holds, and

9   I quote from the opinion:  "Morgan Stanley's

10  deferred compensation programs are ERISA plans."

11  That's the law.

12         Throughout this entire hearing, Morgan

13  Stanley has been trying to distract from the law.

14  They have done that by mischaracterizing our

15  claims and by flooding the panel with repetitive

16  testimony and irrelevant documents that have

17  nothing to do with whether their plan is governed

18  by ERISA.  So to state our argument again, as in

19  the Shafer case decided by Judge Gardephe, we are

20  arguing under subsection 2 of the ERISA statute.

21         Morgan Stanley's arguments that its plan

22  was not set up as a retirement plan under

23  subsection 1 are irrelevant.  Their attempt to

24  distract and confuse, just ignore them.  They're

1   not part of our claims.

2          Under subsection 2, which is the only

3   subsection at issue here, what matters is the plan

4   documents, how it works, and what payments result

5   from it.

6          A deferred compensation plan is covered by

7   ERISA pursuant to the statute itself if -- we have

8   highlighted the language of subsection 2 that we

9   are under, if it, quote:

10         Results in a deferral of income by

11  employees for periods extending to the termination

12  of covered employment or beyond, end quote.

13         We'll be happy to provide copies of what

14  you see on the screen afterwards, after the

15  closing statements.

16         So the standard that is the focus is

17  whether Morgan Stanley's deferred compensation

18  plan results in a deferral of income by employees

19  for periods extending to the termination of

20  covered employment or beyond.

21         There can be no doubt, as the Court found

22  in Shafer, that Morgan Stanley's deferred

23  compensation plan results in a deferral of income

24  to employees to the period of separation or

1   beyond.

2         As Judge Gardephe found in Shafer, looking

3   at the plan documents itself, there are several

4   paths the plan provides that result in payments to

5   employees at or after the time of separation.  And

6   they include, as a reminder, if the employee

7   retires from the industry, separates employment

8   due to death or disability, takes certain kinds of

9   governmental preference or is terminated

10  involuntarily during a layoff.

11        All of those paths under the plan lead to

12  the payment of income to employees at the time of

13  the separation or beyond.  And that's enough.

14  That's what the statute provides.  That's what

15  subsection 2 provides, and that's what Judge

16  Gardephe found when reviewing the exact same plan

17  that the panel is here this week to analyze.

18        Under ERISA to determine if a plan is

19  governed by ERISA, the decider has to look to the

20  plan documents itself.  It is the plan that is

21  governed by ERISA or not.  It's not actions or

22  communication -- that doesn't determine whether

23  something is governed by ERISA.  It's the plan.

24        And because we wanted to make this clear,

```
 1   we have cases -- we'll provide it in the cite.
 2   These cases provide that the decision is based on
 3   the express terms of the plan.  And if the express
 4   terms of the plan provide pathways for payments to
 5   occur at or after the termination of employment,
 6   the plan documents are all that are needed to be
 7   considered.
 8           Courts decide these matters, as a matter
 9   of law, without submitting them to triers of fact
10   when the plan documents themselves, as they are
11   here, provide for these pathways to payment for
12   separation of employment and beyond.  That's what
13   Judge Gardephe found in his decision.
14           Now, Morgan Stanley has tried hard to
15   minimize this by suggesting in various ways that
16   the plan didn't result in all that many payments
17   to separated employees.
18           And first off, in so doing, they are
19   relying on evidence outside the plan documents,
20   and so this is already afoul.  We don't need to
21   look beyond the plan to know if the plan is
22   governed by ERISA.
23           But even more so, they haven't been
24   exactly straight with you in how they have
```

1  presented that evidence, and so I want to show you

2  what I mean.

3       Let's take a look at their first exhibit,

4  Respondent's Exhibit 1.  This is the document they

5  used to calculate percentages.  And what I

6  encourage you to look at is the column highlighted

7  in yellow.  And what you will see is this shows

8  that this plan, in fact, resulted in large

9  payments to separated employees.

10      Every year tens of millions of dollars

11 under this plan were paid out to employees at or

12 after the time of separation of employment.  This

13 is a plan that clearly results in payment in the

14 millions, tens of millions of dollars, to

15 employees at or after the separation of

16 employment.  It is governed by ERISA.  End of

17 story.

18      Since 2015, where our claims are faced,

19 there has been $243 million by their own documents

20 paid to employees at or after the separation of

21 employment.  That's almost a quarter of a billion

22 dollars, with a B.  Are they seriously contending

23 a quarter of a billion dollars is de minimis?  You

24 should look past that?

Page 12

1      And Morgan Stanley also had an expert
2  witness prepare a chart, and I'd like to show you
3  that chart.
4      This is Exhibit 4, Respondent's Exhibit 4.
5  And this is the chart where they show the red
6  column, and it states only 14.7 percent of
7  payments under the MSCIP, the MSCIP, were paid to
8  separated employees.
9      First off, I can't help but note that's a
10  lot of money and that's enough for coverage, but
11  let's see how they presented this evidence by
12  looking back at the underlying data and seeing
13  what they did.  They watered down the numbers by
14  looking back to periods that our claims do not
15  relate to.  They look beyond 2015.
16      Let's take a look.  This is the same
17  Exhibit 1 I showed you.  I put brackets around it
18  so you can see where I'm focused.  That's the part
19  that deals with -- if you see all the way on the
20  left -- are you able to see the numbers or should
21  I read them?
22      ARBITRATOR SOLOCK:   [Nonverbal response.]
23      MR. GOLDSHAW:  Okay.  2015, '16, '17 '18,
24  '19.  If you look at the bracketed numbers and you

1   do the math, it's not 14.7 percent.  The number

2   jumps to almost 20 percent.  It's 19.9 percent to

3   be exact.

4          That means, to be very clear, that

5   according to their own documents from the year

6   2015 onward, which is where our case is focused

7   on -- and we get to decide where we are focused on

8   our case.  We are focused on 2015 forward.

