UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, and SANDY JUKEL, on behalf of themselves and all others similarly situated, | **MEMORANDUM OPINION & ORDER**<br><br>20 Civ. 11047 (PGG) |
| Plaintiffs, | |
| - against - | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | |
| Defendants. | |

PAUL G. GARDEPHE, U.S.D.J.:

In this putative class action, Plaintiffs assert that Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management Development and Succession Committee (the "Compensation Committee"), and certain unnamed members of the Compensation Committee (together, "Morgan Stanley," or the "Bank"), violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not paying Plaintiffs all of their deferred compensation when they left their financial advisor positions at Morgan Stanley.

On November 21, 2023, this Court issued a Memorandum Opinion & Order granting Defendants' motion to compel arbitration and stay the proceedings pending the outcome of arbitration. Shafer v. Morgan Stanley, No. 20 CIV. 11047(PGG), 2023 WL 8100717, at *1

(S.D.N.Y. Nov. 21, 2023) (the "Opinion"). In granting Defendants' motion, this Court addressed and resolved the parties' dispute as to whether the deferred compensation programs at issue are covered by ERISA. See, e.g., Am. Cmplt. (Dkt. No. 58) ¶ 3 ("The [Morgan Stanley financial advisors'] Deferred Compensation Program is an 'employee benefit pension plan' under ERISA because it 'results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.'"); Pltf. MTCA Opp. (Dkt. No. 72) at 7 ("[t]he [Financial Advisor] Deferred Compensation Program . . . is an ERISA plan"); Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) (contending that the deferred compensation programs at issue are not covered by ERISA) The Court concluded that "Morgan Stanley's deferred compensation programs are ERISA plans." Shafer, 2023 WL 8100717, at *20.

On December 5, 2023, Defendants – who prevailed on their motion to compel arbitration – moved for "reconsideration and/or clarification" of this Court's determination that Morgan Stanley's deferred compensation programs are covered by ERISA. (Dkt. No. 87)

For the reasons stated below, Defendants' motion for reconsideration or clarification will be denied.

## BACKGROUND[1]

I.     **FACTS**

A.     **Financial Advisor Compensation at Morgan Stanley**

Plaintiffs are former financial advisors at Morgan Stanley Smith Barney. They "reside throughout the country and worked for the Bank at various times between 1994 and

---

[1] This Court assumes familiarity with the facts of this case, which are set forth in greater detail in this Court's Opinion granting Defendants' motion to compel arbitration. See Shafer, 2023 WL 8100717, at *1-7.

2020." Shafer, 2023 WL 8100717, at *1 (citing Am. Cmplt. (Dkt. No. 58) ¶¶ 11-22; Krentzman

Decl. (Dkt. No. 68) ¶¶ 5-16))

As set forth in the Opinion, Morgan Stanley's compensation program for financial

advisors includes both salary and incentive compensation:

> "All Advisors . . . receive a guaranteed monthly salary. Total compensation in any month will not be lower than the applicable monthly salary by state." ([2018 Financial Advisor Compensation Plan (Dkt. No. 83-2)] § 1.1) As of 2018, the salary for New York-based financial advisors was $4,225 per month, or $50,700 per year. (Id. § 1.1)

> Incentive compensation is based on the "Total Credits" that a financial advisor is awarded monthly. (Id. § 1.2.1) "The Advisor's Total Credits for each month [are] determined based on the applicable Credit Rate" – a percentage between 28% and 55.5% that increases with "(1) the Advisor's trailing 12-month Gross Revenue and (2) his/her Length of Service" – "multiplied by the Creditable Revenue generated [by the Advisor] in such month." (Id. § 1.2.1)

> Incentive compensation is further divided between (1) "Cash Credits," which are "calculated monthly and [result in cash compensation] paid in arrears on a monthly basis," and (2) "Deferred Credits," which result in deferred compensation paid out years later. (Id. §§ 1.2.2–1.2.3) The percentage of Total Credits allotted to "Deferred Credits" is "based on a Deferral Ratio determined by the Advisor's Trailing 12-month Gross Revenue," which varies from 1.5% (for the $0 to $239,999 revenue band) to 15% (for the $5 million+ revenue band) as such revenue increases. (Id. §§ 1.2.2–1.2.3)

Id. (citing 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) at 2)[2]

Morgan Stanley's 2018 Financial Advisor Compensation Plan provides the

following example of incentive compensation:

> An Advisor with a Length of Service ("LOS") of 15 years produces $800,000 in Trailing 12-month Gross Revenue as of May 31, 2018. The Advisor's Creditable Revenue for June 2018 is $70,000.

> • Credit Rate is 44.0%

---

[2] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

- Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]

- Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]

- Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

Id. (quoting 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.3)

The parties' dispute here involves the "Deferred Credits" that result in deferred compensation paid out years after it is earned. The Deferred Credits are administered in the following manner:

> "Twenty-five percent of the cumulative monthly Deferred Credits [are] granted in the form of a restricted stock unit [('RSU')] award that is scheduled to convert to shares of Morgan Stanley common stock approximately four years from the grant date" (the "Equity Incentive Plan"). (Id. § 1.2.2) "[S]eventy-five percent of the cumulative monthly Deferred Credits [are] granted in the form of a cash-based deferred compensation award scheduled to be paid approximately six years from the grant date" (the "Compensation Incentive Plan"). (Id. § 1.2.2; see Compensation Incentive Plan Document (Dkt. No. 83-4); Equity Incentive Compensation Plan Document (Dkt. No. 83-8)) The Compensation Committee administers both plans. (Compensation Incentive Plan Document (Dkt. No. 83-4) § 2(a)(i); Equity Incentive Compensation Plan Document (Dkt. No. 83-8) § 5(a))
>
> "[Financial advisors] have individual, notional accounts in the [Compensation Incentive Plan] for each award they receive, i.e., they have an account for each year's deferred compensation. [Financial advisors] can invest their accounts in notional investments, like in a 401(k) plan, with the value of their accounts tracking the performance of the selected investments." (Am. Cmplt. (Dkt. No. 58) ¶ 38 (citing 2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 1)) As to vesting under the Equity Incentive Plan, "a Stock Unit will be payable, at the discretion of the [Compensation] Committee, in Stock or in cash equal to the Fair Market Value on the payment date of one Share." (Equity Incentive Compensation Plan Document (Dkt. No. 83-8) § 8)

Id. at 2-3.

For both the Compensation Incentive Plan and the Equity Incentive Plan, the deferred compensation awards are "'contingent upon the Advisor remaining employed through the grant and vesting dates of the award.'" Id. at 3 (quoting 2018 Financial Advisor

4

Compensation Plan (Dkt. No. 83-2) § 1.2.2)  Plaintiffs refer to this policy as the "Cancellation

Rule." <u>Id.</u> at 3 (quoting Am. Cmplt. (Dkt. No. 58) <u>passim</u>).

> There are several exceptions to the Cancellation Rule:

> Deferred cash compensation and deferred equity compensation both vest after
> employment if the financial advisor's employment ends because of (1) disability;
> (2) "full career retirement" – <u>i.e.</u>, "termination of . . . [e]mployment ... for any
> reason other than under circumstances involving any Prohibited Activity, and
> other than due to [a financial advisor's] death or [departure for] [g]overnmental
> [s]ervice," after a financial advisor has achieved a contractually specified
> combination of age and years of service; (3) "[i]nvoluntary termination by
> [Morgan Stanley]" – <u>i.e.</u>, layoffs; or (4) departure for governmental service.
> (2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) §§ 3(c)-
> (d), 4-5, 16(j); Equity Incentive Compensation Plan Award Certificate (Dkt. No.
> 83-9) §§ 5(c), 6-7, 22(n))

<u>Shafer</u>, 2023 WL 8100717, at *3.