9          And if you look at those numbers instead

10  of the numbers that Morgan Stanley tried to

11  present you going back way beyond the period,

12  their own numbers confirm approximately 20 percent

13  of all the money paid under the MSCIP went to

14  employees at or after the time of separation of

15  employment.  That's significant, especially when

16  that 20 percent means nearly a quarter of a

17  billion, with a B, dollars.

18          Morgan Stanley also tried to show that

19  only a small percentage, single digits of -- or

20  something like this.  I think it was that or not

21  much more -- of the total compensation package to

22  FAs went into the deferred compensation plan.

23          What does that have to do with anything?

24  ERISA has no relationship to what percentage of

1   the total amount of an employee's compensation

2   goes into a covered plan.  In fact, it's quite

3   normal.  There's nothing unusual about ERISA plans

4   to constitute a small percentage of employees'

5   income.  That's what ERISA protects.

6        You can't violate ERISA just because it

7   only violates a small percentage, a relatively

8   small percentage of an employee's total income.

9   There's nothing in the law like that.

10        Now, I also want to say that Morgan

11   Stanley, forgive me for saying, hasn't been

12   exactly straight in its arguments that the post

13   2015 deferred compensation was a bonus.

14        Recall when Mr. Kemp was testifying, what

15   he said, and I quote, is:  "You can think of it as

16   a bonus," end quote.

17        And his careful word choice gives him

18   away.

19        Now, he said these words:  "You can think

20   of it as a bonus," after our claims were filed

21   challenging the legality of the deferred

22   compensation plans under ERISA.

23        And what's going on here is that Morgan

24   Stanley has made legal arguments to try to argue

1    that these deferred compensation of words are

2    somehow a bonus because under the law, there's a

3    higher legal standard that applies to bonus.

4            They want to take advantage of this higher

5    legal standard, and if you note, virtually all of

6    the cases on this issue that they have cited are

7    bonus cases dealing with analysis of bonus, which

8    is not this case.

9            Judge Gardephe reviewed and found as a

10   matter of law -- let me get this quote right.

11   Quote, not my words, his, quote:

12           The deferred compensation programs at

13   issue here are not bonus programs, end quote.

14           This is clear unequivocal language from a

15   federal court which is an authority -- which is

16   the authority on this issue.  His decision is the

17   law.

18           Now, Morgan Stanley has tried to suggest

19   that this panel shouldn't follow the Shafer

20   decision that holds that ERISA governs its plan by

21   saying -- I think the words were something like,

22   oh, all you need to know about it is it's dicta.

23   It's not dicta.

24           Dicta is an extraneous comment that a

Page 16

1   Court might make in an opinion or something that's
2   not central to its holding.  That's what dicta is.
3          Let's take a look at the Shafer decision.
4          Now, what I've done because I'm aware
5   you're viewing from a distance, is in your exhibit
6   binders, it's in dual-column format.  It's a
7   little hard to read.  This is the actual opinion
8   signed by him.  It's the same words, just a little
9   easier to read instead of dual column.
10          Yes, so let me first show you, because we
11   talked a lot about this.  I am not going to review
12   this very long decision with you, I promise.  Go
13   all the way up.  It's a long decision.  You can
14   see on the top right, we are talking 56 pages,
15   right?
16          So here it is.  So you can see at the top,
17   this is that Matthew T. Shafer v. Morgan Stanley.
18   Top right, Memorandum Opinion Order.  This is the
19   judge's order, okay?
20          Judge Paul Gardephe.  If you allow me, I'm
21   going to try to make this a little faster.  I want
22   to make sure you can see.  If you skip to the
23   bottom, last page.  Here's his conclusion.  He
24   signed it November 21st.

1        There it is, Judge Gardephe.  It's signed,

2   right?  United States District Judge.  This is the

3   Shafer decision.

4        Now, it's a long decision.  I want to

5   start at the part where the analysis occurs that

6   we have been talking about this week.

7        So here's where -- I start on page 26.

8   Obviously, read whatever you want.  If you want to

9   read the other parts of the opinion, I am not

10  hiding anything.

11       But here, on page 28, is where it gets

12  interesting for this case.  They talk about how

13  plaintiff's contention is that this is an ERISA

14  plan, and Morgan Stanley's arguing in this case

15  that because of the arbitration agreements -- the

16  same one that brought us here, that this case

17  should be brought not as a class action, but it

18  has to be like arbitration.  That's what the fight

19  is about, a motion about whether this should go to

20  arbitration or not.

21       So here we go.  We are looking at the

22  opinion.  There's a lot in here.  It's

23  considering -- he's describing why he needs to

24  reach this.  And here I'll highlight this:

1        That in considering the arguments

2    regarding whether this should go to arbitration --

3    can you see my cursor moving around?  I wish I had

4    one of those laser pointers.

5        ARBITRATOR SOLOCK:   [Nonverbal response.]

6        MR. GOLDSHAW:  The Court must first

7    determine whether (1) the compensation incentive

8    plan and the equity incentive plan -- that's the

9    MSCIP and the EICP are ERISA plans.

10       The judge is saying it's important to his

11   decision to make this ruling.

12       He goes -- it would take me more than an

13   hour to go over all this.  So this is not meant --

14   because I would love for you all to read this

15   opinion, believe me, but I'm going to try to

16   highlight to guide your way through a little bit.

17       He then talks about whether the deferred

18   compensation plans are ERISA plans, not dicta.

19       This is the point he's addressing.  And

20   this, by the way, was after he specifically asked

21   the parties in this case, including

22   Morgan Stanley, to provide legal briefing on the

23   issue of whether the plans were ERISA plans.  So

24   everyone had a full and fair opportunity to make

1   their arguments to this federal judge because he

2   said this is what I'm going to look at.

3        Whether the deferred compensation plans

4   are ERISA plans, he's citing the law.  Here's the

5   applicable law.  There's a long discussion on the

6   statute and all these cases, including lots of the

7   cases that respondent is relying on now.  Here are

8   all these cases that he's reviewing.  This is not

9   just a quickie decision, right?