> Subject to the exception for involuntary termination,

> "enter[ing] into an employment or consulting relationship with a firm offering
> Competitive Services" constitutes "Prohibited Activity." Accordingly, a long-
> tenured financial advisor who, after leaving Morgan Stanley, accepts a position at
> another bank or brokerage firm is not eligible for the "full career retirement"
> exception to the Cancellation Rule. (2017 Compensation Incentive Plan Award
> Certificate (Dkt. No. 83-5) § 16(p)(3)-(4); Equity Incentive Compensation Plan
> Award Certificate (Dkt. No. 83-9) §§ 10(c)(1), 22(f)(1), 22(n))

<u>Id.</u>

> Defendants contend that "[t]he principal purposes of the [deferred compensation]

awards are to 'reward [advisors] for [their] continued Employment and service to the Firm in the

future and [their] compliance with the Firm's policies (including the Code of Conduct)' – that is,

to promote retention and good conduct." (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2 (second

brackets added; remaining brackets in original) (quoting 2017 Compensation Incentive Plan

Award Certificate (Dkt. No. 83-5) at 2))

## II.    PROCEDURAL HISTORY

### A.    The Amended Complaint

The Amended Complaint was filed on March 24, 2022, and asserts claims for (1) declaratory and equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Amended Cmplt. (Dkt. No. 58) ¶¶ 98-101); (2) "reformation of the [Financial Advisor] Deferred Compensation Plan and [for] benefits under the reformed plan," pursuant to ERISA § 502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3) (id. ¶¶ 102-07); and (3) "breach of fiduciary duty against the Compensation Committee regarding the [Compensation Incentive Plan] and the [Equity Incentive Plan]," pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).  (Id. ¶¶ 108-17 (capitalization altered))

The Amended Complaint pleads extensive allegations in support of Plaintiffs' claim that the Morgan Stanley deferred compensation programs are covered by ERISA:

> ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a term that includes "employee pension benefit plans." ERISA § 3(3), 29 U.S.C. § 1002(3). An "employee benefit pension plan" is:
>
>> any plan, fund, or program which . . . by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>>
>>> (i) provides retirement income to employees, **or**
>>>
>>> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>>
>> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
>
> ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) (emphasis added).

(Am. Cmplt. (Dkt. No. 58) ¶ 53) (emphasis in Amended Complaint)

> Subsections (i) and (ii) in Section 3(2)(A) of ERISA "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan." Pasternack v. Schrader, 863 F.3d 162, 168 (2d Cir. 2017); see also Tolbert v. RBC Capital Markets Corp., 758 F.3d 619, 624 (5th Cir. 2014) ("The plain language of

the statute makes clear that subsection (ii) is separate and distinct from subsection (i)."). The second of these two independent tests – whether a "plan, fund or program" "results in a deferral of income" under ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii) – is "an effects-based inquiry rather than one based on purpose." Pasternack, 863 F.3d at 170, n.5.

(Id. ¶ 59)

The [Financial Advisor] Deferred Compensation Program results in a deferral of FAs' income. The first portion of an FA's Total Credits are designated as Deferred Credits, which the FA receives years later through either the [Morgan Stanley Compensation Incentive Plan] or [Equity Incentive Compensation Plan]. FAs receive their remaining Total Credits, i.e., their Cash Credits, at the end of the next month as cash compensation. In other words, FAs defer the first portion of their compensation, instead of receiving it right away in cash.

(Id. ¶ 60)

The terms of the [Financial Advisor] Compensation Plan demonstrate that FAs defer part of their income. The Plan section titled "Deferred Compensation" describes how FAs earn "deferred compensation awards" by generating revenue. FA Compensation Plan at § 1.2.2. While ERISA does not define the phrase "deferral of income," it has the same meaning as "deferred compensation." See, e.g., Tolbert, 758 F.3d at 625. Accordingly, "by its express terms," Morgan Stanley's compensation program for FAs "results in a deferral of income." See, e.g., id. at 625-26 (plan covered by ERISA because it "contain[ed] provisions for both Voluntary Deferred Case Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred."); Wilson v. Safelite Group, Inc., 930 F.3d 429, 434 (6th Cir. 2019) (ERISA applied "when a deferral of income by employees . . . arises as an effect, issue, or outcome from' the provisions of that plan.").

(Id. ¶ 61)

In addition, Morgan Stanley describes the [Morgan Stanley Compensation Incentive Plan] and [Equity Incentive Compensation Plan] as "Deferred Compensation Plans" in its audited financial statements. Morgan Stanley Form 10-K for YE Dec. 31, 2019, at 137-38. Likewise, [Morgan Stanley Smith Barney] describes the [Morgan Stanley Compensation Incentive Plan] and [Equity Incentive Compensation Plan] as "Deferred Compensation Plans" in its financial statements. MSSB Consolidated Statement of Financial Condition as of June 30, 2020, at 4-5.

(Id. ¶ 62)

These descriptions are consistent with the dictionary definition of "deferred compensation" as (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed

when received or distributed rather than when earned. . . ." BLACK'S LAW
DICTIONARY (11th ed. 2019). Here, FAs defer part of their compensation for
work performed (by generating revenue) until a later date and do not pay taxes on
this compensation until it is distributed. 2018 FA Compensation Plan at 4;
MSCIP Plan Document at § 11; EICP Plan Document at § 16(a). . . .

(Id. ¶ 63)

The FA Deferred Compensation Program results in FAs deferring income "for
periods extending to the end of covered employment and beyond." ERISA §
3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii). The phrase "end of covered employment"
refers to when an employee stops working for a company. Wilson, 930 F.3d at
435.

(Id. § 64)

A plan need **not** require employees to defer income until "the end of covered
employment or beyond" in order to be governed by ERISA. Wilson, 930 F.3d at
434. ERISA "covers plans containing terms that have as an effect, issue, or
outcome – even if not a requirement – deferral of income by employees extending
to the termination of covered employment or beyond." Id. at 435. As the court
explained in Wilson,

> Subsection (ii) does not specify deferral of income "until termination" or
> "to termination;" rather it says "for periods extending to the termination."
> Thus, deferrals may occur for various periods, and those periods may last
> up to and/or beyond termination. Subsection (ii) covers a wide array of
> plans and does not exclude plans that give participants the option to
> receive in service distributions.

(Id. ¶ 65) (emphasis in original)

The FA Deferred Compensation Program contains several provisions that
contemplate FAs receiving their deferred compensation at or after the end of their
employment with Morgan Stanley.

(Id. ¶ 66)

FAs whose employment ends because of a Disability, Involuntary Termination,
Retirement, or Full Career Retirement **still receive their deferred compensation**
on the Scheduled Distribution Date under the [Morgan Stanley Compensation
Incentive Plan] and on the Scheduled Vesting Date under the [Equity Incentive
Compensation Plan] – both of which occur after their employment with Morgan
Stanley has ended. Meanwhile, FAs who qualify for a Government Service
Termination receive their deferred compensation when they leave Morgan
Stanley. Thus, "by design," Tolbert, 758 F.3d at 625, and "as an effect, issue or
outcome from the provisions of the plan," Wilson, 930 F.3d at 434, Morgan

Stanley pays FAs their deferred compensation on or after their termination of employment.