10       He's talking about the CFR and the statute

11  and the cases, that he's doing a survey from all

12  these places around the country.  See, I know

13  these cases.  I want to talk about all of them,

14  but I'm going to keep this moving.

15       In the Tolbert opinion, he's talking about

16  that one, which we've talked.  He's still going on

17  in the decision before he eventually gets to...

18       He talks about here in Subsection B,

19  whether plaintiffs' deferred compensation programs

20  are bonus plans.

21       I point this out because I want the panel

22  to understand, when I quote the Shafer decision,

23  that Judge Gardephe found these are not bonus

24  plans.  It was not a throwaway line.  It is a

1    separate section and analysis of his opinion.

2          He goes forward looking at the plans

3    themselves, which, as I've already explained, is

4    the area focused to decide if it's governed by

5    ERISA, you look at the plans.  He's not looking at

6    extraneous information.  He's looking at the plan

7    documents to see the results in the deferral

8    payment at or after the time of separation of

9    employment.

10         So this is where concludes the deferred

11   compensation programs at issue here are not bonus

12   plans.  He discusses Morgan Stanley's arguments.

13   The same arguments we're making to you here, he

14   rejected those.

15         He's talking about the case law, how other

16   courts have decided.  He's doing a thorough

17   analysis and finding these are not bonus plans.

18         And then he gets to the issue, which is

19   the ultimate issue of course, of whether the

20   deferred compensation plans result in a deferral

21   of income by employees for periods extending to

22   the termination of covered employment or beyond.

23         After a week with me, you'll probably be

24   able to cite that phrase in your sleep, but that's

1   because this is where the ball game is, right?

2          It's talking about the definition of

3   ERISA.  He's explained that this is coming

4   from -- and this is in answer to one of the two

5   questions, I believe, that the panelists have

6   asked us to address.

7          He is specifically analyzing where does

8   this money come from?  Is it a bonus?

9          He says:  No, it comes from their

10  commissions.

11         The grid.  The grid.  Remember, Morgan

12  Stanley spent a lot of time, I contend, trying to

13  confuse the issue by saying:  Oh, we're trying to

14  simplify.  We have all these grids before 2015.

15  We're condensing.  And they said:  We had to make

16  a couple tweaks to make it fit like a jigsaw.

17         Maybe that's more complicated than I can

18  understand.  I'm not focused on that.

19         When you look at 2015, that's the document

20  where these awards were granted.  They come from

21  commissions, the witness testimony, the documents

22  are clear, and Judge Gardephe found that.

23         Because the grid calculates the money, and

24  it says what percentage gets paid out now.  And

Page 22

```
 1   then there's a separate column which tells what
 2   percentage would go to deferred comp coming from
 3   the commissions in the incentive comp part of the
 4   plan.
 5          And notably, I think Judge Gardephe,
 6   mentions, but you can see for yourselves, that
 7   plan document has a separate section on bonuses,
 8   and that's not where it's coming from.  That's an
 9   attempt to confuse, respectfully.  This, oh, it
10   could be thought of as a bonus.
11          Judge Gardephe finds, as is here, and this
12   is where I've quoted before:  Both at the deferred
13   compensation programs resulted in the deferral of
14   income -- I'm not going to say the same language
15   over and over -- and after the reasons stated
16   above, which remember, is like ten pages worth of
17   analysis, the reason stated above, he is talking
18   about that.
19          This Court concludes that Morgan Stanley's
20   deferred compensation programs are ERISA plans.
21   Period, full stop.  Federal court has made the
22   ruling.
23          I mean, in short -- I can take this down
24   for now, and we can get back to some other slides.
```

Page 23

1          In short, I mean, Shafer is a very
2     thorough, analytical detailed opinion by a
3     prestigious federal judge, Judge Gardephe.  Not
4     that all judges aren't prestigious, but he's a
5     particularly prestigious one, that he delves into
6     the plan documents, he does the analysis, he gives
7     the parties a chance to argue, and Morgan Stanley
8     lost.  Their plan is covered by ERISA.  That is
9     the law.  That's the law.
10          Now, Morgan Stanley has tried to suggest
11     in some subtle ways as well that this panel
12     disregard the law in this case.  And I want to
13     review them, because, again, my big concern here
14     is to avoid confusion and keep the focus of what
15     is the issue actually before this panel as we, the
16     claimants, decide, because we bring the claims,
17     right?  We get to decide what the issue is we are
18     presenting based on our claims.
19          I want to point out ways that -- was
20     there --
21          ARBITRATOR SOLOCK:  No.
22          MR. GOLDSHAW:  I thought there was a
23     question.
24          One, they put forth two prior FINRA

1   arbitrations that they contend involve similar

2   issues that they won.  These are decisions that

3   occurred before Judge Gardephe issued Shafer.

4   Those panels did not have a binding legal ruling

5   that these plans are governed by ERISA.

6        And plus, because of the nature of FINRA

7   arbitration awards, I don't have a complaint with

8   it.  I'm just pointing out, there's not a reasoned

9   decision, so there's no way to tell what led those

10  panels to the decision they did.

11       Even if -- regardless, though, they did

12  not have a federal law compelling their finding

13  that ERISA governs these plans.

14       Two, Morgan Stanley has put forth a lot of

15  evidence to try to show that the claimants earned

16  a lot of money and they grew their business at

17  Morgan Stanley.

18       Again, what does that have to do with

19  whether Morgan Stanley set up a deferred

20  compensation plan with vesting periods that didn't

21  comply with ERISA?  It's nothing.  It has nothing

22  to do with it.  Morgan Stanley's plans stand or

23  fall on their own terms.  They apply equally no

24  matter how much money the claimants did or did not

Page 25

1    make, or whether they made money at Morgan Stanley

2    for which they were paid, and by the way, for

3    which they provided value.  That's why Morgan

4    Stanley was paying them.

5         It's not like Morgan Stanley didn't get a

6    share in the deal too, right?  They benefitted

7    from the arrangement.  But none of that has

8    anything to doing with whether the vesting periods

9    are too long under ERISA, under their plans.  It

10   is a pure distraction.