(<u>Id.</u> ¶ 67) (emphasis in original)

### B. Defendants' Motion to Compel Arbitration

On May 9, 2022, Defendants moved to compel arbitration and for a stay of the proceedings.  (Dkt. No. 65)

In opposing Defendants' motion, Plaintiffs argued that "[t]he [Financial Advisor] Deferred Compensation Program . . . is an ERISA plan" (Pltf. MTCA Opp. (Dkt. No. 72) at 7), and that compelling Plaintiffs to arbitrate their claims would violate their rights under ERISA. For example, Plaintiffs argued that (1) their "claims under ERISA § 502(a)(2) can be brought only in a representative capacity on behalf of the plan," and therefore "these claims must proceed in court under the terms of the arbitration provisions, which prohibit the arbitration of representative actions" (<u>id.</u> at 16) (citation omitted); (2) "Plaintiffs' § 502(a)(2) claims 'belong' to the FA Deferred Compensation Program," which "never agreed to arbitrate them" (<u>id.</u> at 18); and (3) the "arbitration agreements are unenforceable as 'prospective waiver[s] of a party's right to pursue statutory remedies' under ERISA § 502." (<u>Id.</u> at 21)

In their June 29, 2022 reply brief, Defendants did not directly respond to Plaintiffs' claim that the Morgan Stanley deferred compensation programs are covered by ERISA.  (Dkt. No. 69)  Defendants instead argued that compelled arbitration would not violate any of Plaintiffs' rights under ERISA.  For example, Defendants argued that "plaintiffs do <u>not</u> actually bring [their ERISA] claims in a representative capacity," because "plaintiffs seek the recovery of alleged benefits that were not paid <u>to them</u>, and their claims 'fall[] comfortably within the scope of [ERISA] § 502(a)(1)(B), which allows a plan participant to recover benefits due to him.'"  (Def. MTCA Reply (Dkt. No. 69) at 9-10 (emphasis in original) (quoting

Frommert v. Conkright, 433 F.3d 254, 270 (2d Cir. 2006))) Defendants similarly argued that it is irrelevant that "'the plan itself never agreed to arbitrate' [Plaintiffs'] claims,'" because "the plan need not agree to arbitrate claims that plaintiffs bring on their own behalf." (Id. at 10 (quoting Pltf. MTCA Opp. (Dkt. No. 72) at 18)) Finally, Defendants argued that because Plaintiffs "can obtain complete relief, if any, through their individual claims for benefits," "[a]rbitration of plaintiffs' claims . . . does not frustrate anyone's ability to obtain any ERISA remedy that they may be due." (Id. at 11) (emphasis in original)

While Defendants did not directly address Plaintiffs' claim that the Morgan Stanley deferred compensation programs are covered by ERISA, they also did not invite the Court to assume – for purposes of deciding the motion to compel arbitration – that Morgan Stanley's deferred compensation programs are covered by ERISA.

In a September 15, 2023 order, this Court stated that because "[t]he parties' briefing [in connection with Defendants' motion to compel arbitration] does not adequately address whether Morgan Stanley's deferred compensation program is an ERISA plan," the parties would submit supplemental briefing by September 20, 2023 addressing "whether Plaintiffs' allegations that, in certain scenarios, some financial analysts receive their scheduled payouts after their employment with Morgan Stanley ends demonstrates that the deferred compensation program is an ERISA plan." (Sept. 15, 2023 Order (Dkt. No. 82) at 2)

On September 20, 2023, the parties filed supplemental briefing addressing whether Morgan Stanley's deferred compensation programs are covered by ERISA. Plaintiffs argued that Defendants' deferred compensation programs were covered by ERISA (Sept. 20, 2023 Pltf. Ltr. (Dkt. No. 84)), while Defendants argued that they were not. (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85))

C.    **The November 21, 2023 Memorandum Opinion & Order**

In the November 21, 2023 Opinion, the Court granted Defendant's motion to compel arbitration. <u>Shafer</u>, 2023 WL 8100717, at *1.

The Court began its analysis by considering whether the parties had entered into valid agreements to arbitrate. <u>Id.</u> at *9-14. While Plaintiffs conceded that they had entered into agreements that provided for arbitration of claims arising out of Morgan Stanley's deferred compensation programs, Plaintiffs asserted that they had

> brought their claims in a representative capacity on behalf of ERISA plans, and that as a result their claims are not arbitrable. According to Plaintiffs, (1) "[t]he parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity"; (2) "[t]he ERISA plan[s] did not agree to arbitrate Plaintiffs' claims"; and (3) "[e]ven if the parties agreed to arbitrate Plaintiffs' claims in individual arbitrations, those arbitration agreements are unenforceable as 'prospective waiver[s] of a party's right to pursue statutory remedies' under ERISA § 502." (Pltf. Opp. (Dkt. No. 72) at 15, 18, 21 (quoting <u>Am. Exp. Co. v. Italian Colors Rest.</u>, 570 U.S. 228, 235 (2013)) (brackets in Pltf. Opp.))

<u>Id.</u> at 15.

This Court found that "[b]ecause the arbitration provisions provide that the validity of the class action waivers must be determined by a court, . . . this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator." <u>Id.</u> at 15 n.11. And in order to decide whether the claims asserted in the Amended Complaint are subject to arbitration, this Court concluded that it "must first determine whether (1) the Compensation Incentive Plan and the Equity Incentive Plan are ERISA plans; and (2) if so, whether – as Plaintiffs contend – arbitration of their claims was not consented-to by each alleged ERISA plan and/or would be contrary to ERISA." <u>Id.</u>

This Court went on to conclude that while "Morgan Stanley's deferred compensation programs are ERISA plans," Plaintiffs "have not demonstrated that the instant claims are outside the scope of the arbitration provisions to which they agreed." <u>Id.</u> at 20, 29.

In concluding that Morgan Stanley's deferred compensation programs are ERISA plans, this Court surveyed the applicable law regarding ERISA's definition of "pension plan" in 29 U.S.C. § 1002(2)(a), as well as the U.S. Department of Labor's treatment of "[b]onus program[s]" in 29 C.F.R. § 2510.3-2(c). See id. at *16-18. This Court also addressed Tolbert v. RBC Cap. Markets Corp., 758 F.3d 619 (5th Cir. 2014), and Wilson v. Safelite Grp., 930 F.3d 429 (6th Cir. 2019), in which the Fifth and Sixth Circuits find that deferred compensation programs similar to those at issue here are covered by ERISA. See id. After surveying the applicable statutory, regulatory, and case law authority, this Court concluded that

> the test to be applied for determining ERISA coverage is whether the deferred compensation program at issue is a bonus plan. If it is, a court must consider both the plan's purpose and whether deferral of income is systematic. If the deferred compensation program is not a bonus plan, a court should consider only whether the deferred compensation program "results in" deferred income.

Id. at 18.