11        They have similarly put forth lots of

12   testimony about how recruiting is done to suggest

13   they need to consider cancellation of deferred

14   compensation awards as part of negotiations.  Very

15   general statements.  Nobody has any knowledge of

16   what happened during the claimants' negotiations,

17   and I point out there's no evidence that any of

18   the claimants actually negotiated for an offset.

19        But the idea here, if I could try to state

20   it more clearly than I just did, is that they seem

21   to be arguing, oh, you shouldn't care if we

22   violated claimants' ERISA rights because they made

23   up for it by negotiating good packages with their

24   next employer.

Page 26

1    That has absolutely nothing to do with the

2  law.  Under the law, if an employer fails to make

3  a payment, they're required to make the payment.

4  If someone negotiates for a very high-paying job

5  afterwards, that doesn't excuse an employer from

6  making the payments it was required to make that

7  the employee earned.  It is a non sequitur.  There

8  is no law on that point, and it is essentially an

9  argument that the panel disregard the law which

10  does not provide for an offset in the way that

11  they seem to be arguing.

12    They have been very good with some of

13  their word choices.  They talk about these

14  exceptions as humanitarian exceptions.  I don't

15  want to go down into the ditch and argue if

16  they're humanitarian or if they serve a purpose

17  for Morgan Stanley as well, et cetera, because

18  ERISA doesn't care.  I know I'm sounding like a

19  broken record -- I hope not -- but ERISA doesn't

20  care what you call the exceptions.

21    They call -- is there a pathway to payment

22  to employees at the time of separation or beyond?

23  And there's no doubt whether you label it a

24  humanitarian exception or not, 20 percent of the

```
 1   payments, as we saw when you did the data that
 2   they put up the correct way by focusing on the
 3   years that they're supposed to, about 20 percent,
 4   for whatever reason you call it, went to employees
 5   at or after the term of the separation of
 6   employment, and the title you give it or the
 7   reasons you wanted to do it is of no relevance
 8   under ERISA.  ERISA focuses on the plan and the
 9   results.
10        Now, Morgan Stanley has also seemed to try
11   to argue that they needed to have these long
12   vesting periods to make the regulators happy.
13   They all seem to be suggesting that they can get
14   to regulatory problems or not comply with federal
15   regulations if they abide by ERISA.
16        That is complete nonsense.  No federal
17   regulator is requiring Morgan Stanley to break the
18   ERISA law.  And if you noticed when Mr. Kemp was
19   asked about it on cross-examination, he confessed
20   that the topic of ERISA never came up.  No
21   regulator ever asked them to violate ERISA.
22   There's been no explanation as to why -- and to be
23   clear, we are saying they could have a deferred
24   comp plan.  It just has to have ERISA-compliant
```

Page 28

1    vesting schedules.  They did not do it.

2         So this argument of "woe is me, we are

3    just trying to make sure that our investors don't

4    commit fraud, and we want to make the regulators

5    happy is complete nonsense.

6         Let me point out employers have a wide

7    array of devices at their disposal to make sure

8    their employees abide by rules and abide by codes

9    of ethics.  Their playing employers without long,

10   non-ERISA-compliant, vesting schedules where their

11   employees are good stewards of the company, don't

12   violate codes of ethics, abide by the law.  And,

13   yes, you can fire employees for doing for doing

14   this conduct.  So this argument is really quite a

15   distraction, and I wanted to point out, shine the

16   flashlight, on why it makes no sense at all.

17        Same with their argument about employee

18   retention.  They're really arguing that they need

19   to create these long vesting periods to create

20   financial disincentives so they can retain their

21   employees.  Well, how about retaining the

22   employees for legal reasons, by providing a good

23   work environment, paying them well, treating them

24   fairly, providing a brand name that helps them

1    grow their business.

2         The idea that to retain employees you need

3    to violate ERISA is again absurd.  It is not part

4    of the law, and I will call it out.  It is an

5    attempt to try to put pressure, psychological

6    pressure, on the panel to look the other way for

7    their violating ERISA because you feel bad, "oh,

8    woe is me.  We need to keep our financial

9    advisers."  That is a ridiculous argument, and it

10   is not warranted by law.  It is a distraction from

11   the law.

12        They have also subtly, I believe, tried to

13   create the impression that oh, we are just doing

14   what everyone else is doing, and we need to stay

15   competitive and everyone else is doing it.  Well,

16   there's so many ways to go after that argument

17   it's hard to know where to start, but let me start

18   by saying that this panel need not be concerned

19   that there's going to be some sea change in the

20   industry if it rules in claimant's favor.

21        If there's a sea change, Judge Gardephe

22   already did that.  He put an opinion out there

23   that is the law.  It's widely available.  So as

24   much clout and respect as I have for the panel, I

1  don't think that this panel's decision is going to

2  put the industry over the edge in how it handles

3  its deferred compensation schedule vesting.

4       And I will point out that it didn't, you

5  know, even before Judge Gardephe, Wells Fargo had

6  to pay -- made headlines.  It was all over the

7  news about making $79 million in payments for

8  settling ERISA claims.  If you're interested,

9  publicly available documents.  The witness was

10  wrong.  Wells Fargo did claim the argument that it

11  wasn't governed by ERISA.  He was wrong about

12  that, and that's something that if anyone finds

13  important could easily take judicial notice of

14  that.

15       But in addition to trying to get the panel

16  to disregard the law, Morgan Stanley this week has

17  tried to distract you with lots and lots of

18  totally irrelevant evidence, none of which goes

19  to:  Does the plan result in a payment of income

20  to employees at separation or beyond?

21       Were the plans' vesting schedules too long

22  under ERISA?  And did Morgan Stanley cancel

23  claimant's deferred compensation awards by relying

24  on the illegally long vesting provisions?