This Court went on to find that Morgan Stanley's deferred compensation program is not a "bonus program," because

> Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate. Compensation as a percentage of individually generated revenue is a "commission." See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction"); Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("a percentage of the money received in a sale or other transaction paid to the agent responsible for the business").
>
> By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation." Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual compensation").
>
> Courts generally treat these two types of compensation as distinct. See Smith v. Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in

ERISA action, concluding that employee benefits committee did not "err[ ] in deciding that commissions are not bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v. Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).

The same approach is appropriate here. Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

Id. at 19.

This Court next concluded that Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond" under 29 U.S.C. § 1002(2)(A)(ii):

"Although [ERISA] do[es] not define 'deferral of income' or 'deferred compensation,' Black's Law Dictionary defines '[d]eferred compensation' as either:  (1) '[p]ayment for work performed, to be paid in the future or when some future event occurs,' or (2) 'an employee's earnings that are taxed when received or distributed rather than when earned, such as contributions to a qualified pension or profit-sharing plan.'" Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017) (quoting Deferred Compensation, Black's Law Dictionary (10th ed. 2014)).  And "a 'plan' is a 'pension plan' [under ERISA] when a 'deferral of income' . . . to the end of . . . employment or beyond . . . arises as an 'effect, issue, or outcome' from that plan." Tolbert, 758 F.3d at 625 (quoting [Burrage v. United States, 571 U.S. 204, 210, (2014)]).

As described above, the "credits" that determine a Morgan Stanley financial advisor's incentive compensation – which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan – are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1)  Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however.  (Id. § 1.2.2)  Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs

(see ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future." And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." Therefore, Morgan Stanley's deferred compensation programs "result[ ] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Id. § 3(2)(A)(ii).

And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" [Pasternack v. Shrader, 863 F.3d 162, 168 (2d Cir. 2017) (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980))], application of ERISA in these circumstances does not unreasonably expand the reach of the Act. Although Plaintiffs in the instant case – unlike plaintiffs in Tolbert and Wilson – cannot elect post-employment vesting, disability, retirement, layoff, and government service are not unusual means by which workers leave their employment. And nothing in the record suggests that post-employment deferred compensation payments are rare.

Defendants argue, however, that Plaintiffs did not earn payments under the Compensation Incentive Plan and Equity Incentive Plan in advance of receiving such payments, because financial advisors "have no right to payment until and unless they remain employed at vesting – a condition [P]laintiffs [did not] meet." (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 4) Defendants thus argue that "Morgan Stanley's program does not entail any 'deferral of income by employees.'" (Id. at 4 (emphasis in original)) This argument is not persuasive, because it exalts form over substance. Whenever an action (here, leaving Morgan Stanley's employ) results in the forfeiture of a contractual right, those facts can always be recharacterized by stating that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent to the performance of the contract.

Id. at 19-20.

For these reasons, this Court concluded that "Morgan Stanley's deferred compensation programs are ERISA plans." Id. at 20.

D.    **Defendants' Motion for Reconsideration and/or Clarification**

On December 5, 2023, Defendants moved for "reconsideration and/or clarification" of this Court's determination that Morgan Stanley's deferred compensation

programs are ERISA plans.  (Dkt. No. 87)  Plaintiffs filed an opposition brief on January 9, 2024

(Dkt. No. 91), and Defendants filed a reply brief on January 30, 2024.  (Dkt. No. 92)

In an April 2, 2024 letter, Defendants seek expedited resolution of their motion

and request that this Court consider supplementary evidence from recently concluded ERISA

arbitration proceedings involving Defendants.  (April 2, 2024 Def. Ltr. (Dkt. No. 93) at 1)

Plaintiffs filed an April 5, 2024 letter opposing both requests.  (April 5, 2024 Pltf. Ltr. (Dkt. No.

95))[3]

## **DISCUSSION**

### I.    **MOTION FOR CLARIFICATION**

In their motion, Defendants ask this Court to "clarify" that the Opinion "decide[s]

only the arbitrability issue presented by [Defendants'] motion to compel, and that the question

whether ERISA applies to Morgan Stanley's deferred compensation program can and must be

decided by the arbitration panel."  (Def. Reconsid. Br. (Dkt. No. 88) at 10)

While "'there is no Federal Rule of Civil Procedure specifically governing

'motions for clarification,'" Nortek Inc. v. ITT LLC, No. 21-CV-03999 (PMH), 2022 WL

2657189, at *1 (S.D.N.Y. July 8, 2022) (quoting United States v. Timmons Corp., No. 03-CV-

00951, 2017 WL 11237145, at *7 (N.D.N.Y. Sept. 20, 2017)), "[c]larifications of previously

issued orders 'add certainty to an implicated party's efforts to comply with the order and provide

fair warning as to what future conduct may be found contemptuous,' and 'may be obtained on

motion or made sua sponte by the court.'"  Jones v. United States Postal Serv., No. 20 CIV 6516

---

[3]  On May 24, 2024, Defendants filed a petition for a writ of mandamus with the Second Circuit, seeking an order directing this Court to, inter alia, rule on their motion for reconsideration.  On August 27, 2024, the Second Circuit denied Defendant's mandamus petition "without prejudice to renewal if the district court fails to act on the reconsideration motion within a reasonable time."  (Aug. 27, 2024 2d Cir. Order (Dkt. No. 97))

(VM), 2020 WL 6554904, at *5 (S.D.N.Y. Sept. 29, 2020) (quoting <u>N.A. Sales Co. v. Chapman Indus. Corp.</u>, 736 F.2d 854, 858 (2d Cir. 1984)). However, "a motion for clarification is not intended to alter or change a court's order, but merely to resolve alleged ambiguities in that order." <u>Metcalf v. Yale Univ.</u>, No. 15-CV-1696 (VAB), 2019 WL 1767411, at *2 (D. Conn. Jan. 4, 2019)); <u>see</u> <u>Deutsche Bank Nat'l Tr. Co. v. WMC Mortg., LLC</u>, No. 12-CV-1699-CSH, 2015 WL 11237310, at *6 (D. Conn. July 6, 2015) ("A clarification motion asks the Court: 'What did you mean to say?' A reconsideration motion says to the Court: 'We know what you said. It is wrong. Change it.'").

Here, there is no ambiguity to "clarify." After an extensive discussion of the relevant language in the plan documents and the applicable case law, this Court concluded that "Morgan Stanley's deferred compensation programs are ERISA plans." <u>Shafer</u>, 2023 WL 8100717, at *20.

To the extent that Defendants seek clarification as to whether this Court's decision will have preclusive effect in subsequent proceedings regarding Morgan Stanley's deferred compensation programs, that subject "is better suited to be addressed in any subsequent litigation where the issue arises." <u>RJE Corp. v. Northville Indus. Corp.</u>, 329 F.3d 310, 316 (2d Cir. 2003).

Accordingly, Defendants' motion for clarification will be denied.

## II.    <u>MOTION FOR RECONSIDERATION</u>

### A.    <u>Legal Standard</u>

"Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court." <u>Liberty Media Corp. v. Vivendi Universal, S.A.</u>, 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012). "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of

scarce judicial resources.'" <u>RST (2005) Inc. v. Research in Motion Ltd.</u>, 597 F. Supp. 2d 362,

365 (S.D.N.Y. 2009) (quoting <u>In re Health Mgmt. Sys., Inc. Sec. Litig.</u>, 113 F. Supp. 2d 613, 614

(S.D.N.Y. 2000) (citations and quotation marks omitted)).  "A motion for reconsideration may

not be used to advance new facts, issues or arguments not previously presented to the Court, nor

may it be used as a vehicle for relitigating issues already decided by the Court."  <u>Davidson v.