1    How much of their evidence went to those

2    issues which are the questions that guide this

3    decision?  Almost all of the evidence that Morgan

4    Stanley presented goes to the various irrelevant

5    arguments that I've already mentioned, plus a

6    couple of straw man arguments that they introduced

7    that we didn't.

8        In Morgan Stanley's opening statement on

9    Monday, I've been waiting three days to get a

10   chance to argue and address the panel to correct

11   this.  They badly misrepresented our claims.

12       You will recall that I made a big point at

13   the very beginning of my opening statement of

14   saying I want to be very clear on what we are

15   claiming here.  You recall that at the prehearing

16   conference ten days before the hearing, we said

17   what the claims are.  We narrowed our claims.

18       It's not unusual, before a hearing, we you

19   start out, you make a claim, you cast it broad,

20   you get some discovery, decide what claims you

21   want to pursue, you narrow.  That's what we did.

22   And in order to have a launching point for lots

23   and lots of evidence about things such as, oh, the

24   claimants understood the plan.  We made

1  disclosures.  We have never argued in this hearing

2  that the claimants should win because they didn't

3  understand the plan terms or it wasn't

4  communicated.

5       It wasn't part of my opening statement.

6  It wasn't part of our arguments.  None of our

7  witnesses testified to it.  They kept parading

8  witnesses and documents to show how clearly the

9  terms of the plan were communicated.

10      And let me be clear, because I have to

11 keep coming back to this:  Our contention is not

12 that the claimants did not understand the plan or

13 contentions that the plan is illegal, as a matter

14 of law, because the vesting periods are too long.

15 The vesting periods are too long.  That's it.

16 ERISA does not allow those long vesting periods.

17      It doesn't matter if they're communicated

18 to the employees.  It doesn't matter if the

19 employees agree to them.  The employees don't have

20 the right to overall rule ERISA any more than the

21 employer does.  This is all a big distraction,

22 almost as if to say that, oh, the claimants

23 understood the deal.  They made a lot of money.

24 You shouldn't worry about the law.  That is not

1   the role of the panel of arbitrators.  It is to

2   apply the law, and the law is settled.

3          Again, all of this had the launching

4   point, not on my statements, but on

5   Morgan Stanley's statements in opening as to what

6   we were arguing.  We get to say what we are

7   arguing, not them.  We did not say that that was

8   our case, and that should be completely

9   disregarded and recognized for the distraction

10  that it is.

11         The other severe mischaracterization of

12  our claims that was made in Morgan Stanley's

13  opening statement is they actually said that we

14  conceded that Morgan Stanley's deferral of

15  compensation plans were legal before 2015.  That

16  is absurd.  We have never said that.  Why would

17  anybody say that anyway, even if they thought it

18  was true?  What they're saying is they are trying

19  to hook on to the fact that we chose to assert our

20  claims by focusing on the period of 2015 forward.

21         That is not the same as saying, "and we

22  concede that prior to 2015, we agree that was all

23  lawful."  And then they try to say, well, if prior

24  to 2015, if it was lawful, well, there's not much

```
 1  difference between what happened before and after.
 2  That is a complete huge snowball of a distraction.
 3  Why are you looking at the plan before 2015 if
 4  that's not what our claims are based on?
 5         If they really can stand behind the
 6  legality of their plans starting in 2015, there's
 7  no need for them to make this roundabout argument,
 8  oh, well, instead of looking at 2015, let's look
 9  at before.  We'll prove that's legal, and it's not
10  too different, so this is legal.
11         What is that?  That is a very indirect
12  path to argument, and it is, again, based on a
13  severe mischaracterization of the claims that I
14  tried very hard to very clearly state what we were
15  claiming, and that it was mischaracterized, and it
16  is the launching pad for lots and lots of
17  irrelevant evidence about what changes to the plan
18  took place.
19         Now, I can tell you that -- forgive me.  I
20  think I might have gone out of order in my slides.
21         One of the other reasons that they are
22  focused on the period prior to 2015 relates to
23  Morgan Stanley realizing or deciding that it's an
24  advantage for them to try to characterize these
```

1   deferred compensation awards that were taken out

2   of the commissions and try to cast them as like a

3   bonus, right?

4          So let's look at -- we had a lot of these

5   examples -- or a number, I should say, but let's

6   look at just one to remind the panel of what I'm

7   talking about of how Morgan Stanley characterized

8   these awards before they knew about our claims

9   that they were violating ERISA, and before they

10  decided to try to argue they were bonuses.

11         So let's take a look.  These are the

12  descriptions of the canceled awards.  This is back

13  to one of our claims.  And if you notice, prior to

14  2015, we have highlighted where they are

15  describing these awards as bonuses.  That's what

16  they did before 2015.

17         But come 2015, after what they claim were

18  inconsequential changes to the plan, they go

19  silent.  These aren't bonuses.  They come from

20  where?  Incentive compensation.  2015, incentive

21  compensation, 2016.

22         This is for the ES, for the EICP, the ones

23  on shares.  I don't want you to think we are

24  hiding the ball.  Let's look at the ones for the

Page 36

```
 1   cash.  This is the MSCIP.  You can see that's on
 2   the left.
 3        Here we go again:  2009, '10, '11, '12.
 4   They have bonus, bonus, bonus, bonus.  I guess it
 5   starts at '10:  Bonus, bonus, bonus, bonus.
 6        And then we come to 2015, where supposedly
 7   nothing changed.  Remember, same as it ever was,
 8   right?  Well, not in their own documents.
 9        All of a sudden, those bonuses are
10   incentive compensation, which is what we have been
11   arguing all along.
12        And so, again, I want to remind, and I
13   hope I am making clear to the panel, the only
14   reason any of this is coming up is because Morgan
15   Stanley has mischaracterized our claims as stating
16   that the plans were legal before 2015, and we did
17   not.
18        I want to show you why they're doing it.
19   We did not and in truth, it should not matter
20   because as the claimants, we have the right to
21   assert the claims that we want.
22        I did want to talk about damages,
23   including the panel's question regarding
24   attorneys' fees on damages.
```