Scully</u>, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001).

   "The major grounds justifying reconsideration are 'an intervening change in

controlling law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice.'"  <u>Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245, 1255 (2d

Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, <u>Federal Practice & Procedure</u> § 4478).

"To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or

factual matters put before the court in its decision on the underlying matter that the movant

believes the court overlooked and that might reasonably be expected to alter the conclusion

reached by the court."  <u>RST (2005) Inc.</u>, 597 F. Supp. 2d at 365 (citing <u>Shrader v. CSX Transp.,

Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995)).

   "[Local] Rule 6.3 is intended to '"ensure the finality of decisions and to prevent

the practice of a losing party . . . plugging the gaps of a lost motion with additional matters."'"

<u>Id.</u> (second alteration in original) (quoting <u>S.E.C. v. Ashbury Capital Partners, L.P.</u>, No. 00 Civ.

7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting <u>Carolco Pictures, Inc. v. Sirota</u>,

700 F. Supp. 169, 170 (S.D.N.Y. 1988))).  "A court must narrowly construe and strictly apply

Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule

6.3 from being used to advance different theories not previously argued, or as a substitute for

appealing a final judgment."  <u>Id.</u>

B.      <u>Analysis</u>

In seeking reconsideration, Defendants contend that this Court erred in ruling that Morgan Stanley's deferred compensation programs are covered by ERISA, because (1) the applicability of ERISA was "unnecessary to the Court's decision"; (2) the Court's resolution of this issue violates "the principle of party presentation," given that Defendants had not asked for a ruling on this issue; (3) the decision regarding the applicability of ERISA is "beyond the Court's authority" under the Federal Arbitration Act ("FAA"); and (4) the issue is "fact-specific" and "must be decided based on a developed record and dedicated briefing." (Def. Reconsid. Br. (Dkt. No. 88) at 15-25) Defendants also contend that this Court's ruling regarding the applicability of ERISA "reflects clear errors that warrant reconsideration." (<u>Id.</u> at 15-31)

This Court addresses each of Defendants' arguments below.

1.      **Whether it Was Necessary for the Court
to Resolve the ERISA Coverage Issue**

Defendants contend that it was unnecessary for this Court to decide the ERISA coverage issue, given the Court's later determination that Plaintiffs "do not assert any genuinely representative claims [under ERISA] or seek any uniquely classwide relief." According to Defendants, this Court "should [have] . . . simply assum[ed] that the [Morgan Stanley deferred compensation] program[s] [are] ERISA plan[s] and [then] ask[ed] whether plaintiffs could . . . avoid arbitration on any of their asserted grounds." (Def. Reconsid. Br. (Dkt. No. 88) at 16)

Through three rounds of briefing concerning their motion to compel arbitration, however, Defendants never suggested that this Court should assume – for purposes of their motion to compel arbitration – that ERISA applied to their deferred compensation programs. To the contrary, Defendants asked this Court to rule that their deferred compensation programs were not covered by ERISA. <u>See</u>, <u>e.g.</u>, Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2) ("Plaintiffs cannot

claim their unvested, cancelled deferred compensation is an unpaid ERISA benefit, because

ERISA has no application to this program at all.").

Indeed, the issue of ERISA coverage was squarely posed by the parties' briefing,

because Plaintiffs' arguments opposing Defendants' motion were premised on their claim –

repeatedly pled in the Amended Complaint (see Am. Cmplt. (Dkt. No. 58) ¶¶ 3-4, 53-67) – that

Morgan Stanley's deferred compensation programs are ERISA plans. Plaintiff's ERISA-based

arguments include the following: that (1) Plaintiffs' claims under ERISA § 502(a)(2) are

brought in a representative capacity and therefore are not subject to arbitration under the terms of

the arbitration agreements; (2) in the alleged ERISA plan documents there is no agreement to

arbitrate claims; and (3) the arbitration agreements are unenforceable as "'prospective waiver[s]

of a party's right to pursue statutory remedies'" under ERISA. (Pltf. MTCA Opp. (Dkt. No. 72)

at 16, 18, 21)

In sum, in order to rule on the enforceability of the arbitration provisions on

which Defendants rely, this Court had to determine (1) whether ERISA applies to Plaintiffs'

claims – i.e., whether Morgan Stanley's deferred compensation programs are indeed ERISA

plans; and (2) if so, whether arbitration of Plaintiffs' claims would be contrary to ERISA. See

Shafer, 2023 WL 8100717, at *15 & n.11. Ruling on the first of those questions – whether the

deferred compensation programs are covered by ERISA – was necessary, because if Morgan

Stanley's deferred compensation programs are not covered by ERISA, Plaintiffs' arguments to

avoid arbitration fail, and there would be no need to reach the second issue – whether arbitration

of Plaintiffs' claims would be contrary to ERISA.

In any event, Defendants never suggested that this Court should assume – for

purposes of resolving their motion to compel arbitration – that their deferred compensation

programs are ERISA plans. To the contrary, Defendants denied that their deferred compensation programs are covered by ERISA. Having chosen to litigate ERISA coverage on the merits, Defendants will not be heard to complain that this Court ruled on the merits arguments they chose to make.

      **2.**    <u>**Whether this Court Violated the Principle of Party Presentation**</u>

Defendants contend that this Court committed "clear error" in deciding the ERISA coverage question, because in doing so it violated "'the principle of party presentation.'" (Def. Reconsid. Br. (Dkt. No. 88) at 20) (quoting <u>Greenlaw v. United States</u>, 554 U.S. 237, 243 (2008)) According to Defendants, in "[n]one of the nine filings on Morgan Stanley's motion [did it] ask[] the Court to decide whether the program really is an ERISA plan." (<u>Id.</u>)

This argument is both disingenuous and incorrect. As discussed above, several of Plaintiffs' arguments in opposition to the motion to compel arbitration turn on the applicability of ERISA. And, as discussed above, Defendants never asked this Court to assume that their deferred compensation programs are ERISA plans. Indeed, they vigorously argued that their deferred compensation programs are not ERISA plans. (<u>See</u>, <u>e.g.</u>, Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2) And the Opinion addresses at length Defendants' arguments as to ERISA's applicability. <u>See</u> <u>Shafer</u>, 2023 WL 8100717, at *15-20.[4]

---

[4] Defendants also complain that it was a "manifest injustice" for this Court to decide the ERISA coverage question on the basis of "five pages" of supplementary briefing, which the Court directed be submitted "on five days' notice." (Def. Reconsid. Br. (Dkt. No. 88) at 24-25) This argument is likewise both disingenuous and incorrect. The issue of ERISA's applicability to Defendants' deferred compensation programs has been front and center since this lawsuit was filed in 2020. The Complaint alleges three ERISA-based claims and repeatedly asserts that Defendants' deferred compensation programs are covered by ERISA. (Am. Cmplt. (Dkt. No. 58) ¶¶ 3-4, 53-67) In opposing the motion to compel arbitration, Plaintiffs repeatedly argued that granting the motion would violate ERISA. (Pltf. MTCA Opp. (Dkt. No. 72) at 16, 18, 21) In sum, Defendants were on notice of the ERISA coverage issue from the outset of this action and chose not to properly brief it, which is what led to the Court's order (Dkt. No. 82) directing that

Given these circumstances, this Court's decision to reach the ERISA coverage issue does not violate "the principle of party presentation."