Page 37

1          Yes, so let's first start with the
2    document that was presented this morning and
3    admitted into evidence, right?  I wasn't there for
4    the proceeding, the affidavit from Mr. Rosca.
5          ARBITRATOR SOLOCK:  I'm not sure of the
6    status of that.
7          MR. GOLDSHAW:  It needs to be -- the
8    discussion yesterday is we would come in this
9    morning and present it to the panel so it could be
10   admitted in part of the record.  That's why I
11   didn't want to close our case officially.
12         ARBITRATOR SOLOCK:  Is there any objection
13   to that?
14         MS. VERGOW:  No objection.
15         ARBITRATOR SOLOCK:  Okay.  Declaration of
16   Alan Rosca with the attachments will be admitted
17   into evidence and made part of the record.
18         Its date is February 28, 2024.  It's
19   affirmed under penalty of perjury by Mr. Rosca,
20   and it contains two attachments:  Exhibit A, which
21   goes to expenses, and Exhibit B, which goes to
22   damages.  Okay.  That's admitted into the record.
23         (Rosca Declaration with Exhibits A and B
24   offered and received in evidence.)

Page 38

```
 1          MR. GOLDSHAW:  Okay.  And if you have that
 2   handy, that was submitted this morning.
 3          Oh, it is up on the PowerPoint.  Thank
 4   you.  I have a wonderful team.  It's on the
 5   PowerPoint.  It's a little too hard to read, So
 6   I'm just going to try to describe it, because I
 7   don't think we need to go over in detail here, but
 8   when you do your deliberations, I want to make
 9   sure that you understand the purpose of the
10   document and how it functions and how to use it.
11          It's really presented so that the panel
12   can assess the damages in the case, and what it
13   does is it first starts out with the deferred
14   compensation awards.  It goes claimant by
15   claimant, and it lists out the total deferred
16   compensation awards that was canceled from 2015
17   forward.
18          As a reminder, we had some discussion
19   earlier on in the hearing.  We stipulated to what
20   is the damages, and we limited it to 2015 forward.
21   And that's what this is.  I'm trying to make it
22   easier for the panel.
23          The next column is interest.
24          ARBITRATOR SOLOCK:  Well, that column
```

Page 39

1   would be prejudgment interest, correct?

2          MR. GOLDSHAW:  Correct.

3          ARBITRATOR SOLOCK:  The next column is

4   post-judgment interest, right?  Or damages -- if

5   damages are assessed, then the interest with those

6   damages, correct?

7          MR. GOLDSHAW:  Yes.  And the way -- I

8   think we are saying the same thing, but just to be

9   clear, it's just so that you don't have to get out

10  our calculators and add the two numbers up.  The

11  third column is just adding the first two columns.

12         ARBITRATOR SOLOCK:  We understand this

13  document.  Our question is what's the

14  justification.  What is your --

15         MR. GOLDSHAW:  There's two.

16         ARBITRATOR SOLOCK:  Okay.  So what are

17  they?

18         MR. GOLDSHAW:  One is that the statute

19  under which we are proceeding, ERISA, specifically

20  allows for the award of attorneys' fees, which are

21  routinely awarded in ERISA cases.

22         And secondly, the arbitrators' guide for

23  FINRA arbitrations.  It's guide page 71, the cite

24  to ERISA.  So that was the guide for the

Page 40

1  arbitrators, page 71.

2          For ERISA, the statute we are proceeding

3  under, it's 29 U.S.C. Section 1132, so G, as in

4  Goldshaw, sub 1.  There's case law.  I guess I

5  don't need to show evidence of case law, but

6  you'll see they're routinely awarded in ERISA

7  cases when claimants prevail.  And it goes the one

8  way.  So when claimants prevail, the attorneys'

9  fees will go to that.

10          Also, the cite showing that costs can be

11  recovered in ERISA actions is 28 U.S.C.

12  Section 1920.  I think it's actually really

13  somewhat of a backup to costs.  If you get to the

14  first question to ERISA, we don't get costs twice,

15  right?  But the ERISA statute can cover that.

16          And, for example, there's the case for the

17  appellate court in the same region as Judge

18  Gardephe's decision, I'll just read this because I

19  have a note passed to me from one of my colleagues

20  who did some quickie research.  In response to the

21  panel's question, quote:

22          "In light of the ERISA fee provision's

23  'statutory purpose of vindicating retirement

24  rights granting a prevailing plaintiff's request

1  for fees is appropriate absent 'some particular

2  justification for not doing so.'"

3       That case is Donachie, D-O-N-A-C-H-I-E,

4  versus Liberty Life Insurance.  The cite is

5  745 F.3rd, 41, at page 47, Second Circuit, 2014.

6       It's the kind of thing that you will see.

7  So the statute itself talks about as an option the

8  case law will provide that.  Unless there's some

9  compelling reason not to in light of the statutory

10  provisions, attorneys' fees should be awarded.

11       And while I know I can't really ask

12  questions during my closing argument, I hope I've

13  addressed the questions I wrote down from the

14  arbitrators, both as to the basis for attorneys'

15  fees and costs, and explaining how the plan

16  functioned in 2015 forward coming from the

17  deferred compensation where it's coming from the

18  commissions that were earned by the financial

19  advisers.

20       ARBITRATOR SOLOCK:  The one thing that

21  wasn't addressed was -- and I know that you don't

22  think it's relevant, but prior to 2015, did the

23  pool of -- was there a change in where the

24  deferred compensation came from, as far as if you

1    know?

2           MR. GOLDSHAW:  So this is my answer.

3           ARBITRATOR SOLOCK:  I know you're going to

4    say it's irrelevant.

5           MR. GOLDSHAW:  No.  You've heard me say

6    that enough this week.  I'm done saying that in

7    response to your questions.  I am not going to do

8    that.  The answer is this:

9           In this case, we received the compensation

10   guide for 2014, but we did not focus discovery on

11   that period the way we did for 2015, so I'm a

12   little hesitant to go too deep.