### 3.     Whether Resolution of the ERISA Coverage Issue Violated the Federal Arbitration Act

Defendants also contend that because this Court "did not need to decide whether the deferred compensation program is an ERISA plan to compel arbitration," its decision on the ERISA coverage question constitutes "clear error under decades of case law [under the Federal Arbitration Act] holding that courts deciding whether to compel arbitration 'have no business weighing the merits of the grievance.'" (Def. Reconsid. Br. (Dkt. No. 88) at 19 (quoting United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564, 568 (1960)))

Defendants have never disputed, however, that "[b]ecause the arbitration provisions provide that the validity of the class action waivers must be determined by a court, . . . this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator." Shafer, 2023 WL 8100717, at *15 n.11. Where, as here, "the merits and arbitrability questions are inextricably intertwined, a court's arbitrability decision may, of necessity, touch incidentally on the merits." Rite Aid of Pennsylvania, Inc. v. United Food & Com. Workers Union, Loc. 1776, 595 F.3d 128, 136 (3d Cir. 2010); see Int'l Bhd. of Elec. Workers, AFL-CIO, Loc. 1 v. GKN Aerospace N. Am., Inc., 431 F.3d 624, 628 (8th Cir. 2005) ("[T]he judicial responsibility to determine arbitrability takes precedence over the general rule to avoid consideration of the merits of a grievance."); Indep. Lift Truck Builders Union v. Hyster Co., 2

---

the issue of ERISA coverage be briefed. And to the extent that Defendants believed that they could not properly present their arguments in five single-spaced pages, or lacked sufficient time to do so, they could have requested an extension of time or an increase in the page limit. They did neither.

F.3d 233, 236 (7th Cir. 1993) ("If the court must, to decide the arbitrability issue, rule on the merits, so be it.").

Defendants respond that – because this Court could have resolved the ERISA coverage question by assuming that ERISA applies – the arbitrability issue is not "inextricably intertwined" with the merits. (Def. Reconsid. Reply Br. (Dkt. No. 92) at 8-9) As discussed above, however, Defendants never suggested that – in resolving their motion to compel arbitration – the Court should assume that their deferred compensation programs were covered by ERISA. To the contrary, Defendants argued that their deferred compensation programs were not covered by ERISA.

In any event, and as explained above, it was necessary to resolve the ERISA coverage issue because – if ERISA does not apply to Morgan Stanley's deferred compensation programs – Plaintiffs' arguments to avoid arbitration fail. The arbitrability question is thus "intertwined" with the merits, and this Court did not err in reaching the issue of ERISA coverage.

### 4.     Whether this Court Decided the ERISA Coverage Issue Without an "Adequately Developed Record"

Defendants also argue that it was "clear error" for this Court to decide the ERISA coverage issue because it is a "fact-based question that must be answered based on . . . a fully developed factual record and full briefing by the parties regarding the applicability of the law to those facts." (Def. Reconsid. Br. (Dkt. No. 88) at 21-24)

"'[W]here the record contains the undisputed terms of the disputed plan[, however,] . . . a [c]ourt may decide the applicability of ERISA as a matter of law.'" Adams v. Intralinks, Inc., No. 03 CIV.5384 SAS, 2004 WL 1627313, at *7 (S.D.N.Y. July 20, 2004) (quoting Foster v. Bell Atl. Tricon Leasing Corp., No. 93 CIV. 4527 (LAP), 1994 WL 150830, at

*1 (S.D.N.Y. Apr. 20, 1994)); see Shea v. Wells Fargo Armored Serv. Corp., 810 F.2d 372, 377

(2d Cir. 1987) (affirming summary judgment for defendant based on review of alleged ERISA

plan's terms).  And "where the language of a [plan] is unambiguous, the parties' intent is

determined within the four corners of the contract, without reference to external evidence."

McCutcheon v. Colgate-Palmolive Co., 62 F.4th 674, 691 (2d Cir. 2023) (quoting Feifer v.

Prudential Ins. Co. of Am., 306 F.3d 1202, 1210 (2d Cir. 2002)); see also Tolbert, 758 F.3d at

626 & n.5 (concluding that deferred compensation programs were ERISA plans based solely on

plan documents).

   Here, all of the Morgan Stanley deferred compensation program documents cited

in the Amended Complaint were submitted to the Court.  (Sept. 15, 2023 Def. Ltr. (Dkt. No. 83))

Indeed, Defendants cited to these plan documents and argued that they "establish beyond

question" that ERISA does not apply to Morgan Stanley's deferred compensation programs.

(Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2 & n.2, 5)  Prior to this Court's November 21, 2023

ruling that the deferred compensation programs were subject to ERISA, Defendants never argued

that this Court should consider additional plan documents or other evidence prior to ruling on the

ERISA coverage question.

   Only now, in connection with their motion for reconsideration, do Defendants

argue that this Court should have considered "the full array of documents applicable to plaintiffs'

deferred compensation awards, documents clearly denominating the deferred compensation a

'bonus,' and documents reflecting advisors' understanding that the deferred compensation is not

'earned' until the terms of the awards are satisfied."  (Def. Reconsid. Br. (Dkt. No. 88) at 23-24)

According to Defendants,

  the Court did not . . . have before it the foundation it would need to determine
  what "plan" controls plaintiffs' claims – is it the award certificates, the summary

term sheets, the [Morgan Stanley Compensation Incentive Plan/Equity Incentive Compensation Plan], the compensation guide plaintiffs cite as evidence the compensation is "earned" without conditions, or some or all of the above?

(Def. Reconsid. Reply Br. (Dkt. No. 92) at 11)

"[I]t is well established[, however,] that the submission of new evidence is precluded on a motion for reconsideration." Davidson, 172 F. Supp. 2d at 463. In sum, Defendants cannot support their reconsideration motion with documents that were available to them during the briefing process for their motion to compel arbitration, but which they chose not to submit to the Court.

In any event, while Defendants provide a general description of these documents, they have not (1) identified specific documents that should be considered; or (2) explained why the content of these documents demonstrates that Morgan Stanley's deferred compensation programs are not covered by ERISA.

The same is true as to Defendants' argument that the Court should have invited "testimony of . . . witnesses who could address the history of the program, the regulatory directives that influenced its structure, and how it operates in practice." (Def. Reconsid. Br. (Dkt. No. 88) at 23) Defendants did not offer to provide any such testimony in connection with their motion, of course. And even assuming arguendo that it would have been appropriate for this Court to sua sponte direct that evidence outside the plan documents be submitted in connection with the ERISA coverage issue, Defendants briefing on their reconsideration motion provides no explanation as to what the content of this testimony would be and why it would result in a different outcome. (See Def. Reconsid. Br. (Dkt. No. 88) at 23-24; Def. Reconsid. Reply Br. (Dkt. No. 92) at 11)

In an April 2, 2024 letter – submitted more than two months after the close of briefing on January 30, 2024 – Defendants offer excerpts of testimony from a related arbitration proceeding. According to Defendants, this testimony demonstrates that

- most of the deferred compensation that Morgan Stanley pays out goes to current employees;

- government regulators believe that Morgan Stanley's deferred compensation programs promote good guardianship of assets and stability in client service;

- financial advisors understand that they must act as good guardians of client assets and remain at Morgan Stanley in order to receive their deferred compensation awards;

- deferred compensation is awarded separately from financial advisors' base compensation; is distinct from incentive compensation paid to them in cash on an ongoing basis; and, unlike these other components of compensation, is not earned unless and until additional requirements are met;

- the exceptions to the Cancellation Rule are intended to benefit financial advisors who can no longer work;

- financial advisors benefit from having deferred compensation paid during their employment, without having to wait until retirement to receive these payments; and

- similar deferred compensation programs are in place throughout the financial services industry.