13          But what I can tell you is that it was not

14   the case for 2014, as it wasn't the system of what

15   they called a unified grid with the documents that

16   we showed you.  And you don't remember the board

17   minutes?  I didn't talk about that in my closing.

18          They specifically talk about the total

19   payout and then there's the footnote that talks

20   about the earned commissions.  I hope you remember

21   that.  Can we get a --

22          ARBITRATOR SOLOCK:  That's okay.

23          MR. GOLDSHAW:  Okay.  So, but before 2014,

24   what we can see is the documents -- perhaps we

Page 43

```
 1    could bring up the document again, where we show
 2    that prior to 2015 we saw the word "bonus" all
 3    over the place.
 4              ARBITRATOR SOLOCK:  Exactly.
 5              MR. GOLDSHAW:  So we are not going to
 6    argue if it was a bonus or not.  We don't really
 7    have that information that we would want to make
 8    that -- we are not trying to make that argument,
 9    but we are trying to rebut an argument that Morgan
10    Stanley raised by what we contend is a
11    mischaracterization of our argument, and we are
12    doing our best to counter it, not because we think
13    it's relevant, but we don't want it to create
14    confusion as we believe that confusion and
15    distraction has been the strategy we are trying to
16    battle.
17              ARBITRATOR SOLOCK:  Okay.
18              MR. GOLDSHAW:  So, I will -- I'm sorry.
19    Have I finished addressing all the questions, just
20    a little wrap-up?
21              ARBITRATOR SOLOCK:  Sure.
22              MR. GOLDSHAW:  Okay.  So as I've been
23    arguing, Morgan Stanley has been encouraging you
24    throughout this hearing to ignore the Shafer
```

Page 44

1      decision, which is the law, or to second-guess it

2      or to decide for yourselves that it was somehow

3      wrong or mistaken, and I want to say respectfully

4      that that is not appropriate in arbitration.

5            And, respectfully, the panel's duty is to

6      apply the law, and Shafer is the law.

7            And make no mistake that when you cut to

8      the core, Morgan Stanley is asking you to

9      disregard the law and, respectfully, a federal

10     court decision, if it is to be challenged, the

11     proper place to do that is in the federal courts,

12     the federal appellate courts, and it is not within

13     the province of a panel in arbitration to overrule

14     a federal court decision.

15            Thanks very much.

16            ARBITRATOR SOLOCK:  Thank you.

17            You may proceed.

18            MS. VERGOW:  Thank you, Mr. Chair.

19                 CLOSING ARGUMENT OF RESPONDENT

20            MS. VERGOW:  Good morning, members of the

21     panel.  I want to start by thanking you for

22     listening to the evidence and to the parties and

23     witnesses this week.  We saw you paying close

24     attention, we saw you taking notes, and we really

Page 92

1    make a rebuttal argument?

2           MR. GOLDSHAW:  Yes, please.

3           ARBITRATOR SOLOCK:  You may proceed.

4           MR. GOLDSHAW:  Thank you.

5           PLAINTIFF REBUTTAL CLOSING ARGUMENT

6           MR. GOLDSHAW:  Morgan Stanley just said

7    play by the rules of the game.  ERISA sets the

8    rules of the game.

9           Relying on the law in a federal court

10   ruling is not a "gotcha" argument.  The decision

11   was not a radical departure.  It was grounded in

12   two appellate court opinions among lots of other

13   law.  I don't want to pull up the opinion again.

14   It thoroughly reviewed the court case law in

15   reaching its decision.

16          And most importantly, it is the only

17   decision to rule on the specific -- it is the only

18   decision to rule on the specific plan at issue

19   here.

20          One thing that every case has in common,

21   that both parties have cited except for Shafer, is

22   they deal with different plans.  Plans have

23   differences and variations.  I mean, they get

24   amended every year.  We have heard that, right?

Page 93

1          The exact plan that was considered in this

2      case was considered in Shafer, and that is the law

3      on that plan.  We've heard, again, "a deal is a

4      deal," and I'd like to complete the expression, "a

5      deal is a deal unless it's illegal."

6          There's nothing in ERISA that provides

7      that if an employer gets employees to agree to an

8      unlawful vesting period that "a deal is a deal"

9      supplants federal law, which dictates maximum

10     vesting periods.

11         Employers can't get around the law by

12     getting their employees to agree to it.  They

13     can't get around the law by having a disclaimer in

14     their plans.

15         This plan is not subject to ERISA.  If

16     that were the case, I'm not sure every client

17     would not be subject to ERISA.  It would include

18     the tag line.  It's meaningless.

19         As tempting as it is to rebut the

20     individual arguments that we just heard, I would

21     like to just point out that all of the arguments

22     you just heard were presented to and considered

23     and analyzed and rejected by Judge Gardephe in

24     Shafer.  There's nothing new.

Page 94

1          Do we know why we have been cut off of the

2     meeting?

3          MS. CASALE:  My Wi-Fi went out.

4          UMPIRE SOLOCK:  I didn't do it.

5          MS. CASALE:  My Wi-Fi cut out.

6          MR. GOLDSHAW:  Ms. VerGow basically just

7     made an appellate court argument to this panel and

8     presented reasons why this panel should substitute

9     its judgment on Morgan Stanley's plan for that of

10    Judge Gardephe.

11         And while we are all capable of forming

12    our own opinions, respectfully the role of the

13    arbitration panel is to apply the law as it exists

14    now, not to decide issues like an appellate court

15    or to rule on the law as if you were the judge who

16    had set the law.

17         Important people.  I'm not trying to

18    denigrate that, but there is the law out there,

19    and the law is made by the courts, and it is clear

20    on the plans at issue in this case.

21         Now, there was a lot of talk about

22    bonuses, and, again, the reason why is, as was

23    flashed on the board, there's a different standard

24    for bonuses.  And that's some of the confusion

Page 95

1   that's created.