(April 2, 2024 Def. Ltr. (Dkt. No. 93) at 4)

None of this testimony sheds light on the plan documents that this Court previously addressed, however. For example, whether or not the deferred compensation programs encourage employees to be "good guardians" of their clients' assets is irrelevant to whether the plans at issue are covered by ERISA. Likewise irrelevant is the testimony that similar deferred compensation programs are common throughout the financial services industry. Moreover, the fact that deferred compensation is awarded separately from financial advisors' base compensation and is a sub-set of their incentive compensation was already clear in the

record.  Similarly, the fact that most of the deferred compensation payments are made to current employees requires no change in this Court's analysis.[5]

In sum, the testimony cited by Defendants does not shed light on the meaning of the plan documents that this Court previously analyzed, and Defendants have not shown that this Court erred in deciding the ERISA coverage issue that the Defendants chose to litigate, on the record that they laid before the Court.

5.    **Whether this Court's Analysis of the ERISA Coverage Issue Constitutes "Clear Error"**

Defendants contend that this Court committed clear error in (1) concluding "that the Department of Labor's 'bonus' regulation, 29 C.F.R. § 2510.3-2(c), does not apply to Morgan Stanley's deferred compensation program"; and (2) "in its analysis of when the awards at issue here are earned and whether payments are deferred, based on an apparent misunderstanding of the terms of the contracts governing the awards."  (Def. Reconsid. Br. (Dkt. No. 88) at 26, 29)

a.    **Applicability of the Bonus Regulation**

As discussed in the Opinion, ERISA defines "pension plan" to include

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--

---

[5]  At the arbitration proceeding, a Morgan Stanley employee testified that "in the case of the equity awards [under the deferred compensation program], it was 8 percent [that] went to former employees [as opposed to current employees] and then for the deferred cash awards, it was just under 15 percent [that] went to former employees."  (Feb. 27, 2024 Arb. Tr., Serrano v. Morgan Stanley (No. 22-02150) (Dkt. No. 94-3) at 224)  This testimony merely confirms this Court's statement in the Opinion that "post-employment deferred compensation payments are [not] rare." Shafer, 2023 WL 8100717, at *20.  Deferred compensation payments to former employees cannot be considered "rare" when they occur at a rate of 8 to 15 percent.

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to
the termination of covered employment or beyond.

29 U.S.C. § 1002(2)(A)

U.S. Department of Labor regulations provide, however, that "the term[] . . .

'pension plan' shall not include payments made by an employer to some or all of its employees

as bonuses for work performed, unless such payments are systematically deferred to the

termination of covered employment or beyond, or so as to provide retirement income to

employees."  29 C.F.R. § 2510.3-2(c).

As discussed above, in concluding that the Department of Labor's "bonus"

regulation is not applicable to Morgan Stanley's deferred compensation programs, this Court

reasoned as follows:

> Morgan Stanley financial advisors' deferred compensation is a portion of their
> incentive compensation, which in turn is a fraction of the revenue they generate.
> Compensation as a percentage of individually generated revenue is a
> "commission."  See Commission, Black's Law Dictionary (11th ed. 2019) ("[a]
> fee paid to an agent or employee for a particular transaction, usually as a
> percentage of the money received from the transaction"); Webster's Third New
> International Dictionary of the English Language – Unabridged (1993 ed.) ("a
> percentage of the money received in a sale or other transaction paid to the agent
> responsible for the business").
>
> By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,]
> [especially] a payment by way of division of a business's profits, given over and
> above normal compensation."  Bonus, Black's Law Dictionary (11th ed. 2019);
> accord Webster's Third New International Dictionary of the English Language –
> Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual
> compensation").
>
> Courts generally treat these two types of compensation as distinct.  See Smith v.
> Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in
> ERISA action, concluding that employee benefits committee did not "err[ ] in
> deciding that commissions are not bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994);
> Haropulos v. First Am. Title Ins. Co. of New York, No. 93 CIV. 2369 (MGC),
> 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiff's] salary was
> $50,000 per year plus incentive commissions and bonuses."); Israel v. Voya

Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).

The same approach is appropriate here.  Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4

Shafer, 2023 WL 8100717, at *19.

Defendants contend that this Court should have given weight to the fact that "Morgan Stanley['s] deferred compensation program . . . expressly states that its purposes include encouraging retention," citing language in Morgan Stanley's Compensation Incentive Plan Document stating that the plan "'is intended to attract, retain and motivate employees and to compensate them for their contributions to the Firm.'"  (Def. Reconsid. Br. (Dkt. No. 88) at 27 (quoting Compensation Incentive Plan Document (Dkt. No. 83-4) § 1))  Defendants also cite cases stating that a plan's stated purpose of "motivat[ing] retention" is relevant to determining whether that plan falls within the Department of Labor's bonus regulation.  (Id. at 26-27 (citing, e.g., Wilson v. Safelite Grp., Inc., 930 F.3d 429, 435-36 (6th Cir. 2019); Oatway v. Am. Int'l Grp., Inc., 325 F.3d 184, 189 (3d Cir. 2003); and McKinsey v. Sentry Ins., 986 F.2d 401, 406 (10th Cir. 1993))

None of these cases suggests that a plan's stated purpose is dispositive, however, much less that a court may ignore the structure and operation of a compensation plan in determining whether it falls within the Department of Labor's bonus regulation.

In concluding that Morgan Stanley's deferred compensation programs do not fall within the Department of Labor's bonus regulation, this Court noted that (1) "Morgan Stanley

financial advisors' deferred compensation is premised on the revenue they generate," in the form of a percentage commission rather than a payment "over and above normal compensation"; and (2) "Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan." Shafer, 2023 WL 8100717, at *19. In other words, the objective features of Morgan Stanley's deferred compensation programs – considered in light of the other forms of compensation paid to Morgan Stanley financial advisors – are not consistent with a bonus plan. While this Court considered the fact that one of the deferred compensation programs' stated purposes is to encourage employee retention, this fact was outweighed by the other circumstances cited by the Court.

In sum, the Court did not commit clear error in concluding that Morgan Stanley's deferred compensation programs do not fall within the U.S. Department of Labor's bonus regulation.[6]

### b.       When the Deferred Compensation Awards are "Earned"

Defendants contend that this Court "clearly erred in its analysis of when the [deferred compensation] awards at issue here are earned [by Morgan Stanley financial advisors] and whether payments are deferred." According to Defendants,

> the condition precedent [for entitlement to an award of deferred compensation] is contained in the contract itself. Put differently, the contractual right to payment is itself conditioned on the requirement that an employee remain employed through the vesting period. The conditional nature of the compensation is built directly into the contract. The materials before the Court reflect that financial advisors have no right to the deferred compensation at the time of the award. In contrast to cash-based incentive compensation, which is earned and paid on an ongoing basis, the deferred compensation is expressly conditioned on an employee's

---

[6] Defendants also complain that this Court failed to "cite any authorities applying the [bonus] regulation." (Def. Reconsid. Br. (Dkt. No. 88) at 28) But this Court addressed at length Tolbert, 758 F.3d at 626, Wilson, 930 F.3d at 438, and Oatway, 325 F.3d at 188, all of which considered whether the compensation plan at issue fell within the bonus regulation. Shafer, 2023 WL 8100717, at *16-18.

remaining with the firm for the vesting period.  Morgan Stanley's program does not result in the "forfeiture" of any "contractual right" because – as the governing documents clearly explain – financial advisors <u>do not acquire any right to payment until they satisfy the conditions for payment</u>.