2         Let's start from the beginning.  This is

3   not a bonus plan.  Judge Gardephe considered that

4   issue.  He spent pages of analysis on that issue.

5   He reviewed the plans and the case law, and he

6   ruled in a way that I can't put up on the screen

7   right now:  Point blank: This is not a bonus plan.

8   End of story, clear as day.  No strings attached.

9   This is not a bonus plan.  That is what is in the

10  federal court decision.

11        So the statutes relating to bonuses and

12  the cases are all a distraction because they're

13  dealing with something else.  I also have to call

14  out that there was just a representation made to

15  this panel about what a prior arbitration position

16  decided and rejected arguments under ERISA.

17        Now, I continue to believe that the fact

18  that there was no federal court ruling at that

19  time is what matters most, but I also have to call

20  out that FINRA decisions do not contain reasoned

21  decisions, and the representation of what they

22  decided or not under ERISA or the reasons for

23  their decision is not supported in any way.

24        There is no way -- we can all take our

Page 96

1    guesses, but that's not -- it certainly is not a

2    basis to disregard well-reasoned, firm opinions by

3    federal court judges.

4         You heard again arguments about how

5    important the deferred compensation plans are to

6    Morgan Stanley, and, without regurgitating, wish

7    to remind the panel that regardless of how

8    important they consider them or not, there is no

9    exception to the law to require compliance with

10   the law based on how important it is.

11        It's as if to say, well, the law doesn't

12   allow it, but I really, really, really want to do

13   it, so, okay, then the law will bend.  No, it

14   doesn't work that way.

15        We heard, yet again, how the plan was

16   communicated and the claimants understood the

17   words.  You saw that posted on the screen -- do we

18   have access to the screen yet -- listed on the

19   screen about how the complainants admitted that

20   they understood the award.

21        Yes, without saying that, this is all just

22   an excuse to point to evidence of things that are

23   not at issue in the case.  That has nothing to do

24   with whether the vesting provisions comply with

Page 97

```
 1   ERISA or not.
 2        And I will tell you that respondent's
 3   counsel has accused us of putting form over
 4   substance, you'll recall.  And I can't help but
 5   bring up and show you, if we have access to it,
 6   what Judge Gardephe said about the same arguments
 7   that Morgan Stanley just made to this panel.
 8        MR. GOLDSHAW:  Can we highlight that or is
 9   that...
10        Let's get the whole paragraph.  I want to
11   make sure the context is there.  Thank you.  It's
12   blue, but you can read it?
13        UMPIRE SOLOCK:  Yes, I can.
14        Can you read it?
15        ARBITRATOR GREENBERG:   [Nonverbal
16   response.]
17        MR. GOLDSHAW:  We can enlarge it.
18        Defendants are Morgan Stanley, right?
19        Defendants argue, however, that plaintiffs
20   did not earn payments under the compensation
21   incentive plan and equity incentive plan in
22   advance of receiving such payments.
23        By the way, exactly what you just heard
24   argued now, right?
```

1      Continuing:  Because financial advisers,

2   quote, have no right to payment until and unless

3   they remain employed at vesting - a condition

4   plaintiffs did not meet, end quote.

5      Okay.  Pause.  Same argument you just

6   heard right now from Morgan Stanley's counsel.

7   There's the citation.

8      Defendants thus argue, that, quote, Morgan

9   Stanley's program does not entail any, single

10  quote, deferral of income by employees, single

11  quote, end quote.

12      Again, same arguments you heard just now.

13      Judge Gardephe continues:  This argument

14  is not persuasive because it exalts form over

15  substance.

16      Morgan Stanley is asking you to play the

17  role of an appellate court.  They are telling you

18  point blank Shafer got it wrong I think were the

19  exact words.  You made a mistake.

20      That is asking you, as a FINRA arbitration

21  panel, to disregard the law as it stands now,

22  which is not appropriate to ask of a panel.

23      The law for these exact plans has been

24  decided.  They are not bonus plans.  They are

Page 99

1    ERISA plans.  It's been decided.  And their

2    vesting periods are too long to comply with ERISA.

3         Counsel made a comment about they would be

4    required to not pay out under ERISA.  It's not

5    true.  It's not the law.  I haven't heard that

6    before, but I will tell you, they can put their

7    money into a self-directed account, they can take

8    money out, there's different tax consequences, but

9    it's wrong to say that they couldn't access the

10   money.

11        Again, it's a distraction.  I almost wish

12   I hadn't mentioned it just now because it's so far

13   off the path of whether the plan at issue is

14   governed by ERISA, which it is.  We know that from

15   the law.

16        Whether Morgan Stanley's plan complied

17   with the vesting requirements, they were too long,

18   we know that.  And whether they cancelled the

19   awards previously awarded to the claimants by

20   relying on those illegal vesting provisions, and

21   we know that they did, that's why we presented

22   such a simple case of getting the plan documents

23   before you, so you could see the terms of the

24   plan, which is what you need to determine that, as

Page 100

1    Judge Gardephe did, that it's governed by ERISA.

2         And we have simple, short testimony

3    showing that these awards were granted and then

4    canceled, due to the reliance on the illegal

5    vesting provisions.  That's it.

6         And so at the end of my comments I want to

7    thank you for your time in this hearing, and my

8    lasting comments, which I hope you will recall, is

9    to pay careful attention, of course, to what is

10   the law you're being asked to decide this case

11   under, and what evidence and testimony have you

12   seen relates to that decision, that simple

13   three-part decision that, one, Judge Gardephe

14   found is governed by ERISA; two, that the vesting

15   provisions are too long, and, three, 1.5 million

16   in deferred compensation awards were canceled by

17   relying on those unlawful provisions.

18        Thank you.

19        UMPIRE SOLOCK:  Thank you, both.  The

20   panel would, first of all, like to thank the

21   attorneys in this case for their preparation and

22   professionalism.

23        If we could be provided the documents that

24   were promised us, because we are not going to be