(Def. Reconsid. Br. (Dkt. No. 88) at 29-30) (emphasis in original)

   Defendants also argue that this Court overlooked

the critical limiting factor in <u>Tolbert</u> for ERISA to apply:  that the plan entail employees *forgoing* income <u>to which they have a present right</u>.  <u>See</u> <u>Tolbert v. RBC Cap. Mkts. Corp.</u>, 758 F.3d 619, 625-26 (5th Cir. 2014) ("The first section of the [wealth accumulation plan] . . . explains that, by design, employees have the option 'to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.' . . . Put another way, by participating in the [wealth accumulation plan], the plaintiffs have foregone income … in exchange for receiving income at a later date." (quotation and alteration omitted)).

(<u>Id.</u> at 31) (emphasis in original)

   Finally, Defendants assert that the "vast majority of compensation [under Morgan Stanley's deferred compensation programs] is paid to current employees" (Apr. 2, 2024 Def. Ltr. (Dkt. No. 93) at 4), citing testimony from a Morgan Stanley employee – at an arbitration proceeding – that "in the case of the equity awards [under the deferred compensation program], it was 8 percent [that] went to former employees [as opposed to current employees] and then for the deferred cash awards, it was just under 15 percent [that] went to former employees."  (Feb. 27, 2024 Arb. Tr., <u>Serrano v. Morgan Stanley</u> (No. 22-02150) (Dkt. No. 94-3) at 224)

   For the reasons explained below, none of these arguments is persuasive.

   As an initial matter, "the submission of new evidence is precluded on a motion for reconsideration."  <u>Davidson</u>, 172 F. Supp. 2d at 463.  Accordingly, the Morgan Stanley employee's testimony at an arbitration proceeding is not properly offered in connection with Defendants' reconsideration motion.  This data was in Defendants' possession during the briefing on their motion to compel arbitration, but Defendants chose not to submit it.  They may not supplement the record with this evidence in connection with their reconsideration motion.  In

any event, this data supports the Court's ruling, because it indicates that post-termination awards of deferred compensation are not rare.

As to Tolbert, Defendants' argument that that case turns on the fact that employees were "*forgoing* income to which they have a present right" (Def. Reconsid. Br. (Dkt. No. 88) at 31 (emphasis in original), is misleading, because Defendants tell only half the story. While the "wealth accumulation plan" in Tolbert included "Voluntary Deferred Compensation" that reflected "the percentage of a participating employee's compensation that the employee elects to defer," and which "is always fully vested," Tolbert, 758 F.3d at 622, the plan in Tolbert also included "Mandatory Deferred Compensation," which reflected "the percentage of an employee's compensation that the [Company] Committee designates as a required deferral," as well as "Company Contributions," which "includ[ed] matching contributions and discretionary contributions." Id. The Mandatory Deferred Compensation "vest[s] later, on dates determined by the Committee." Id.

> Notwithstanding the Committee's vesting dates, Mandatory Deferred Compensation and Company Contributions vest immediately upon either the death of the employee or the separation of the employee. In order for the amounts to vest at the time of an employee's separation, certain criteria must be met; if the criteria are not met, then the employee forfeits the unvested amounts. . . . Vesting where the employee has separated from employment is dependent on the employee either (1) entering into a "business transition agreement" or (2) satisfying the requirements "under the Plan for Retirement" and entering into a non-competition agreement.

Id. at 622 & n1.

The Fifth Circuit considered these features of the company's "wealth accumulation plan" in concluding that

> [t]he "express terms" of [that plan] . . . contemplate employees deferring income "to the termination of covered employment or beyond." The vesting sections explain that, upon separation, unvested amounts vest immediately. The distribution sections contain further support: "If distribution is made due to Separation," then "[a]vailable forms of distribution include a single lump sum or,

if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years." Accordingly, the [wealth accumulation plan] fits comfortably within the meaning of subsection (ii) [of 29 U.S.C. § 1002(2)(A)].

Id. at 626 (emphasis in original).

Morgan Stanley's deferred compensation programs and the "wealth accumulation plan" in Tolbert share multiple common features: both involve mandatory deferred compensation that vests after the award date (rather than immediately); both expressly provide for post-employment vesting upon an employee's death or separation; and both require that – in the case of an employee's separation – the employee must meet certain conditions or the deferred compensation will be forfeited. The Tolbert court does not draw a distinction – as Defendants do here – between voluntary deferred compensation that vests immediately, and mandatory deferred compensation that vests later, subject to conditions. See id. at 624-26. To the contrary, Tolbert implies that both forms of compensation may qualify as a "pension plan" under ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii), so long as they "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Id.

Here, Morgan Stanley's deferred compensation programs expressly provide for post-employment vesting and payment in the case of "disability, full career retirement, layoffs, or departure for governmental service." Shafer, 2023 WL 8100717, at *20. Where Morgan Stanley makes payments to former employees in those situations, all of the relevant "condition[s] precedent" in the contracts – i.e., leaving Morgan Stanley's employment under qualifying circumstances – have been satisfied, and the income has by then been "earned." (See Def. Reconsid. Br. (Dkt. No. 88) at 29-30) In such circumstances, it is irrelevant that "financial advisors have no right to the deferred compensation at the time of the award," as opposed to the time at which the award vests. (Id. at 30) Whether such deferred compensation is "earned"

when it is awarded or when it vests, the operation of Morgan Stanley's deferred compensation programs "results in a deferral of income . . . for periods extending to the termination of covered employment or beyond." ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii).

Moreover, in the Opinion, this Court reasoned that "disability, retirement, layoff, and government service are not unusual means by which workers leave their employment," and that "nothing in the record suggests that post-employment deferred compensation payments are rare." Shafer, 2023 WL 8100717, at *20.  As noted above, Defendants have proffered evidence – in support of their reconsideration motion – demonstrating that deferred equity and cash awards to former employees are in fact not rare; such payments occur at a rate ranging from 8 to 15 percent.  (Feb. 27, 2024 Arb. Tr., Serrano v. Morgan Stanley (No. 22-02150) (Dkt. No. 94-3) at 224)  Acknowledging that "'the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage,'" Tolbert, 758 F.3d at 625 (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980)), payments made at a rate of 8 to 15 percent are not rare – they are commonplace.  And here, the payments to former employees are expressly contemplated by the terms of the plan documents.  Morgan Stanley's deferred compensation programs therefore "fit[] comfortably within the meaning of [29 U.S.C. § 1002(2)(A)(ii)]." Id. at 626.

## **CONCLUSION**

For the reasons stated above, Defendants' motion for reconsideration and/or

clarification (Dkt. No. 87) is denied.

The Clerk of Court is directed to terminate the motions.  (Dkt. No. 87, 89, 93)

Dated: New York, New York
       November 4, 2024

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge